UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

WILLIAM G. and JULIE A. HARSHAW, | Case No. 1:08-cv-104
Husband and Wife, individually and as Guardian of
ROMAN A. HARSHAW, a minor,

    Plaintiffs,

| HONORABLE PAUL L. MALONEY

    v.

BETHANY CHRISTIAN SERVICES,
A Michigan corporation, and
BETHANY CHRISTIAN SERVICES INT'L, INC.,
a Michigan corporation,

    Defendants.

_____

# OPINION and ORDER
*" Harshaw II "*

**Denying Defendants' Belated Request to Amend their Answer to Assert a Limitations Defense;
Denying the Defendants' Motion to Dismiss Counts 1, 2 and 3 as Waived**

    This is a diversity tort case arising under Michigan law and, by statutory incorporation, under Virginia common law. Plaintiffs William and Julie Harshaw ("Harshaw"), a married couple proceeding individually and as guardians of their adopted son Roman Harshaw, are Virginia citizens. *See* Complaint filed January 31, 2008 ("Comp") ¶¶ 1-2. The Harshaws' complaint alleges that both remaining defendants – Bethany Christian Services and Bethany Christian Services International, Inc. (collectively "BCS") are Michigan corporations, but it fails to specify their principal places of business. *See id.* ¶¶ 2-5. BCS has not challenged the existence of diversity jurisdiction.

    In response to a BCS advertisement, the Harshaws attended an informational meeting at

BCS's regional office in Virginia Beach, Virginia on June 12, 2003, and the following day they completed and submitted a preliminary application to adopt a child through one of BCS's programs in Russia, China or Guatemala. *See* Comp ¶¶ 11-13 and Exhibit ("Ex") A. The Harshaws' application stated that they would accept a child with "very minor medical problems and would not consider a child with moderate to severe medical problems." Comp ¶ 13. The Harshaws submitted another Application for International Adoption to BCS on June 18, 2003 which stated that they were "interested in parenting a child that has a positive prognosis for both mental and physical development." Comp ¶¶ 14-15 and Ex B.

As required by Bethany, the Harshaws underwent a pre-adoption family assessment conducted by BCS's regional office in Virginia, during which they signed an International Adoption Services Agreement. *See* Comp ¶¶ 17-18 and Ex C. Relying on BCS's claimed experience and expertise in international adoption, the Harshaws understood that if the pre-adoption family assessment was favorable, BCS would act as intermediary and/or fiduciary on their behalf to effectuate an adoption. *See* Comp ¶¶ 16 and 19.

On August 22, 2003, BCS issued a pre-adoption assessment report stating that the Harshaws "feel equipped to parent a child who may have a minor, correctable problem with a good prognosis for normal development." The assessment approved the Harshaws to adopt a child from Russia who was aged 12 to 36 months and had (at most) a "minor, correctable problem with a good prognosis for normal development." *See* Comp ¶¶ 20-22 and Ex D. The Harshaws paid BCS about $16,000 for its services. *See* Comp ¶ 24.

BCS representative Jeannie Walton initially referred a Russian child as a candidate for the Harshaws, but the child had been severely burned by his mother and suffered medical problems as

a result.  The Harshaws declined the referral and emphasized to BCS that they could only accept a child with minor, correctable conditions and a prognosis for normal development.  *See* Comp ¶ 25. Next, BCS provided the Harshaws with the name, age, sex, and photograph of Roman; a two-page document represented to be an English translation of Roman's medical records at his orphanage; and an untranslated videotape showing what appeared to be Roman interacting with his caregivers in Russia.  *See* Comp ¶¶ 26-29 and Ex E (Translated Summary of Russian Medical Records).

Relying on the videotape and the purported summary of Roman's medical records, the Harshaws notified BCS that they were willing to adopt Roman so long as BCS first provided any additional medical information about the boy.  *See* Comp ¶ 30.  At the invitation of BCS representative Jeannie Walton, the Harshaws visited a BCS office to discuss the adoption.  When the Harshaws asked Walton whether Roman and the other Russian children which they were considering for adoption were medically healthy, Walton responded that they were healthy,

> and explained that a medical doctor associated with Bethany, referred to as "Dr. D," had specific expertise in the evaluation of Russian children for the purposes of adoption and that Dr. D regularly examined the children in Russia on trips from his home in New York.  Ms. Walton stated that Dr. D had examined Roman and that Roman was O.K.  The Harshaws learned that the individual referred to as "Dr. D", is Dr. Michael Dubrovsky.

Comp ¶ 31.  Relying on Walton's assurances regarding Dr. Dubrovsky's purported regular examination of Roman *et al.*, the Harshaws traveled to the orphanage in Krasnoyarsk, Russia in December 2003, with two BCS representatives, Aleksandr Vladimirovich ("Alex") and Yelena Vladimirovna ("Yelena"), acting as interpreters and guides.  The Harshaws were permitted to see Roman for only about one hour.  *See* Comp ¶¶ 32-33.  Noting that Roman looked thin and perhaps ill, the Harshaws asked interpreter Alex if Roman was okay; after consulting with orphanage staff, Alex told the Harshaws that Roman had had bronchitis.  *See* Comp ¶¶ 34-35.  The Harshaws asked

for additional information about Roman and about his mother's social and medical background, but Alex responded that no further information was available. They saw Roman for about an hour the next day, then returned to America and met again with BCS's Jeannie Walton. *See* Comp ¶¶ 36-38.

When Walton asked how Roman looked and the Harshaws responded that he "appeared as if he might have been sick but otherwise appeared okay", Walton reassured them that what they saw in Roman was common in institutionalized children, and that his issues were minor and often resulted from malnutrition and crowded living conditions. Walton asked if the Harshaws wished to proceed with the adoption, and they said yes. *See* Comp ¶¶ 38-40.

The next month, January 2004, the Harshaws returned to Russia to attend the final adoption hearing and take custody of Roman. When they took physical custody of Roman at the orphanage, they asked if there were any more medical records regarding Roman or his mother and were told that there were none, and BCS never provided them with any additional medical information from then until after the adoption was completed. *See* Comp ¶¶ 41-44.

After the Krasnoyarsk Regional Court entered an Order of Adoption on January 27, 2004, the Harshaws took Roman home to America, where they soon noticed that he was not developing and acting normally for his age and reported health. They spent about a year and a half taking Roman to physicians and mental-health professionals to figure out what might be wrong, leading to a January 2006 examination by neurodevelopmental pediatrician Dr. Frank Aiello III, M.D., who suggested that Roman might be suffering from fetal alcohol syndrome and ordered more testing. *See* Comp ¶¶ 45-49. Following three days of examination and tests in June 2006, Dr. Ronald S. Federici, Psy.D., clinical director of a "neuropsychological and family therapy" clinic in Virginia, who diagnosed Roman with an alcohol/drug-related birth defect, identified as a fetal alcohol

spectrum disorder causing neurocognitive and psychiatric abnormalities. *See* Comp ¶¶ 50-51.

The Harshaws allege that throughout the 24 months following the January 2004 adoption, they expressed concerns to BCS's social worker, during post-placement visits, about Roman's medical, emotional and psychological condition and behavior. The BCS social worker responded that Roman's problems were frequently associated with being institutionalized and that children adopted from such institutionalized settings could "grow out of" the problems with a loving family. Neither the social worker nor anyone else at BCS provided advice or referrals to help the Harshaws diagnose and treat Roman. *See* Comp ¶ 59.

At an unspecified time in or after June 2006 (when Dr. Federici examined Roman), the Harshaws informed BCS of Federici's diagnosis and asked for more medical information, which BCS stated would be difficult to retrieve. *See* Comp ¶¶ 52-53. After the Harshaws repeated their requests, in October 2006 BCS provided two items which they had not previously provided: a ten-page Russian-language extract of Roman's medical records and history, and a six-page English translation. *See* Comp ¶¶ 54-55 and Ex F. The Harshaws allege that BCS either had these two documents in its possession all along (i.e., before the adoption was completed) or could and should have obtained them for review, translation and delivery to the Harshaws before they made their decision whether to adopt Roman. *See* Comp ¶¶ 56-57. The Harshaws allege that they relied on BCS to provide all the information reasonably available to it and if BCS had done so, they would not have pursued Roman's adoption. *See* Comp ¶¶ 58 and 64-66. They also hypothesize that if BCS had provided complete, accurate medical information and appropriate post-placement assistance, they could have diagnosed Roman's condition earlier and started providing more-appropriate treatment earlier. *See* Comp ¶ 67.

The Harshaws assert three claims on their own behalf under Michigan common law: fraud / intentional misrepresentation in count one (Comp ¶¶ 68-83), negligent misrepresentation in count two (Comp ¶¶ 84-94), and negligent failure to disclose in count three (Comp ¶¶ 95-99). They assert one claim on behalf of Roman, who is still a minor: count four, simple negligence under Michigan common law (Comp ¶¶ 100-104). They allege that after Roman's adoption in January 2004, BCS admitted it had "misinformed" the Harshaws by providing "unclear" medical information during the adoption process, and that Dr. Dubrovsky never examined Roman as it had represented. *See* Comp ¶¶ 60-61. On each of the four counts, the Harshaws seek $75,000 in compensatory damages plus punitive damages, interest, and attorneys' fees and costs, and they demand a jury trial. *See* Comp at 15, 17, 18 and 19 (prayers for relief after each count).

The Harshaws filed the instant complaint on January 31, 2008, and with an extension of time the defendants jointly filed an answer in April 2008. *See* Doc. Nos. 1, 6 and 8. From about October 2008 through June 2009, the parties conducted discovery and the Magistrate Judge resolved discovery disputes, *see* Docs. 17-78. On September 1, 2009, the Harshaws filed a motion to compel production of documents requested in their second and third sets of requests for production, and the defendants filed an opposition brief on September 18, 2009. *See* Doc. Nos. 112, 113 and 125. Pursuant to 28 U.S.C. § 636(b)(1)(A) the matter was referred to the Magistrate Judge, who held a hearing on September 25, 2009 and issued a non-documentary order granting in part the Harshaws' motion to compel, *see* Doc. No. 128. The Magistrate Judge then held a telephone status conference regarding discovery on September 28, 2009, *see* Doc. No. 129.

On September 2, 2009, BCS filed a motion to dismiss or for summary judgment on counts one, two and three – common-law claims for fraud/intentional misrepresentation, negligent

misrepresentation, and negligent failure to disclose – on the ground that they are barred by the statute of limitations in both Michigan and Virginia. *See* Doc. Nos. 130 (motion) and 131 (brief).[1] The Harshaws filed an opposition brief on October 28, 2009, *see* Doc. No. 161, which the court treated it as timely as suggested by the parties' joint stipulation, *see* Doc. Nos. 162 & 163. Finally, the defendants filed a reply brief on November 4, 2009, *see* Doc. No. 164, completing all the briefing contemplated by our Local Civil Rules. The Harshaws did not seek leave to file a sur-reply brief.

For the reasons that follow, the court will deny BCS's unjustifiably late request for leave to amend their answer to assert the defense that counts one, two and three are barred by the applicable Michigan and/or Virginia statutes of limitation. BCS does not show good cause for failing to move for leave to amend their answer before the deadline which the case management order imposed.[2]

---

[1]

The defendants explain why they did not move to dismiss Count Four (Common-Law Negligence) as time-barred: "The claim is filed on behalf of the minor Plaintiff, and Michigan and Virginia both provide that the statute of limitations on a claim is tolled when a plaintiff is a minor." Defs' MSJ at 5 n.2 (citing MICH. COMP. LAWS § 600.5851 and VA. CODE ANN. § 8.01-229(A)).

*See* MICH. COMP. LAWS § 600.5851(1) ("Except as otherwise provided in subsections (7) and (8) [medical-malpractice claims], if the person first entitled to make an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run. This section does not lessen the time provided for in section 5852 [governing situations where the person dies before the limitations period expires, or within thirty days after the period expired].");

VA. CODE ANN. § 8.01-229(A)(1) ("If a person entitled to bring any action is at the time the cause of action accrues an infant, except if such infant has been emancipated . . . , such person may bring it within the prescribed limitation period after such limitation is removed."). The Virginia Legislature has not amended section 8.01-229 since 2001.

[2]

If the court allowed BCS to assert the limitations defense at this very late stage, it would dismiss counts 1, 2 and 3 as barred by the applicable Virginia statute of limitations, though not by

**FEDERAL COURT'S INTERPRETATION OF STATE LAW**

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, 602 F. Supp.2d 829, *14 (W.D. Mich. 2008) (Paul L. Maloney, J.) ("*ARS*") (quoting *NUFIC of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Richard Allen Griffin, J.) (citation omitted)). If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts: "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'" *ARS*, 602 F. Supp.2d at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)); *see also West v. AT&T Co.*, 311 U.S. 223, 236-37 (1940) ("A state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. In those circumstances the federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court . . . ."), *followed by Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993) and *Dairy, Bakery & Food Workers Local Union No. 386 v. Grand Rapids Milk Div. of Nat'l Dairy Prods. Corp.*, 160 F. Supp. 34, 39 (W.D. Mich. 1958) (Kent, J.).

In determining the controlling law of the State, a federal court also "*may* give weight" to the decisions of a State trial court, *Lakeland Reg. Health Sys. v. Walgreens Health Initiatives, Inc.*, 604

---

the applicable Michigan statute of limitations.

F. Supp.2d 983, 989 (W.D. Mich. 2009) (Maloney, C.J.) (citing *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975)), especially when it is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605. But the federal court is not *obligated* to follow state trial-court decisions. *See Krakoff v. US*, 431 F.2d 847, 849 (6th Cir. 1970) ("a federal court is not bound by the decision of state lower court where there has been no determination of a question of state law by the state's highest court.") (citing *CIR v. Bosch*, 387 U.S. 456 (1967)); *see also Gray v. Green Tokai Co., Ltd.*, 2007 WL 1026425, *3 (S.D. Ohio Mar. 30, 2007) ("Lower state court decisions are not binding on federal courts seeking to decide an issue of state law if the federal court is convinced that the highest state court would decide otherwise.") (citing *Woods v. Vermillion Local Sch. Dist.*, 1999 WL 652019, *2 (N.D. Ohio Aug. 9, 1999)) (other citations and internal quotation marks omitted).[3]

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts. *See ARS*, 602 F. Supp.2d at – (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")). If a state court would not be bound by a particular state-court decision, then neither is this court. *ARS*, 602 F. Supp.2d at – (citing *King v. Order of United Commercial Travelers of America*, 333 U.S. 153,

---

[3] *Accord Am. Int'l Ins. Co. of P.R. v. Lampe GmbH*, 307 F. App'x 645, 647 (3d Cir. 2009) (citing *Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 199 (3d Cir. 2004)).

161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis." This subsection makes no distinction based on when the decision was issued.. *ARS*, 602 F. Supp.2d at –.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule." *ARS*, 602 F. Supp.2d at – (emphasis added).

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued. *ARS*, 602 F. Supp.2d at –. When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails. *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue. *ARS*, 602 F. Supp.2d at – (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *ARS*, 602 F. Supp.2d at – (citing *Iqbal v.*

*Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing MICH. CT. R. 7.215(J)(1))). Nonetheless, this court may consider and follow unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals. *See Republic-Franklin Ins. Co. v. Bosse*, No. 95-3401, 89 F.3d 835, 1996 WL 301722, *5 n.4 (6th Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

**Finally, a federal court's interpretation of state law is not binding.** *ARS*, 602 F. Supp.2d at – (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")); *accord McGrath v. Toys 'R Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) (citing *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996)); 20 AM. JUR.2D COURTS § 225 (1965). As our Circuit recently emphasized,

> No federal court has the final say on what [state] law means. Even the decision of the highest federal court, the United States Supreme Court, about the meaning of [a state] law has no more binding authority on the [state] Supreme Court than the decision of [another State's] Supreme Court or for that matter any other court.

*Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008); *see also Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1042 (6th Cir. 1992) ("the district court's reliance on federal cases interpreting Ohio law is only correct if those cases accurately reflect the law of Ohio") (citation omitted).

Accordingly, this court will seriously consider our Circuit's interpretation of state law, or

another district court's interpretation of state law, but is not bound by it. *See ARS*, 602 F. Supp.2d at –; *see also Pack v. Damon Corp.*, 2006 WL 1156489, *1 (E.D. Mich. May 1, 2006) ("Michigan courts, in turn, are not bound by the Sixth Circuit's interpretation of Michigan law."). *See, e.g., MPAS v. Michigan DOC*, 581 F. Supp.2d 847, 856 (W.D. Mich. 2008) (Maloney, C.J.) (declining to follow U.S. District Court for the Eastern District of Michigan's determination that MDOC is a political subdivision of the State of Michigan, a matter of state law).

## DISCUSSION
### BCS/BCSI Waived Their Limitations Defense

The court denies BCS leave to amend their answer to assert the statute of limitations as an affirmative defense. Federal Rule of Civil Procedure 8(c)(1) requires a defendant to affirmatively plead the defense that a statute of limitations bars a claim. *See, e.g., US v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995) (denying leave to amend where defendant "failed to proceed with due diligence" in seeking leave to amend 22 months after filing its first amended answer and after the close of discovery); *cf. Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (denying leave to amend where plaintiff had "delayed pursuing [the] claim until after discovery had passed, the dispositive motion deadline had passed, and a motion for summary judgment had been filed" without offering justification for the delay).

On BCS's behalf, the court notes that the Harshaws cannot show that they are unduly or unfairly prejudiced by this amendment. They have had a full and fair opportunity to oppose the application of the limitations defense, and the court is not convinced that BCS acted in bad faith by failing to assert the defense in their answer or by failing to seek leave earlier to amend their answer to assert it. *Cf. Stupak-Thrall v. Glickman*, 346 F.3d 579, 585 (6th Cir. 2003) ("Because the plaintiffs

had a fair opportunity to respond to the government's statute of limitations argument, we find that the plaintiffs suffered no prejudice and, therefore, the government did not waive their defense."); *Midura v. Lincoln Consol. Sch. Dist.*, 314 N.W.2d 691, 693, 111 Mich. App. 558, 562 (Mich. App. 1981) ("Delay in seeking amendment, without a finding of bad faith or prejudice caused by the delay, does not justify denial of a motion to amend.") (citing *Ben P. Fyke & Sons v. Gunter Co.*, 213 N.W.2d 134, 390 Mich. 649, 663-64 (Mich. 1973)). The fact that the amendment adds a defense which would eliminate three of the Harshaws' four claims does not constitute a reason to deny leave to amend. *See Midura*, 314 N.W.2d at 693 (citing *Fyke & Sons*, 213 N.W.2d at 140). "Prejudice refers to [a] matter which would prevent a party from having a fair trial, or [a] matter which he could not properly contest, e.g., when surprised. It does not refer to the effect on the result of the trial or otherwise." *Fyke & Sons*, 213 N.W.2d at 137 (citation and internal quotation marks omitted).

Moreover, as shown below, BCS's proposed amendment would not be futile: if BCS were allowed to assert the limitations defense now, it would result in the dismissal of the first three counts as narrowly barred by the applicable Virginia statute of limitations.

The court is also unconvinced by the Harshaws' objection that allowing the assertion of the limitations defense after the close of discovery severely prejudices them because they need to re-open discovery in support of their argument that BCS fraudulently concealed the existence of their claims. *See* P's Opp at 7 (citing MICH. COMP. LAWS § 600.5855). The Harshaws do not present a particularly convincing argument that BCS concealed their claims so as to justify tolling the Virginia limitations period which would bar those claims.

Under the liberal standard of Federal Rule of Civil Procedure 15(a) alone, then, the court would be inclined to grant BCS leave to amend their answer, even at this late stage, to assert their

meritorious limitations defense against counts one, two and three. *See* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires.").

**Unfortunately for BCS, however, Rule 15(a) is not the only Rule governing the propriety of granting leave to amend a pleading. Federal Rule of Civil Procedure 16 also governs leave to amend a pleading, and it imposes a much stricter standard for obtaining such leave.** "Once the scheduling order's deadline to amend the [pleading] passes, however, 'a [party] first must show good cause under Rule 16(b) for failure earlier to seek leave to amend' . . . 'before a court will [even] consider whether amendment is proper under Rule 15(a).'"[4] *Commerce Benefits Group, Inc. v. McKesson Corp.*, 326 F. App'x 369, 376 (6th Cir. 2009) (Clay, McKeague, D.J. Holschuh) (quoting *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003)). Under such circumstances, BCS is effectively asking for a retroactive modification of the scheduling order's deadline for amendment of pleadings, and Rule 16(b)(4) provides that a scheduling order "may be modified only for good cause and with the judge's consent." *Commerce Benefits Group*, 326 F. App'x at 376 n.4.

The original case management order (Doc. No. 13, issued June 10, 2008) required the parties to file motions for leave to amend pleadings no later than August 29, 2008. That deadline passed long before the first amended case management order (Doc. No. 28) issued on January 16, 2009.

---

[4] If the court had never set a deadline for amending without leave (or seeking leave to amend) pleadings, Rule 16(b) would not apply, and BCS would be subject only to the more permissive standard of Rule 15(a). *See Century Business Servs., Inc. v. Bryant*, No. 1:2001-cv-2166, slip op. at 3 (N.D. Ohio Feb. 12, 2004) (Ann Aldrich, J.) (not on WestLaw or Lexis) ("Rule 16(b)'s good cause requirement does not apply in this case, however, because the court never set a deadline for amending pleadings without leave of court. The court customarily issues a pretrial scheduling and procedures order following the initial case management conference ('CMC'), setting forth deadlines for amending pleadings without leave of court, *inter alia*. But the atypical posture of this case offered no occasion to do so.").

The first amended case management order did not set a new amendment-of-pleadings deadline in place of the already-expired deadline.

Finally, on November 6, 2009, this court issued a second amended case management order. *See* Doc. No. 167. The second amended case management order likewise did not set a new amendment-of-pleadings deadline in place of the long-expired deadline.

BCS did not seek leave to amend its answer to assert the limitations defense until September 2, 2009 (when it filed the instant motion to dismiss or for summary judgment on the ground of that defense) – more than one full year after the August 29, 2008 deadline for seeking leave to amend the pleadings. BCS's opening brief in support of the instant motion simply makes no attempt to show good cause for missing that deadline, let alone for missing it by more than a year.

BCS's reply brief in support of the instant motion addresses the leave-to-amend issue, and it makes sound or colorable arguments on other elements of the leave-to-amend analysis (as discussed above). However, it does not even arguably show good cause for missing the August 2008 amendment deadline by more than a year. BCS's reply on this score reads as follows:

> Plaintiffs argue that Defendants have waived the statute of limitations defense, relying upon *Burgess v. Bell*, 555 F. Supp. 855 (E.D. Mich. 2008). In *Burgess*, the district court concluded that the defendant waived the statute of limitations defense because the defendant failed to file a timely answer. *Id.* at 858. Obviously, that did not occur here. Thus, this Court retains the authority to grant Defendants leave to amend their answer. *See Stupak-Thrall v. Glickman*, 346 F.3d 579, 585 (6th Cir. 2003); Fed. R. Civ. P. 15. Plaintiffs urge this Court to dent Defendants' request for two reasons: Defendants are too late and Plaintiffs would suffer prejudice. Neither contention is true.
>
> Plaintiffs argue that their claims accrued after January 31, 2006 when they were certain of their adopted son's diagnosis. When Plaintiffs discovered or should have discovered that their son was not "healthy" and had more than "minor, correctible" problems (beyond what was clear from the Complaint) could not have been known until Plaintiffs were deposed. Plaintiffs' depositions were completed in May 2009. In June 2009, Defendants told Plaintiffs that they intended to raise a statute of

-15-

limitations defense. Defendants did not delay; they prudently and timely raised the issue once discovery showed that Plaintiffs' claims were untimely.

Defs' Reply at 7-8.

But BCS's argument is foreclosed by their own counsel's words. In a letter to the Harshaws' counsel, BCS's counsel stated their view that the applicability of the limitations defense was apparent from the face of the complaint alone. BCS's counsel stated, "It is our view that the grounds for dismissal of the lawsuit based on the applicable statute of limitations can be taken from the allegations in your complaint, and thus a motion to dismiss pursuant to Rule 12(b) is appropriate." P's Opp, Ex A (July 30, 2009 letter from Perrin Rynders to plaintiffs' counsel) at 1. In other words, according to BCS's own stated view, it knew or should have known of the existence of the limitations defense as soon as it was served with the complaint. Accordingly, BCS cannot now be heard to claim that the existence of the limitations defense only recently became known. *See Commerce Benefits Group*, 326 F. App'x at 376 ("*[B]ecause* CBG could not adequately explain its delay in bringing the claims – indeed, *the factual basis for the new claims existed at the beginning of the lawsuit* – . . . *the district court did not abuse its discretion in denying CBG's motions to amend.*") (emphasis added).

In turn, BCS proffers no reason why it did not seek leave to amend its answer before the amendment deadline, when it concededly knew the need for the amendment existed long before that deadline. As our Circuit remarked in a similar situation,

> The district court did not abuse its discretion in denying Franklin's motion to amend her answer to Pittman's second amended complaint. In the instant case, *Franklin waited more than seventeen months after the initiation of the malpractice suit before filing a motion to amend her answer and six months after the deadline to amend pleadings*. * * *
> * * *
> Moreover, Franklin failed to meet the heightened burden placed on her motion to

> amend because it was sought at a late stage in the litigation. In fact, in her initial Rule 15(a) motion to the district court, Franklin offered no justification for her failure to amend her answer to include a comparative fault defense at earlier stages in the litigation. Instead, Franklin simply stated why she sought the amendment and quoted language from Rule 15(a) which states that leave to amend "shall be freely given as justice requires."
>
> [footnote 5] Similarly, Franklin's total failure to offer any real justification for the delay in amending her answer not only fell far short of her heightened burden but also well below her obligation to demonstrate "good cause" for failing to comply with the district court's scheduling order as required by Rule 16 of the Federal Rules of Civil Procedure. * * *

*Pittman v. Franklin*, 282 F. App'x 418, 425 (6th Cir. 2008) (Moore, Clay, D.J. Schwarzer) (record citation omitted, emphasis added). Similarly, District Judge Thomas Varlan recently invoked Rule 16(b) to deny leave to amend a complaint, noting that plaintiffs, who had originally proceeded *pro se*,

> obtained counsel more than one year prior to the filing of the present motion to amend [the] complaint and, thus, had more than ample opportunity to request these amendments prior to the Scheduling Order's deadline. Also . . . Plaintiffs could have requested an extension [of] the amendments deadline prior to the close of the discovery and dispositive motion deadlines yet failed to do so. * * * In light of all this, the Court finds that Plaintiffs have failed to satisfy the requirements of Rule 16(b), rendering it unnecessary for the Court to consider whether amendment is proper under Rule 15(a).

*Weese v. Wyndham Vacation Resorts*, – F. Supp.2d –, –, 2009 WL 1884045, *2 (E.D. Tenn. June 30, 2009). *See also Howe v. City of Akron*, 2008 WL 5115752, *1-2 (N.D. Ohio Dec. 1, 2008) (John Adams, J.) ("Defendant requests this Court's leave to amend its answer so that it can add a Rule 12(b)(7) defense [plaintiff's failure to add an allegedly required party under FED. R. CIV. P. 19]. However, Defendant makes this request more than six months after the time allowed for amending the pleadings and adding parties set forth in the scheduling order. Therefore . . . Rule 16(b)(4) applies. Thus, Defendant must show good cause. Defendant, however, relies only on the more liberal standard of Rule 15 and does not even attempt to show good cause. [T]here is no good cause

. . . .");

For these reasons, BCS is not entitled to leave to amend its answer to assert the statute of limitations as a defense against counts one, two and three.

# ORDER

The defendants' request for leave to amend their answer in order to assert the affirmative defense of the statute of limitations [contained in doc. #115] is **DENIED**.

The defendants' motion to dismiss counts 1, 2 and 3 as barred by the applicable Michigan and/or Virginia statutes of limitation [doc. # 115] is **DENIED as waived**.[5]

This is <u>not</u> a final and appealable order.[6]

**IT IS SO ORDERED** on this 15th day of December 2009.

/s/ Paul L. Maloney<br>
Honorable Paul L. Maloney<br>
Chief United States District Judge

---

[5]

All four claims remain in the case for the time being: Count 1 Common-Law Fraud, Count 2 Common-Law Negligent Misrepresentation, Count 3 Common-Law Negligent Failure to Disclose, and Count 4 Common-Law Negligence.

On October 1, 2009, the defendants filed a motion to dismiss for failure to state a claim and/or for summary judgment on the *merits* of all four claims. *See* Docs. 130 (motion) & 131 (brief). The Harshaws timely filed an opposition on October 28, and the defendants timely filed a reply on November 4, 2009. *See* Docs. 138 and 166.

Also on October 1, 2009, the Harshaws moved for summary judgment on the *merits* of claims 2-4. *See* Docs. 132 (motion) and 133 (brief). The defendants timely filed an opposition on October 28, and the Harshaws timely filed a reply on November 4, 2009. *See* Docs. 139 and 166.

The court intimates no opinion as to which State's substantive law will govern the claims.

[6]

Pursuant to the second amended case management order issued on November 6, 2009, the Magistrate Judge will conduct a settlement conference in Grand Rapids on May 7, 2010 (with the parties required to send representatives with actual settlement authority). This judge will conduct the final pretrial conference in Kalamazoo on June 7, 2010, and will preside over a jury trial commencing with *voir dire* in Kalamazoo on July 7, 2010. *See* Doc. Nos. 28 and 167.

-19-