UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

WILLIAM G. and JULIE A. HARSHAW, | Case No. 1:08-cv-104
Husband and Wife, individually and as Guardian of
ROMAN A. HARSHAW, a minor,

    Plaintiffs,

                                                               HONORABLE PAUL L. MALONEY

          v.

BETHANY CHRISTIAN SERVICES,
A Michigan corporation, and
BETHANY CHRISTIAN SERVICES INT'L, INC.,
a Michigan corporation,

    Defendants.
_____

# OPINION and ORDER
*"Harshaw 3"*

**Denying the Defendants' "Motion for Reconsideration" as Untimely and Meritless;
Denying the Plaintiffs' Motion to Strike the Reconsideration Motion**

This is a diversity tort case arising under Michigan and/or Virginia law. Plaintiffs William and Julie Harshaw ("Harshaw"), a married couple proceeding individually and as guardians of their adopted son Roman Harshaw, are Virginia citizens, *see* Complaint filed January 31, 2008 ("Comp") ¶¶ 1-2, and the court has proceeded on the premise – uncontested by BCS – that both defendants are citizens of Michigan alone, *see id.* ¶¶ 2-5.

In response to a BCS advertisement, the Harshaws attended an informational meeting at BCS's regional office in Virginia on June 12, 2003, and the following day they submitted a preliminary application to adopt a child through one of BCS's programs in Russia, China or

Guatemala. *See* Comp ¶¶ 11-13 and Exhibit ("Ex") A. The application stated that they would accept a child with "very minor medical problems and would not consider a child with moderate to severe medical problems." Comp ¶ 13. The Harshaws submitted another Application for International Adoption to BCS on June 18, 2003 which stated that they were "interested in parenting a child that has a positive prognosis for both mental and physical development." Comp ¶¶ 14-15 and Ex B.

As required by Bethany, the Harshaws underwent a pre-adoption family assessment conducted by BCS's Virginia office, during which they signed an International Adoption Services Agreement. *See* Comp ¶¶ 17-18 and Ex C. Relying on BCS's claimed experience and expertise in international adoption, the Harshaws understood that if the pre-adoption family assessment was favorable, BCS would act as intermediary and/or fiduciary on their behalf to effectuate an adoption. *See* Comp ¶¶ 16 and 19. On August 22, 2003, BCS issued a pre-adoption assessment report stating that the Harshaws "feel equipped to parent a child who may have a minor, correctable problem with a good prognosis for normal development." The assessment approved the Harshaws to adopt a child from Russia who was aged 12 to 36 months and had (at most) a "minor, correctable problem with a good prognosis for normal development." *See* Comp ¶¶ 20-22 and Ex D. The Harshaws paid BCS about $16,000 for its services. *See* Comp ¶ 24.

BCS representative Jeannie Walton initially referred a Russian child as a candidate for the Harshaws, but the child had been severely burned by his mother and suffered medical problems as a result. The Harshaws declined the referral and emphasized to BCS that they could only accept a child with minor, correctable conditions and a prognosis for normal development. *See* Comp ¶ 25. Next, BCS provided the Harshaws with the name, age, sex, and photograph of Roman; a two-page

document represented to be an English translation of Roman's medical records at his orphanage; and a untranslated videotape showing what appeared to be Roman interacting with his caregivers in Russia. *See* Comp ¶¶ 26-29 and Ex E (Translated Summary of Russian Medical Records).

Relying on the videotape and the purported summary of Roman's medical records, the Harshaws notified BCS that they were willing to adopt Roman so long as BCS first provided any additional medical information about the boy. *See* Comp ¶ 30. At the invitation of BCS representative Jeannie Walton, the Harshaws visited a BCS office to discuss the adoption. When the Harshaws asked Walton whether Roman and the other Russian children which they were considering for adoption were medically healthy, Walton responded that they were healthy,

> and explained that a medical doctor associated with Bethany, referred to as "Dr. D," had specific expertise in the evaluation of Russian children for the purposes of adoption and that Dr. D regularly examined the children in Russia on trips from his home in New York. Ms. Walton stated that Dr. D had examined Roman and that Roman was O.K. The Harshaws learned that the individual referred to as "Dr. D", is Dr. Michael Dubrovsky.

Comp ¶ 31. Relying on Walton's assurances regarding Dr. Dubrovsky's purported regular examination of Roman *et al.*, the Harshaws traveled to the orphanage in Krasnoyarsk, Russia in December 2003, with two BCS representatives, Aleksandr Vladimirovich ("Alex") and Yelena Vladimirovna ("Yelena"), acting as interpreters and guides. The Harshaws were permitted to see Roman for only about one hour. *See* Comp ¶¶ 32-33. Noting that Roman looked thin and perhaps ill, the Harshaws asked interpreter Alex if Roman was okay; after consulting with orphanage staff, Alex told the Harshaws that Roman had had bronchitis. *See* Comp ¶¶ 34-35. The Harshaws asked for additional information about Roman and about his mother's social and medical background, but Alex responded that no further information was available. They saw Roman for about an hour the next day, then returned to America and met again with BCS's Jeannie Walton. *See* Comp ¶¶ 36-38.

When Walton asked how Roman looked and the Harshaws responded that he "appeared as if he might have been sick but otherwise appeared okay", Walton reassured them that what they saw in Roman was common in institutionalized children, and that his issues were minor and often resulted from malnutrition and crowded living conditions. Walton asked if the Harshaws wished to proceed with the adoption, and they said yes. *See* Comp ¶¶ 38-40.

The next month, January 2004, the Harshaws returned to Russia to attend the final adoption hearing and take custody of Roman. When they took physical custody of Roman at the orphanage, they asked if there were any more medical records regarding Roman or his mother and were told that there were none, and BCS never provided them with any additional medical information from then until after the adoption was completed. *See* Comp ¶¶ 41-44.

After the Krasnoyarsk Regional Court entered an Order of Adoption on January 27, 2004, the Harshaws took Roman home to America, where they soon noticed that he was not developing and acting normally for his age and reported health. They spent about a year and a half taking Roman to physicians and mental-health professionals to figure out what might be wrong, leading to a January 2006 examination by neurodevelopmental pediatrician Dr. Frank Aiello III, M.D., who suggested that Roman might be suffering from fetal alcohol syndrome and ordered more testing. *See* Comp ¶¶ 45-49. Following three days of examination and tests in June 2006, Dr. Ronald S. Federici, Psy.D., clinical director of a "neuropsychological and family therapy" clinic in Virginia, who diagnosed Roman with an alcohol/drug-related birth defect, identified as a fetal alcohol spectrum disorder causing neurocognitive and psychiatric abnormalities. *See* Comp ¶¶ 50-51.

The Harshaws allege that throughout the 24 months following the January 2004 adoption, they expressed concerns to BCS's social worker, during post-placement visits, about Roman's

medical, emotional and psychological condition and behavior. The BCS social worker responded that Roman's problems were frequently associated with being institutionalized and that children adopted from such institutionalized settings could "grow out of" the problems with a loving family. Neither the social worker nor anyone else at BCS provided advice or referrals to help the Harshaws diagnose and treat Roman. *See* Comp ¶ 59.

At an unspecified time in or after June 2006 (when Dr. Federici examined Roman), the Harshaws informed BCS of Federici's diagnosis and asked for more medical information, which BCS stated would be difficult to retrieve. *See id.* ¶¶ 52-53. After the Harshaws repeated their requests, in October 2006 BCS provided two items which they had not previously provided: a ten-page Russian-language extract of Roman's medical records and history, and a six-page English translation. *Id.* ¶¶ 54-55 and Ex F. The Harshaws allege that BCS either had these two documents in its possession all along (i.e., before the adoption was completed) or could and should have obtained them for review, translation and delivery to the Harshaws before they made their decision whether to adopt Roman. *Id.* ¶¶ 56-57. The Harshaws allege that they relied on BCS to provide all the information reasonably available to it and if BCS had done so, they would not have pursued Roman's adoption. *Id.* ¶¶ 58 and 64-66. They also hypothesize that if BCS had provided complete, accurate medical information and appropriate post-placement assistance, they could have diagnosed Roman's condition earlier and started providing more-appropriate treatment earlier. *Id.* ¶ 67.

The Harshaws assert three common-law claims on their own behalf: fraud / intentional misrepresentation in count one (Comp ¶¶ 68-83), negligent misrepresentation in count two (Comp ¶¶ 84-94), and negligent failure to disclose in count three (Comp ¶¶ 95-99). They assert one common-law claim on behalf of Roman, who is still a minor: negligence (Comp ¶¶ 100-104). They

allege that after Roman's adoption in January 2004, BCS admitted it had "misinformed" the Harshaws by providing "unclear" medical information during the adoption process, and that Dr. Dubrovsky never examined Roman as it had represented. *See* Comp ¶¶ 60-61. On each of the four counts, the Harshaws seek $75,000 in compensatory damages plus punitive damages, interest, and attorneys' fees and costs, and demand a jury trial. *See id.* at 15, 17, 18 and 19 (prayers for relief).

The Harshaws filed the instant complaint on January 31, 2008, and with an extension of time the defendants jointly filed an answer in April 2008. In September 2009, BCS filed a motion to dismiss or for summary judgment on counts one, two and three – William and Julie Harshaws' common-law claims for fraud/intentional misrepresentation, negligent misrepresentation, and negligent failure to disclose – on the ground that they are barred by the statute of limitations in both Michigan and Virginia. The court denied the defendants' request for leave to amend their answer to assert the limitations defense, holding that BCS did not show good cause for failing to move for leave before the deadline which the case management order imposed. *See Harshaw v. Bethany Christian Servs.*, 2009 WL 5149925 (W.D. Mich. Dec. 15, 2009) (Maloney, C.J.) ("*Harshaw 2*").

Five weeks later, the defendants filed a motion for reconsideration. "In a civil case . . . the timeliness of a motion for rehearing or reconsideration is governed by Rule 52(b) or Rule 59 . . . ." *Browder v. Director, Dep't of Corrs. Of Ill.*, 434 U.S. 257, 268-69 (1978) (footnote 13 omitted). Rule 52, entitled Amended or Additional Findings, provides in pertinent part:

> On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings – or make additional findings – and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59.

FED. R. CIV. P. 52(b). Rule 59, entitled New Trial / Altering or Amending a Judgment, provides in pertinent part, "A motion to alter or amend a judgment must be filed no later than 28 days after the

entry of the judgment." FED. R. CIV. P. 59(e).[1]

Put another way, motions denominated as motions for reconsideration are customarily treated as motions under Rule 59(e). *See Huff v. Metropolitan Life Ins. Co.*, 678 F.2d 119, 122 (6th Cir. 1982) ("The district court properly treated the motion to reconsider as a motion under Rule 59 to alter or amend judgment."), *cited by Lawson-Brewster v. River Valley Sch. Dist.*, 2008 WL 2224116, *1 (W.D. Mich. May 29, 2008) (Wendell Miles, Sr. J.) ("Because Rule 59(e) motions are aimed at reconsideration, a motion for reconsideration may be treated as a motion under Rule 59(e) to later or amend judgment."). *See also, e.g., Commerce Benefits Group, Inc. v. McKesson Corp.*, 326 F. App'x 369, 373 (6th Cir. 2009) (Clay, McKeague, D.J. Holschuh) ("CBG filed a motion for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure . . . ."); *McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 224 (6th Cir. 2009) (noting with approval, "On January 17, 2006, McMillan filed a motion . . . for reconsideration of the bankruptcy court's order of January 6, 2006. The bankruptcy court considered McMillan's motion as a Rule 59(e) motion . . . ."), *reh'g & reh'g en banc denied* (6th Cir. May 4, 2009).

This court issued *Harshaw II* on Tuesday, December 15, 2009, and BCS did not file the instant "motion for reconsideration" until Tuesday, January 19, 2010. The 28-day period for filing a Rule 59(e) motion began running on Wednesday, December 16, 2009, the day after this court issued *Harshaw II*. *See* FED. R. CIV. P. 6(a)(1)(A). Due to a recent amendment, the court counts all calendar days, including weekends and federal holidays. *See* FED. R. CIV. P. 6(a)(1)(B). Applying these rules, the 28th and last day for the defendants to file a motion for reconsideration was Tuesday, January 12, 2010. (Under new FED. R. CIV. P. 6(a)(4)(A), the defendants had until midnight to

---

[1] Before an amendment effective on December 1, 2009, the time limit was ten days.

electronically file the motion.) The defendants filed the instant motion after that date, so the court will deny the motion as untimely. *See Lommen v. McIntyre*, 125 F. App'x 655, 659 (6th Cir.) ("The district court dismissed Lommen's complaint . . . on July 10, 2003. Lommen filed his motion for reconsideration 40 days later, on August 19, 2003. Because a motion for reconsideration brought pursuant to Rule 59(e) of the Federal Rules of Civil Procedure must 'be filed no later than 10 [now 28] days after entry of the judgment,' we conclude that the district court did not abuse its discretion in denying Lommen's motion as untimely."), *cert. denied*, 546 U.S. 872 (2005).[2]

**In any event, the defendants' motion would be improper even if it were timely. "'Rule 59(e) allows for reconsideration; it does not permit parties to effectively reargue a case.'"** *Howard v. US*, 533 F.3d 472, 475 (6th Cir. 2009) (Rogers, J., joined by Shadur, D.J.) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998)); *see also American Marietta Corp. v. Essroc Cement Corp.*, 59 F. App'x 668, 671 (6th Cir. 2003) ("As the district court here correctly observed, a motion to reconsider should not be used to re-litigate issues previously considered."). Accordingly, "[a] motion for reconsideration that merely presents the same issues ruled upon by the court, either expressly or by reasonable implication, shall be denied." *Savage v. US*, 102 F. App'x 20, 23 (6th Cir. 2004) (internal quotation marks and citation to district-

---

[2]

BCS cites two decisions where this court granted at least partial reconsideration of its prior orders. But BCS conveniently neglects to mention that in both cases, the party seeking reconsideration – unlike BCS here – filed its motion for reconsideration within the time period then required by Rule 59(e). *See* Defs' Mot. for Recon. at 3 (citing *Pinika, LLC v. MetLife, Inc.*, 2009 WL 891723 (W.D. Mich. Mar. 31, 2009) (Maloney, C.J.) (plaintiff filed motion on July 31, 2008 seeking reconsideration of summary-judgment decision entered July 21, 2008; defendant then filed motion on April 14, 2009 seeking reconsideration of decision rendered March 31, 2009) and *Glass v. Kellogg Co. Bakery, Confectionery, Tobacco Workers & Grain Millers Pension Plan*, 2009 WL 2166269 (W.D. Mich. Apr. 3, 2009) (plaintiff filed motion on October 15, 2008 seeking reconsideration of Rule 12(b)(6) dismissal entered October 6, 2008)).

court opinion omitted); *Gray v. SSA*, 2006 WL 3825066, *2 (E.D. Mich. Dec. 13, 2006) (Lawson, J.) ("A motion under Rule 59 should not be granted if it just repeats the same arguments already considered by a court."). Thus, to the extent that BCS merely repeats arguments which it made in its briefs seeking limitations dismissal – absent new published precedent issued during the intervening period – reconsideration is not appropriate. *See US v. Simon*, 2009 WL 1953134, *2 n.1 (E.D. Mich. July 2, 2009) (Rosen, C.J.) ("Plaintiff is merely attempting to re-hash arguments that he already raised in his [section] 2255 motion. Therefore, treating the motion either as a motion to alter or amend judgment under Rule 59(e) or as a motion rehearing or reconsideration under Local Rule 7.1(g), the Court would deny the motion because plaintiff is merely presenting issues which were already ruled upon by this Court.").

Conversely, to the extent that the defendants marshal arguments or authorities which were available during briefing on their limitations motion to dismiss, a motion for reconsideration again is not a proper vehicle. *See Sault Ste. Marie Tribe*, 146 F.3d F.3d at 374; *Exide Techs. v. K-Mart Corp.*, 2009 WL 1600693, *1 (E.D. Mich. June 8, 2009) (Steeh, J.) (citing 11 Wright, Miller & Kane, Federal Practice & Procedure § 2810.1 at (2d ed. 1995)); *Lee v. Putz*, 2006 WL 1791304, *2 (W.D. Mich. June 27, 2006) (Robert Holmes Bell, C.J.) (a "motion for reconsideration . . . 'is not appropriately used to advance arguments or theories that could and should have been raised prior to the court's ruling.'") (quoting *Martin v. A.O. Smith Corp.*, 931 F. Supp. 543, 550 (W.D. Mich. 1996) (McKeague, J.) (citation to Seventh Circuit omitted)).

**Finally, even if the defendants' "motion for reconsideration" were both timely and proper, it fails on its merits. First,** the court remains of the view that the decisions cited by the defendants cannot be applied so as to eviscerate Rule 16(b)'s requirement that a party show good

cause for failing to seek leave to amend a pleading before a court-ordered deadline.

The court also continues to adhere to its finding that the defendants did not show good cause for their failure to seek leave to amend their answer to assert the limitations defense before the court-ordered deadline for such amendments. The defendants' attempt to evade the consequences of their own counsel's prior statements is specious. The defendants write as follows:

> In holding that there was no good cause, this Court noted correspondence in which Defendants' counsel explained to Plaintiffs' counsel that "the grounds for dismissal of the lawsuit based on the applicable statute of limitations can be taken from the allegations in your complaint, and thus a motion to dismiss pursuant to Rule 12(b) is appropriate."
>
> This assertion, based on a correct summary of the law in the Sixth Circuit, was not a representation about any actual conclusion made at the time Defendants were served with the Complaint. Defendants' counsel was merely explaining that the statute of limitations defense was not waived.

Defs' Mot. for Recon. at unnumbered page 7 n.5 (paragraph break added). This argument is illogical and unsupported by precedent. Under the defendants' view, it would not matter whether a defense was apparent from the face of a complaint; so long as the defendant did not realize this (reach the "actual conclusion") when they were served with the complaint, it could wait as long as it wished, even until the eve of trial, before raising a defense which *by its own admission* any reasonable defendant would have realized was available immediately upon reading the complaint. This is not the law in our Circuit, and it would be neither sensible nor fair to make it the law.

The defendants will not be permitted to deny the clear meaning and import of their own counsel's written statement to opposing counsel, opining that the limitations defense was apparent from the face of the complaint. A statement that a defense "can be taken from the allegations in your complaint" is the diametric *opposite* of the view that the defense was not reasonably apparent until some post-complaint events occurred, or until discovery was conducted.

**ORDER**

Defendants' motion for reconsideration [doc. #199] is **DENIED**.

Plaintiffs' motion to strike the reconsideration motion as untimely [doc. #201] is **DENIED**.

This is <u>not</u> a final and immediately-appealable order.

**IT IS SO ORDERED** on this ___21st___ day of January 2010.

                                                /s/ Paul L. Maloney
                                                Honorable Paul L. Maloney
                                                Chief United States District Judge