UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
|
WILLIAM G. and JULIE A. HARSHAW,                 |        Case No. 1:08-cv-104
Husband and Wife, individually and as Guardian of |
ROMAN A. HARSHAW, a minor,                        |
                                                  |
        Plaintiffs,                               |
                                                  |
                                                  |        HONORABLE PAUL L. MALONEY
        v.                                        |
                                                  |
BETHANY CHRISTIAN SERVICES,                       |
A Michigan corporation, and                       |
BETHANY CHRISTIAN SERVICES INT'L, INC.,           |
a Michigan corporation,                           |
                                                  |
        Defendants.[1]                            |
                                                  |
_____

## OPINION and ORDER
*" Harshaw 5 "*
DRAFT 2

**Granting Defendants' Motion to Declare that Virginia Substantive Law Governs these Claims;**
**Directing the Parties to Brief the Corporate Alter Ego Issue under Virginia Law;**
**Scheduling Oral Argument on the Corporate Alter Ego Issue**

This is a diversity tort case. Plaintiffs William and Julie Harshaw ("Harshaw"), a married

_____
[1]

In June 2009, the Harshaws moved to voluntarily dismiss without prejudice a third defendant, Bethany Christian Services of Hampton Roads, Inc. (*"BCS-Hampton Roads"*), on the ground that its presence as a non-diverse, non-indispensable party would defeat this court's jurisdiction. This court granted the Harshaws' motion, but conditioned the dismissal of BCS-Hampton Roads on the Harshaws reimbursing the defense for the legal fees and costs incurred due to the erroneous inclusion of that party in this lawsuit. *See Harshaw v. Bethany Christian Services et al.*, 2009 WL 2232740 (W.D. Mich. July 22, 2009) (Maloney, C.J.) (*"Harshaw I"*) (Doc. No. 85).

In August 2009, the defendants filed an itemized list of the fees and costs they incurred due to the erroneous inclusion of BCS-Hampton Roads in this suit. On August 28, 2009, the Harshaws filed a notice stating that they agreed to the condition and would electronically transfer $14,805.00 to the account of defense counsel on August 31, 2009. *See* Docs. 108 & 110.

couple proceeding individually and as guardians of their son Roman, are Virginia citizens; both defendants – Bethany Christian Services and Bethany Christian Services International, Inc. (together "BCS") are Michigan corporations with unspecified principal places of business. *See* Complaint filed January 31, 2008 ("Comp") ¶¶ 1-5. Defendant BCS has filed a motion to dismiss on several legal grounds, or in the alternative for summary judgment on more fact-intensive grounds, as to all four claims. The Harshaws have opposed the motion to dismiss and cross-moved for summary judgment on the negligence-based claims (counts 2-4). In the parties' dispositive-motion briefs, they vigorously argue the choice-of-law issue; the Harshaws contend that Michigan substantive law applies, while BCS contends that Virginia substantive law applies.

More recently, BCS followed up by filing a motion on January 26, 2010 to declare that these claims and motions will be adjudicated under Virginia substantive law. As directed by the court, *see* Doc 210, the Harshaws filed an opposition brief on Friday, February 12, 2010. The Harshaws contend that BCS's motion to declare the applicable law is an inappropriate attempt to have a "second bite at the apple", as the parties already had the opportunity to argue the choice-of-law issue, and did argue it, in their summary-judgment briefs. *See* P's Opp to Choice-of-Law at 3-4. The Harshaws also contend, less persuasively, that it is premature and inappropriate to decide the choice-of-law issue, which they wish to postpone "until all proofs have been entered into evidence at trial." *See* P's Opp to Choice-of-Law at 6-7. It is neither efficient nor sensible to have the parties brief, and the court consider, numerous claims under two different States' substantive laws, all the way until trial; this is especially true given that one or the other State's law may call for the Harshaws or BCS to win summary judgment (or dismissal) of some claims without the need to submit them to a factfinder at all. The court has elected to consider BCS's motion to declare the

applicable law, as well as, of course, the Harshaws' timely opposition. The additional briefs inform and expand the court's discussion.

**For the reasons that follow, the court will grant BCS's motion and declare that under Michigan choice-of-law principles, these tort claims (and pending dispositive motions) are governed by Virginia law.[2] The court also directs the parties to brief a potentially dispositive issue – whether the defendants are alter egos of non-party BCS-Hampton Roads – under Virginia law (the Harshaws' briefs thus far seriously discuss the issue only under Michigan law, which does not apply).**

In response to a BCS advertisement, the Harshaws attended an informational meeting at BCS's regional office in Virginia Beach, Virginia on June 12, 2003, and the next day they submitted a preliminary application to adopt through BCS in Russia, China or Guatemala. The application stated that they would accept a child with "very minor medical problems and would not consider a child with moderate to severe medical problems." They submitted an Application for International Adoption to BCS on June 18, 2003 which stated that they were "interested in parenting a child that has a positive prognosis for both mental and physical development." *Id.* ¶¶ 11-15 and Exs A & B.

The Harshaws underwent a pre-adoption family assessment conducted by BCS's regional

---

[2]
The defendants' motion to declare the governing law seems to argue that if the court treated these claims as contract claims, Michigan choice-of-law principles would call for application of Virginia substantive law. The court declines to consider this apparent argument, or the Harshaws' response that if these were contract claims, they would be subject to *Michigan* substantive law, *see* P's Opp to Choice-of-Law at 10 n.24. Supplementary choice-of-law briefs are not a proper vehicle for raising entirely new arguments which were not even slightly developed in the parties' summary-judgment briefs. If the defendants believed that the Harshaws were not asserting the breach of any duty separate from contractual duties, the defendants could and should have moved to dismiss the tort claims on that basis; they did not. The defendants have not properly raised the issue of whether the Harshaws' claims (without regard to their merit) allege a breach of duties which are considered sufficiently separate and distinct from contractual duties as a matter of state law.

office in Virginia, during which they signed an International Adoption Services Agreement. Comp ¶¶ 17-18 & Ex C. Relying on BCS's claimed experience and expertise in international adoption, the Harshaws understood that if the assessment was favorable, BCS would act as intermediary and/or fiduciary on their behalf to effectuate an adoption. *Id.* ¶¶ 16 & 19. On August 22, 2003, BCS issued an assessment stating that the Harshaws "feel equipped to parent a child who may have a minor, correctable problem with a good prognosis for normal development." It approved them to adopt a Russian child aged 12 to 36 months who had (at most) a "minor, correctable problem with a good prognosis for normal development." *Id.* ¶¶ 20-22 & Ex D. They paid BCS $16,000. *Id.* ¶ 24.

The first page of BCS-HR's preadoption family assessment for the Harshaws stated,

> Mr. and Mrs. Harshaw have been advised of the risks of international adoption. They understand that children from overseas may arrive with previously undetected heath problems. They recognize that a child may arrive with a contagious condition( e.g., hepatitis, TB, AIDS) that could be contracted by others. They are aware that children from overseas have little or no background information (or inaccurate information) on the birth family, circumstances of the child's placement for adoption[,] or past medical care. They have further been advised that children from overseas may suffer from the effects of minimal care or institutionalization and may suffer from developmental delays or attachment problems.
>
> Mr. and Mrs. Harshaw are aware that there are no guarantees or predictions for the future mental, social, or physical development of the child. They state that they understand and willingly accept these risks. They have been given examples of situations to exemplify potential problems.

Defs' Choice-of-Law Br, Ex L (Aug. 22, 2003 assessment) at 1-2; *see also id.* Ex M (Julie Harshaw deposition testimony that Harshaws had the assessment document before the adoption) at pp. 22-24.

After completion of the favorable preadoption family assessment, BCS-HR referred the Harshaws to Dr. Dubrovsky, who forwarded the assessment to Russia for translation and submission

to the Russian federal Department of Education, which at that time was responsible for approving adoptions and orphanage visits by prospective adoptive parents. *See* Defs' Choice-of-Law Br, Ex O (Dubrovsky Dep) at pp. 57-58, 62 and 72.

BCS representative Jeannie Walton initially referred a Russian child for the Harshaws, but the child had been severely burned by his mother and suffered medical problems as a result. The Harshaws declined and emphasized to BCS that they could only accept a child with minor, correctable conditions and a prognosis for normal development.[3] In October 2003, BCS provided them with Roman's name, age, sex, and photograph; a two-page document said to be an English translation of Roman's medical records at his orphanage; and an untranslated videotape showing what appeared to be Roman interacting with his caregivers in Russia. *See* Comp ¶¶ 25-29 and Ex E; *see also* Def's Choice-of-Law Br, Ex M (Julie Harshaw Dep) at pp. 26-27. Before deciding whether to adopt Roman, the Harshaws had his records and videotape reviewed by their pediatrician in Virginia, Dr. Holland. *See id.*, Ex M (Julie Harshaw Dep) at pp.26-27, and Ex Q (Dr. Holland Dep) at 10 and 14. The Harshaws' pediatrician, Dr. Holland, noted that there was little or no family history but that Roman had been diagnosed with "delay of psychomotor and speech development" and "perinatal impairment of the central nervous system." Dr. Holland told the Harshaws that Roman's mother had conceived eight children but carried only two to term; he also noted that

---

[3]BCS emphasizes, however, that the Harshaws attended BCS-HR educational workshops in Virginia where they heard that BCS-HR considered all international potential adoptees to be special-needs children because of the effects of institutionalization, and that nobody can predict the outcome for a particular child. *See* Def's Choice-of-Law Br, Ex J (Elseroad Dep) at 239 and 302-306. BCS alleges that at these educational workshops the Harshaws attended, she instructed them and the other prospective adoptive parents that institutionalized children sometimes responded to treatment but sometimes had conditions that were not amenable to treatment, such as fetal exposure to alcohol. *Id.*

Roman's *in utero* exposure to alcohol, tobacco and other drugs was unknown and could be affecting him. *Id.* Ex Q (Dr. Holland Dep) at 14, 30 and 33-37. BCS also characterizes Holland as stating that Roman had been diagnosed with "hypotrophy." *Id.* Ex Q (Dr. Holland Dep) at 42-44.

The Harshaws argue that it was in reliance on the video and the purported summary of Roman's medical records that they told BCS they were willing to adopt Roman so long as BCS first provided any additional medical information about the boy. *See* Comp ¶ 30. BCS, in contrast, has pointed out that they did consult their own pediatrician before deciding whether to go forward with the adoption. At Walton's invitation, the Harshaws visited a BCS office to discuss the adoption. When they asked Walton whether Roman and the other Russian children they were considering were medically healthy, Walton responded that they were healthy,

> and explained that a medical doctor associated with Bethany, referred to as "Dr. D," had specific expertise in the evaluation of Russian children for the purposes of adoption and that Dr. D regularly examined the children in Russia on trips from his home in New York. Ms. Walton stated that Dr. D had examined Roman and that Roman was O.K. The Harshaws learned that the individual referred to as "Dr. D", is Dr. Michael Dubrovsky.

Comp ¶ 31. Relying on Walton's assurances regarding Dr. Dubrovsky's purported regular examination of Roman *et al.*, the Harshaws traveled to the orphanage in Krasnoyarsk, Russia in December 2003, with BCS representatives Aleksandr "Alex" Vladimirovich and Yelena Vladimirovna acting as interpreters and guides. They were permitted to see Roman for only about one hour. Noting that Roman looked thin and perhaps ill, the Harshaws asked interpreter Alex if Roman was okay; after consulting orphanage staff, Alex told the Harshaws that Roman had had bronchitis. The Harshaws asked for more information about Roman and his mother's social and medical background, but Alex said none was available. They saw Roman for an hour the next day, then returned to America and met again with BCS's Jeannie Walton. *See* Comp ¶¶ 32-38.

When Walton asked how Roman looked and the Harshaws responded that he "appeared as if he might have been sick but otherwise appeared okay", she reassured them that what they saw was common in institutionalized children, and his issues were minor and often resulted from malnutrition and crowded conditions. Walton asked if they wished to proceed, and they said yes. *Id.* ¶¶ 38-40.

The next month, January 2004, the Harshaws returned to Russia to attend the final adoption hearing. When they took physical custody of Roman at the orphanage, they asked if there were any more medical records regarding Roman or his mother and were told there were none, and BCS never provided any additional medical information from then until after the adoption. *See* Comp ¶¶ 41-44.

After the Krasnoyarsk Regional Court entered an Order of Adoption on January 27, 2004, the Harshaws took Roman home to America, where they soon noticed that he was not developing and acting normally for his age and reported health. They spent about a year and a half taking Roman to physicians and mental-health professionals to figure out what might be wrong, leading to a January 2006 examination by neurodevelopmental pediatrician Dr. Frank Aiello III, M.D., who suggested Roman might be suffering from fetal alcohol syndrome and ordered more testing. *See* Comp ¶¶ 45-49. Following three days of examination and tests in June 2006, Dr. Ronald S. Federici, Psy.D., clinical director of a "neuropsychological and family therapy" clinic in Virginia, who diagnosed Roman with an alcohol/drug-related birth defect, identified as a fetal alcohol spectrum disorder causing neurocognitive and psychiatric abnormalities. *See* Comp ¶¶ 50-51.

The Harshaws allege that throughout the 24 months following the January 2004 adoption, they expressed concerns to BCS's social worker, during post-placement visits, about Roman's medical, emotional and psychological condition and behavior. The BCS social worker responded that Roman's problems were frequently associated with being institutionalized and that children

adopted from such settings could "grow out of" the problems with a loving family.  *See* Comp ¶ 59.

At an unspecified time in or after June 2006 (when Dr. Federici examined Roman), the Harshaws informed BCS of Federici's diagnosis and asked for more medical information, which BCS stated would be difficult to retrieve.  *See* Comp ¶¶ 52-53.  After the Harshaws repeated their requests, in October 2006 BCS provided two items which they had not previously provided:  a ten-page Russian-language extract of Roman's medical records and history, and a six-page English translation.  *See* Comp ¶¶ 54-55 and Ex F.  The Harshaws allege that BCS either had these two documents in its possession all along (i.e., before the adoption was completed) or could and should have obtained them for review, translation and delivery to the Harshaws before they made their decision whether to adopt Roman.  *Id.* ¶¶ 56-57.  The Harshaws allege that they relied on BCS to provide all information reasonably available to it and if BCS had done so, they would not have pursued Roman's adoption.  *Id.* ¶¶ 58 and 64-66.  They also state that if BCS had provided complete, accurate medical information and appropriate post-placement assistance, they could have diagnosed Roman's condition earlier and started providing more-appropriate treatment earlier.  *Id.* ¶ 67.

The Harshaws assert three claims on their own behalf:

| | | |
|---|---|---|
| Count 1 | Fraud / intentional misrepresentation | (Comp ¶¶ 68-83) |
| Count 2 | Negligent misrepresentation | (Comp ¶¶ 84-94) |
| Count 3 | Negligent failure to disclose | (Comp ¶¶ 95-99) |

They assert one claim on behalf of Roman, who is still a minor:  count four, negligence  (Comp ¶¶ 100-104).  They allege that after Roman's adoption, BCS admitted it had "misinformed" the Harshaws by providing "unclear" medical information during the adoption process, and that Dr. Dubrovsky never examined Roman as it had represented.  *Id.* ¶¶ 60-61.  On each count, the Harshaws seek $75,000 in compensatory damages plus punitive damages, interest, and attorneys'

fees, and demand a jury trial. *Id.* at 15-19 (prayers for relief).

The Harshaws filed the instant complaint in January 2008, and the defendants answered in April 2008. *See* Docs. 1, 6 & 8. From October 2008 through June 2009, the parties conducted discovery and the Magistrate resolved discovery disputes, *see* Docs. 17-78. In September 2009, the Harshaws filed a motion to compel production of documents requested in their second and third sets of requests for production, BCS filed an opposition brief, and pursuant to 28 U.S.C. § 636(b)(1)(A) the matter was referred to the Magistrate, who held a hearing and granted in part the Harshaws' motion to compel. *See* Docs. 112, 113, 125 & 128. On October 21, 2009, the Harshaws served the reports of experts Julian Davies M.D., and Andro Zangaladze, M.D., Ph.D., *see* Docs. 135-136.

In September 2009, BCS filed a motion to dismiss or for summary judgment on counts one, two and three – the parents' common-law claims for fraud/intentional misrepresentation, negligent misrepresentation, and negligent failure to disclose – on the ground that they are barred by the statute of limitations in Michigan and Virginia. This court denied BCS's unjustifiably late request for leave to amend their answer to assert the defense that counts 1-3 are barred by statutes of limitation, determining that BCS did not show good cause for failing to move for leave to amend before the deadline which the CMSO imposed. In January 2010, this court denied the defendants' motion for reconsideration as untimely and meritless. *See Harshaw v. Bethany Christian Servs., Inc.*, No. 1:08-cv-104 Doc. 179, 2009 WL 5149925 (W.D. Mich. Dec. 15, 2009) (Maloney, C.J.) ("*Harshaw 2*"), *recon. denied*, Doc. 205, 2010 WL 331708 (W.D. Mich. Jan. 22, 2010) ("*Harshaw 3*").

On October 1, 2009, BCS moved to dismiss for failure to state a claim and/or for summary judgment on the *merits* of all four claims, urging application of Virginia substantive law; the

Harshaws filed an opposition, and BCS replied. *See* Docs. 130-31, 138 & 166. The Harshaws cross-moved for summary judgment on the *merits* of claims2-4, urging application of Michigan substantive law; BCS filed an opposition, and the Harshaws replied. *See* Docs. 132-33, 139 and 166.

## FEDERAL COURT'S INTERPRETATION OF STATE LAW

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, 602 F. Supp.2d 829, *14 (W.D. Mich. 2008) (Maloney, J.) ("*ARS*") (quoting *NUFIC v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Griffin, J.) (cite omitted)). If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to decisions of the state's appellate courts: "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'" *ARS*, 602 F. Supp.2d at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007))); *see also West v. AT&T Co.*, 311 U.S. 223, 236-37 (1940) ("A state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. [T]he federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court . . . ."), *followed by Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993) and *Dairy, Bakery & Food Workers Local Union Local Union No. 386 v. Grand Rapids Milk Div.*, 160 F. Supp. 34, 39 (W.D. Mich. 1958).

In determining the controlling law of the State, a federal court also "*may* give weight" to the

decisions of a State trial court, *Lakeland Reg. Health Sys. v. Walgreens Health Initiatives, Inc.*, 604 F. Supp.2d 983, 989 (W.D. Mich. 2009) (Maloney, C.J.) (citing *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975)), especially when it is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605. But the federal court is not *obligated* to follow state trial-court decisions. *See Krakoff v. US*, 431 F.2d 847, 849 (6th Cir. 1970) ("a federal court is not bound by the decision of state lower court where there has been no determination of a question of state law by the state's highest court.") (citing *CIR v. Bosch*, 387 U.S. 456 (1967)); *see also Gray v. Green Tokai Co., Ltd.*, 2007 WL 1026425, *3 (S.D. Ohio Mar. 30, 2007) ("Lower state court decisions are not binding on federal courts seeking to decide an issue of state law if the federal court is convinced that the highest state court would decide otherwise.") (citing *Woods v . Vermillion Local Sch. Dist.*, 1999 WL 652019, *2 (N.D. Ohio Aug. 9, 1999)) (other citations and internal quotation marks omitted).[4]

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts. *See ARS*, 602 F. Supp.2d at – (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")). If a state court would not be bound by a particular state-court decision, then neither is this court. *ARS*, 602

---

[4]

*Accord Am. Int'l Ins. Co. of P.R. v. Lampe GmbH*, 307 F. App'x 645, 647 (3d Cir. 2009) (citing *Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 199 (3d Cir. 2004)).

F. Supp.2d at – (citing *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis." This subsection makes no distinction based on when the decision was issued.. *ARS*, 602 F. Supp.2d at –. However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule." *ARS*, 602 F. Supp.2d at – (emphasis added).

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued. *ARS*, 602 F. Supp.2d at –. When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails. *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue. *ARS*, 602 F. Supp.2d at – (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *ARS*, 602 F. Supp.2d at – (citing *Iqbal v.*

*Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing MICH. CT. R. 7.215(J)(1))). Nonetheless, this court may consider and follow unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals. *See Republic-Franklin Ins. Co. v. Bosse*, No. 95-3401, 89 F.3d 835, 1996 WL 301722, *5 n.4 (6ᵗʰ Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

Finally, a federal court's interpretation of state law is not binding. *ARS*, 602 F. Supp.2d at – (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")); *accord McGrath v. Toys 'R Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) (citing *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996)); 20 AM. JUR.2D COURTS § 225 (1965). As our Circuit recently emphasized,

> No federal court has the final say on what [state] law means. Even the decision of the highest federal court, the United States Supreme Court, about the meaning of [a state] law has no more binding authority on the [state] Supreme Court than the decision of [another State's] Supreme Court or for that matter any other court.

*Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 472 (6ᵗʰ Cir. 2008).

Accordingly, this court will seriously consider our Circuit's interpretation of state law, or another district court's interpretation of state law, but is not bound by it. *See ARS*, 602 F. Supp.2d at –; *see also Pack v. Damon Corp.*, 2006 WL 1156489, *1 (E.D. Mich. May 1, 2006) ("Michigan

courts, in turn, are not bound by the Sixth Circuit's interpretation of Michigan law."). *See, e.g.,*

*MPAS v. Michigan DOC*, 581 F. Supp.2d 847, 856 (W.D. Mich. 2008) (Maloney, C.J.) (declining

to follow U.S. District Court for the Eastern District of Michigan's determination that MDOC is a

political subdivision of the State of Michigan, a matter of state law).

## DISCUSSION:
## CHOICE OF LAW

The court determines that Michigan choice-of-law precedents call for application of Virginia

substantive law. "Because this is a diversity action, the law of the forum State, including the choice-

of-law rules, apply." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v.*

*Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). "Generally speaking, a tort claim filed in

a Michigan court will be governed by Michigan law 'unless a rational reason exists to displace it.'"

*Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425 (6th Cir. 2009) (citing *Watkins & Son Pet*

*Supplies v. Iams Co.*, 254 F.3d 607, 611 (6th Cir. 2001) (quoting *Olmstead v. Anderson*, 428 Mich.

1, 400 N.W.2d 292, 303 (Mich. 1987))). More precisely, "Michigan choice of law principles

provide that Michigan law applies absent a rational reason – *such as another State's interest* – to

apply other law." *Daimler-Chrysler Servs. North America, LLC v. Summit Nat'l, Inc.*, 289 F. App'x

916, 921 (6th Cir. 2008) (citing *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 562

N.W.2d 466, 471 (Mich. 1997)) (emphasis added), *cert. denied*, – U.S. –, 129 S.Ct. 2009 (2009).[5]

"Michigan choice of law provisions favor allowing Michigan residents to bring suit in

---

[5]

For Michigan's choice-of-law rule governing *contract* claims, *see Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008) and *Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 71, 704-705 (6th Cir. 2002) (discussing *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 528 N.W.2d 698 (Mich. 1995) and RESTATEMENT 2D OF CONFLICT OF LAWS §§ 6 and 188).

Michigan courts under Michigan law", *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425 (6th Cir. 2009) (citation omitted), and our Circuit has recognized a State's interest in "protecting its residents from injury and providing just compensation to its citizens" as a legitimate, relevant interest in a choice-of-law analysis. *See Williams v. Toys 'R' Us*, 138 F. App'x 798, 803 (6th Cir. 2005) ("Pennsylvania may have an interest in having its law applied because the accident occurred there. Pennsylvania's interest, however, does not outweigh Michigan's competing interest in protecting its residents from injury and" providing just compensation to its citizen, like Williams); *Imaging Fin. Servs., Inc. v. Lettergraphics Detroit, Inc*., No. 97-1930, 178 F.3d 1294, 1999 WL 115473, *3 (6th Cir. Feb. 9, 1999) (Boggs, Siler, <u>Moore</u>) ("Although there may be a reason to displace Michigan law on the contract claims (i.e., a choice of law provision in the contract itself), there is no reason to displace it on the tort claim here. The alleged injury occurred in Michigan to a Michigan company.").

By contrast, when the plaintiff is not a Michigan resident, these interests are absent and the analysis is no longer so strongly presumptively tilted in favor of applying the forum State's substantive law. *See, e.g., Ruffin-Steinbeck v. dePasse*, 267 F.3d 457 F.3d 463-64 (6th Cir. 2001) (because plaintiff was a Mississippi resident when she filed the complaint and a Mississippi or Alabama resident when she died, "[t]he district court did not err in determining that Michigan law did not apply to her cause of action, and under Mississippi law, Earline Ruffin's defamation claim was properly dismissed.").

To determine whether there is a rational reason to displace Michigan law, the court undertakes a two-step analysis. First, the court determines whether any foreign State has an interest in having its law applied: "if no State has such an interest the presumption that Michigan law

applies cannot be overcome . . . ." *Miller v. Airborne Express, Inc.* , 2008 WL 2782921, *3 (E.D. Mich. July 17, 2008) (Steeh, J.) (citing *Sutherland*, 454 Mich. at 286, 562 N.W.2d 466) (citing *Olmstead v. Anderson*, 428 Mich. 1, 24, 29-30, 400 N.W.2d 292 (Mich. 1987))).  Second, if a foreign State does have an interest in having its substantive law applied, the court must determine whether Michigan's interests mandate that its law be applied despite the foreign State's competing interests.  *See Sutherland*, 454 Mich. at 286, 562 N.W.2d 466 (citing *Olmstead*, 428 Mich. at 24, 29-30, 400 N.W.2d 292); *see also Hall v. GMC*, 229 Mich. App. 580,587, 582 N.W.2d 866 (Mich. App. 1998) (describing this "interest analysis").

Here the State of Virginia clearly has a strong interest in having its substantive law applied: the aforementioned interest in protecting its citizens and, where necessary, helping them obtain just monetary compensation and other judicial relief for damages unlawfully.  Therefore, the court must consider whether the Michigan appellate courts would consider Virginia's interest in having its substantive law applied to its citizens' claims to be greater than Michigan's interest in having its substantive law applied to these non-residents' claims against its corporate domiciliaries.

Michigan precedent suggests that the Michigan Supreme Court would apply Virginia law here.  While residing in Virginia, the Harshaws reviewed, signed, and submitted their BCS international adoption agreements in Virginia, to an adoption agency licensed and registered as such in Virginia (Bethany Christian Services - Hampton Roads).  *See* Defendants' Brief in Support of their Motion to Declare that Virginia Law Governs ("Def's Choice-of-Law Br"), Ex A (Virginia registration / licensure of BCS-HR); *see generally* VA. CODE ANN. §§ 63.2-1817 through 63.2-1821.

The office presentation and face-to-face discussions before the Harshaws entered this contract took place in Virginia, as did the communication and contact between the parties for the

family adoption assessment (conducted by BCS-*Hampton Roads* social worker Jeanne Walton).

When the Harshaws brought Roman into the United States from Russia, the three of them entered

into Virginia; so far as the record reflects, the Harshaws and their son remain residents of Virginia.

They executed a contract which expressly recited that

> We understand that Bethany is a licensed child placement agency in the State of
> **Virginia**, and will perform the services set forth above in accordance with the terms
> of this Agreement *and the laws and regulations governing adoption in this State.*

Defs' Choice-of-Law Br, Ex B (July 14, 2003 Agreement) (underlining and boldface on the word

"Virginia" in original contract) (italics added by defendants). The Harshaws, however, respond that

the defendants' choice-of-law attachment B is not the adoption agreement but merely a contract for

BCS-HR to conduct a home assessment of the Harshaws in connection with the preadoption family

assessment. *See* Def's Summary of Opp to Choice-of-Law Motion (Doc 205) at 2 ¶ 2.

Even the Russian court which approved the adoption took care to note that there was no

impediment to adoption "[u]nder the laws of Virginia." *See* Defs' Choice-of-Law Br, Ex C (English

translation of Order of Krasnoyarsk Regional Court issued Jan. 27, 2004). Several months after the

Harshaws brought Roman to live with them, they petitioned the circuit court for the City of Virginia

Beach, Virginia for his adoption, *id.* Ex D. That court transmitted an order of reference to the

Virginia Department of Social Services, *id.* Ex E, which received a January 2005 Report of

Investigation from BCS-Hampton Roads regarding the Harshaws and their adoption of Roman in

Russia, *id.* Ex F, leading the Virginia court to approve the adoption in February 2008, *id.* Ex G.

And significantly, the Harshaws' complaint does not seem to allege that any tortious conduct

was committed in Michigan. *Contrast Inland Waters Pollution Control Inc v. Jigawon, Inc.*, 2008

WL 205209, *7-8 (E.D. Mich. Jan. 22, 2008) (Lawson, J.) ("The defendants suggest that Texas law

should apply to the claims of fraud . . . because they are citizens of Texas and that is where the tort took place. Neither of these reasons constitute[s] sufficient interest by a foreign state in having its law apply. [A]t least some of the tortious activity occurred in Michigan . . . ."), *recon. denied*, 2008 WL 373430 (E.D. Mich. Feb. 12, 2008).

In all, our case presents a compelling rationale for application of Virginia law: this was a contractual relationship which began in Virginia, with a Virginia corporation (BCS-Hampton Roads) playing at least an important role (BCS-Hampton Roads), and the damages inflicted, if any, have been (and are being) suffered by the Harshaws and Roman in Virginia, where they continue to reside. *See, e.g., Radeljak v. Daimlerchrysler Corp.*, 475 Mich. 598, 610-11, 719 N.W.2d 40 (Mich. 2006) (holding that Croatian law would apply to a tort claim where the injury occurred in Croatia and the plaintiffs were residents and citizens of Croatia); *Hernandez v. Ford Motor Co.*, 280 Mich. App. 545, 567-68, 760 N.W.2d 751 (Mich. App. 2008); *Munic. High Income Fund, Inc. v. Goldman, Sachs & Co.*, No. 264224, 2006 WL 361149, *2-3 (Mich. App. Feb. 16, 2006) ("An injury state always has an interest in the conduct within its borders . . . .") (New York substantive law applied because the alleged misrepresentations and the resultant injury both occurred there); *accord German Free State of Bavaria v. Toyobo Co., Ltd.*, 480 F. Supp.2d 948, 957 (W.D. Mich. 2007) (Enslen, Sr. J.) ("'The place of the wrong will never be dispositive in a given case, but it remains a factor to be considered in weighing the interests of the involved states . . . [however], the plaintiff's residence is a paramount consideration in determining which state's law to apply in a [Michigan] tort case.'") (quoting *Olmstead*, 428 Mich. at 24, 400 N.W.2d 292 (citing *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 328, 343 N.W.2d 164 (Mich. 1984))); *Drooger v. Carlisle Tire & Wheel Co.*, 2006 WL 1008719, *2 (W.D. Mich. Apr. 18, 2006) (Enslen, Sr. J.) ("Defendant's only interest in having its home state's

law apply . . . is that Defendant is a South Carolina resident.  Mere corporate citizenship is not a weighty enough interest to tip the scales in Michigan's choice-of-law analysis.").

**Accordingly, this court finds that a Michigan appeals court would apply Virginia substantive law to the Harshaws' claims, obligating this court to do so as well.**  "Michigan has no interest in affording greater rights of tort recovery to . . . [Virginia] resident[s] than those afforded by" their own State.  *Hall v. GMC*, 229 Mich. App. 580, 585, 582 N.W.2d 866, 868 (Mich. App. 1998) (fact that plaintiff sustained his injury in North Carolina due to a defective auto part and was a NC citizen at the time of that injury, outweighed the fact that plaintiff had moved to Michigan before bringing suit); *see also Farrell v. Ford Motor Co.*, 199 Mich. App. 81, 502 N.W.2d 567 (Mich. App. 1993); *accord LL NJ, Inc. v. NBC-Subsidiary (WCAU-TV), L.P.*, 2008 WL 1923261, *12-13 (E.D. Mich. Apr. 13, 2008) (Lawson, J.) ("These decisions [*Farrell* and *Hall*] leads ineluctably to the conclusion that Michigan's choice-of-law rules favor application of NJ law to the trespass claim.  Michigan has no real interest in this claim or the facts underlying it.  The alleged trespass took place in NJ, and any harm that did occur happened there. [T]he undercover footage was never publicly disclosed.  Moreover, the individuals involved in the undercover operation were citizens of either NJ or PA, not Michigan.  The only interest that Michigan can claim with respect to the trespass count stems from the fact that the plaintiffs . . . are Michigan corporations.  However, as the decisions in *Farrell* and *Hall* make clear, that alone is an insufficient basis on which to apply Michigan law.  Because NJ has a significant interest in having its laws applied, and Michigan's interest is negligible, there is a rational basis to displace Michigan law and apply NJ law in its stead.") (NJ abbreviated) (citing *Farrell*, 199 Mich. App. at 94, 502 N.W.2d 567, & *Hall*, 229 Mich.

App. at 587, 582 N.W.2d 866).[6]

────────────

6

The Harshaws try to evade the Michigan Court of Appeals' decisions in *Hall* and *Farrell* by invoking *Mahne v. Ford Motor Co.*, 900 F.2d 83, 86 (6th Cir. 1990). As the Harshaws explain it,

> In *Mahne*, the Sixth Circuit reviewed Michigan's approach to choice of law, beginning with *Sexton v. Ryder Truck Rental, Inc.*, 413 Mich. 406, 320N.W.2d [sic] (1982), and culminating with *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W.2d 292 (1987). In *Olmstead*, a Minnesota victim and a Michigan defendant were involved in a fatal accident in Wisconsin. Wisconsin law limited the recovery of damages for wrongful death; Minnesota law did not. The Michigan Supreme Court held that Michigan law as the law of the forum applied. According to the Sixth Circuit in *Mahne*, "After formulating a few generalizations from *Sexton*, *lex fori* rather *lex loci* is the presumptive rule of thumb for choice of law issues in tort cases, but that the issue must be decided on a case-by-case basis." [no citation to *Mahne* provided]
>
> * * *
>
> The Sixth Circuit's exposition of Michigan's *lex fori* approach to choice of law in *Mahne*, based on the Michigan Supreme Court's decision in *Olmstead*, was confirmed in . . . *Sutherland* . . . 454 Mich. 274, 286 . . . (Mich. 1997), where that Court stated as follows: "We will apply Michigan law unless a 'rational reason' to do otherwise exists. * * *"
>
> * * *
>
> [I]n *Mahne*, the Sixth Circuit, applying Michigan conflicts law, held that where an accident took place in Florida, severely injuring a Florida resident, in a vehicle designed and manufactured in Michigan by Ford Motor Company, the Florida statute of repose would not be applied and recovery would be allowed under Michigan law. The [Sixth Circuit panel] stated that:
>
>> We think it is very clear from the lengthy discussion in *Olmstead* that the Michigan Supreme Court would hold, in a suit brought in a Michigan court by a party who is not a citizen of Michigan against a Michigan resident, arising out of an accident that occurred outside of Michigan and in the state of the plaintiff's residence, that Michigan law as the law of the forum presumptively controls the litigation; and further, that there must be a rational reason to displace Michigan law. * * " [*Mahne*,] 900 F.2d at 87 (citing *Olmstead*, 428 Mich. at 30.

P's Opp at 12-15 with n. 33 (other footnotes omitted) (citing *Amend v. Bioport, Inc.*, 322 F. Supp.2d 848(W.D. Mich. 2004) (applying *Mahne* to hold that MI law applied where non-residents were injected outside MI with an anthrax vaccine that had been made in MI by a MI corporation).

The Harshaws acknowledge that the Circuit's interpretation of Michigan choice-of-law principles in *Mahne* calls for the opposite result from the Michigan Court of Appeals's published

decisions in *Hall* and *Farrell*.  The Harshaws accurately states that BCS relies on *Hall*, which

> "held that a foreign state had a greater interest in the application of its law where the plaintiff resided in the foreign state, the injury occurred there, and the plaintiff's claim would have been barred if litigated in the foreign state."
>
> *Hall* was based on the Michigan Court of Appeals's earlier decision in *Farrell* . . . (1993).  *Farrell* was a complete replay of *Mahne* . . . .  In *Farrell*, a NC resident was killed there when a Ford vehicle manufactured and designed in Michigan rolled from neutral to reverse and backed over her.  NC had a statute of repose; Michigan did not.  Although, as in *Mahne*, Ford did not conduct any manufacturing activities in NC, the Michigan Court of Appeals flatly disagreed with the Sixth Circuit in *Mahne*, and held that NC did have an interest in protecting Ford and that NC's interest was greater than Michigan's interest.
>
> *Hall* involved the identical situation as *Farrell* and *Mahne*, and the Court of Appeals held that the result was controlled by *Farrell*.  As the Sixth Circuit made clear in *Mahne*, Michigan follows a *lex fori* approach, not a "greater interest" approach.  Under the *lex fori* approach, Michigan law presumptively applies . . . .
>
> * * *
>
> [T]he court in *Mahne* strongly rejected the view of the Michigan Court of Appeals that Michigan law does not apply whenever the plaintiff resides in a foreign state, the injury occurred there, and the claim is barred by the law of that state.

P's Opp at 17.  The Harshaws go on to say that "[f]or federal courts sitting in Michigan, *Mahne* is controlling in its analysis and application of Michigan choice of law . . . ."  P's Opp at 15.  That is precisely the *opposite* of the law.  This court's task is only to consider how the Michigan Supreme Court would likely rule in the matter.  An interpretation of state law by a federal court – even a Court of Appeals – has no bearing on that question.  As our Circuit acknowledged, "No federal court has the final say on what [state] law means.  Even the decision of the highest federal court, the United States Supreme Court, about the meaning of [a state] law has no more binding authority on the [state] Supreme Court than the decision of [another State's] Supreme Court or for that matter any other court."  *Ohio v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008); *see also Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1042 (6th Cir. 1992) ("the district court's reliance on federal cases interpreting Ohio law is only correct if those cases accurately reflect the law of Ohio"); *Wilkie v. Schwan's Sales Enters., Inc.*, 541 F. Supp. 1193, 1197 (W.D. Mich. 1982) (Enslen, J.) ("It is well settled that a district court is bound in a diversity case to follow published decisions of intermediate state appellate courts in the absence of any opinion of the highest satate court, unless it is convinced by persuasive data that the highest state court would rule otherwise.") (citing, *inter alia*, *Ruth v. Bituminous Cas. Corp.* 427 F.2d 290 (6th Cir. 1970)), *aff'd*, 720 F.2d 680 (6th Cir. 1983).

To the extent that *Mahne*'s interpretation of Michigan choice-of-law is inconsistent with the

The Harshaws contend that even if the court finds that the tort claims themselves are governed by Virginia law, the question of whether these defendants are alter egos of non-party BCS-Hampton Roads is governed by Michigan law because, *inter alia*, they are Michigan corporations. The court disagrees. The *alter ego* question is pertinent here only for two purposes, both inextricably intertwined with *tort* causes of action: (1) to dictate the survival or dismissal of *tort* claims and (2) in the event the factfinder finds liability, to adjudicate any claims for contribution or indemnification between these defendants and their alter ego. Absent Michigan choice-of-law precedent to the contrary, the court determines that the context in which the alter ego issue is raised, and the fundamental tort nature of the dispute as a whole and each of the claims, Virginia law should govern the alter ego issue as it would govern the merits of the claims whose survival hang on its resolution.

## DISCUSSION:
## ISSUE COMMON TO ALL 4 COUNTS

BCS contends that the entire complaint should be dismissed pursuant to Rule 12(b)(6) because the Harshaws allege only that BCS-Hampton Roads committed wrongdoing, not BCSI or BCS, and BCS-Hampton Roads is no longer a party. For example, the alleged misrepresentations in the complaint were made by BCS-HR employee Jeanette Walton. BCS states that "neither

---

Michigan Court of Appeals's published decisions in *Hall* and *Farrell*, this court must follow the latter. After the Michigan Supreme Court's decisions, the precedential decisions of the State's Court of Appeals are the next-best legitimate and relevant predictor of how the Supreme Court would likely rule – not the decisions of a federal court. *Accord Milburn v. GMC*, 958 F. Supp. 318, 320-21 (E.D. Mich. 1997) (Cook, J.) (noting direct conflict between *Mahne* and *Farrell*, and following Michigan Court of Appeals instead of Sixth Circuit; where NC resident died in automobile accident in NC and brought products-liability claims against the Michigan-based automobile manufacturer, Michigan choice-of-law rules called for application of NC law).

William nor Julie Harshaw identified a single misrepresentation by BCS or BCSI through nearly twenty hours of deposition testimony." BCS's M.D. at 22.

Unless the Harshaws establish that BCS or BCSI is an alter ego of BCS-Hampton Roads, it may be appropriate to dismiss the entire complaint. If BCS-Hampton Roads is not an alter ego of these defendants, then a judgment issued in this case ostensibly could not bind BCS-Hampton Roads in any event. *See Mardula v. Mendelson*, 34 Va. App. 120, 127, 538 S.E.2d 338, 342 (Va. App. 2000) ("[W]e hold that the court's finding, in the show cause order of July 20, 1999, that White Star was the 'alter ego' of Fox is also void and, therefore, insufficient as a basis for holding [White Star counsel and agent] Mardula in contempt for failing to transfer Interlase assets to the Special Receiver.") (citing *Zenith*, 395 U.S. at 111 . . . ("Perhaps Zenith could have proved and the trial court might have found that [subsidiary and parent] were alter egos; but absent jurisdiction over [the parent], that determination would bind only [the subsidiary].")).

**BCS and BCSI contend that they are not alter egos of BCS-HR under Virginia law.** In *Sure v. Norfolk Shipbuilding & Drydock*, 263 Va. 624, 561 S.E.2d 663 (Va. 2002), the Supreme Court set forth Virginia's standard for determining whether a parent corporation (such as BCS or BCSI) may be held liable for the acts of a subsidiary or affiliate (such as non-party BCS-HR):

In *Beale v. Kappa Alpha Order*, 192 Va. at 396-97, 64 S.E.2d at 797, we stated that:

> "Before the corporate entity may be properly disregarded and the parent corporation held liable for the acts of its subsidiary . . . it must be shown not only that undue domination and control was exercised by the parent corporation over the subsidiary,[7] but also that this

---

[7]

Virginia courts may be reluctant to find that one corporation unduly dominated and controlled another for this purpose. *See, e.g., Kirkpatrick v. First American Title Ins. Co.*, Law Nos.

control was exercised in such a manner as to defraud and wrong the complainant, and that unjust loss or injury will be suffered by the complainant as the result of such domination unless the parent corporation be held liable."

[quoting *Gledhill v. Fisher & Co.*, 272 Mich. 353, 262 N.W.2d 371 (Mich. 1935)].

The separate corporate entities of corporations will be observed by the courts unless a corporation is shown to be the "adjunct, creature, instrumentality, device, stooge, or dummy of another corporation. *Id.* at 399, 64 S.E.2d at 798. Generally, courts will observe the separate corporate entity, even though one corporation "may dominate or control another, or may treat it as a mere department [or] instrumentality . . . and courts will disregard the separate legal identities of the corporation only when one is used to defeat public convenience, justify wrongs, protect fraud or crime of the other." *Id.* (citation omitted). * * *

*Eure*, 263 Va. at 634, 561 S.E.2d at 669; *see also Barnett v. Kite*, 271 Va. 65, 70, 624 S.E.2d 52, 55 (Va. 2006) (a corporation is entirely separate and distinct from the shareholders or members who own or compose it, and "[t]his principle is applicable even when the corporation is owned totally by a single person, unless the corporation is held to be the alter ego, alias, stooge, or dummy of the [owner].") (citing *O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 115, 431 S.E.2d 318, 320-21 (Va. 1993) and *Cheatle*, 234 Va. at 212, 360 S.E.2d at 831); *Washington & Old Dominion Users Ass'n v. Washington & Old Dominion R.R.*, 208 Va. 1, 6, 155 S.E.2d 322, 326 (Va. 1967).

"'No single rule or criterion . . . can be applied to determine whether piercing the corporate veil was justified.'" *Greenberg v. Commonwealth*, 255 Va. 594, 604, 499 S.E.2d 266, 272 (Va. 1998) (quoting *O'Hazza*, 246 Va. at 115, 431 S.E.2d at 320). But, "applying the first prong of the *Cheatle* test" for corporate alter ego status, the "factors courts have used . . . include failure to

_____

59820 and 61548, 16 Va. Cir. 534,1985 WL 306765, *2 (Va. Cir. Ct. Fairfax Cty. Feb. 25, 1985) (F. Bruce Bach, Cir. J.) ("Although the plaintiffs allege that all decisions regarding funding were controlled by Community Federal, this allegation does not show undue domination of United Mortgage by Community Federal, nor does it demonstrate any wrongful by Community Federal.").

observe corporate formalities, non-payment of dividends, non-functioning of other officers or directors, [and] absence of corporate records . . . ." *City of Virginia Beach v. Nala Corp.*, 53 Va. Cir. 309, 2000 WL 33340689, *19 (Va. Cir. Ct. City of Norfolk, Sept. 29, 2000) (Charles E. Poston, Cir. J.) (citing *DeWitt Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685-87 (4th Cir. 1976)).

The earlier Virginia Supreme Court decision in *Beale* emphasized that before the court may conclude that a corporation should be liable for another corporation's acts as its *alter ego*, "it is not enough that the subsidiary is so organized and controlled as to make it 'merely an instrumentality, conduit or adjunct' of its [parent corporation]. It must further appear that to recognize their separate entities would aid in the consummation of a wrong." *Beale*, 192 Va. at 397, 64 S.E.2d at 797 (citing Ballantine, 60 A.L.R. 19).

To illustrate the stringency of Virginia's standard for an *alter ego* finding, BCS rightly point to *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 360 S.E.2d 828 (Va. 1987). The court is further guided by the Virginia Supreme Court's declaration that "[w]e have consistently held . . . that only an 'extraordinary exception' justifies disregarding the corporate entity and piercing the veil." *C.F. Trust, Inc. v. First Flight, L.P.*, 266 Va. 3, 10, 580 S.E.2d 806, 810 (Va. 2003) (citing, *inter alia*, *Greenberg v. Commonwealth,* 255 Va. 594, 604, 499 S.E.2d 266, 272 (Va. 1998)). *See also Wood-Dale, Inc. v. R.E. Lee & Son, Inc.*, 35 Va. Cir. 121, 1994 WL 1031402, *2 (Va. Cir. Ct. Spotsylvania Cty. Oct. 28, 1994) (Ledbetter, Cir. J.) ("If a subsidiary is duly incorporated and is functioning in a corporate capacity, it would appear that the *Beale* test for piercing the subsidiary's corporate veil in order to hold the parent corporation liable for the subsidiary's contracts or torts is rather difficult to meet."); *see, e.g., Wigand v. Wilkes*, 65 Va. 437, 2004 WL 1939074, *2 (Va. Cir. Ct., City of Norfolk, Sept. 1, 2004) (Leafe, Cir. J.) (determining that Hampton Roads Educational

Televisions Associations, Inc., a non-profit, non-stock Virginia corporation which was incorporated and given its initial funding by several government-school districts, was not the alter ego of those districts because it had a separate Board of Directors which held regular meetings, had separate bank accounts and did not co-mingle funds, had only a "small minority" of its Board seats filled by representatives of participating school "divisions", did not perform governmental functions for those school divisions and set no policies for those divisions).

**As to Virginia's first element of *alter ego* liability,** BCS argues that BCS-HR is not a mere instrumentality of BCS or BCSI because

> [i]t has its own Board of Directors, controls and is responsible for its own budget, and is responsible for the hiring and termination of its own employees. *See* Elseroad Dep. at 29, 52-53 (Ex. A). Karen Elseroad, BCSHR's director, does not report to anyone at BCS; rather, she reports only to the Board of Directors of BCSHR. *See id.* To take advantage of economies of scale, BCS does provide BCSHR (along with the rest of its subsidiaries) with accounting and human-resources support, but BCSHR pays BCS for these services, just as it pays every other service provider. *See id.* at 46.

MTD at 24. **As to Virginia's second element of *alter ego* liability, BCS argues that**

> there is no evidence that BCSHR was operated in a manner to defraud Plaintiffs, or that Plaintiffs would suffer unjust loss unless BCS were held liable. Plaintiffs could have maintained their action against BCSHR and could have obtained the same relief it seeks here if they had filed their action in state court. They simply chose not to. Caught in the awkward position where the only entity against whom they have alleged wrongdoing is not a party to the action, Plaintiffs cannot fix this dilemma by relying upon an alter ego theory.

> Additionally, Plaintiffs would not suffer any unjust loss if BCS were not held liable for BCSHR's alleged misrepresentations [and negligent non-disclosures]. As Plaintiffs are aware, BCSHR is covered by the same insurance policy that covers BCS. Thus, Plaintiff could have maintained an action against BCSHR and obtained the same relief it seeks here.

MTD at 24. **The Harshaws respond that BCS misstates the very essence of this litigation**:

> "Plaintiffs argue that only BCSHR engaged in wrongdoing, and that [the rest of

-26-

Bethany] are liable on a alter ego theory."

> Plaintiffs have asserted from the very beginning of this litigation that Bethany held itself out to the Harshaws as one entity. Furthermore, discovery in this matter has revealed significant wrongdoing by the Bethany nerve center office in Grand Rapids, Michigan, including but not limited to [that office's] being the origin of all of the major material misrepresentations to the Harshaws.

P's Opp at 19. Plaintiff's summary-judgment opposition brief, however, does not attempt to analyze

Virginia case law or marshal specific, organized evidence to show that BCS-Hampton Roads is the

alter ego of defendants BCS and/or BCSI. **BCS replies that** the Harshaws' approach to establishing

that BCS-HR is an alter ego of these defendants

> is to cite a series of facts, none of which individually or collectively support the conclusion. For instance, Plaintiffs note that BCSHR and BCS are both incorporated in Michigan, which proves nothing about undue dominion or control. They also note that monies BCSHR receives are sent to Michigan, and that paychecks for BCSHR employees are processed in Michigan. BCS does provide BCSHR (and the rest of its subsidiaries) with accounting and human-resources support, but BCSHR pays for these services, just like any other service provider. *See* Karen Elseroad Dep., Ex. A to Dkt 131.

> [footnote 9: Plaintiffs' other contentions also miss the mark because they have nothing to do with a parent entity exercising undue dominion or control over a subsidiary. They are also false. For example, some but not all of BCSHR's marketing materials and training programs are created and designed in Michigan. Ms. Elseroad has prepared marketing and training materials for BCSHR. Elseroad Dep. at 72-73, Exhibit G. And any marketing or training materials created in Michigan for BCSHR are paid for by BCSHR. *Id.* Nor was Plaintiffs' adoption application sent to Michigan for approval; rather, because Plaintiffs sought to adopt a child internationally, their application was sent to BCSI to determine whether it revealed any automatically disqualifying details. *Id.* at 76-80. Nor did any referrals of international children come from Michigan. As was explained to Plaintiffs, referrals come from the child's home country. The referral is sent to BCSI, which then forwards it on to BCSHR – the referral goes through Michigan, but it does not come from Michigan.]

> Plainly, Plaintiffs cannot establish that BCSHR is now, or ever was, a stooge or mere instrumentality [of BCS or BCSI].

> Lastly, Plaintiffs' alter ego theory fails because BCSHR was not operated in a

manner to defraud Plaintiffs, and Plaintiffs will not suffer unjust loss by having to proceed against BCSHR directly. Plaintiffs voluntarily dismissed their action against BCSHR for tactical reasons. Caught in the awkward position where the only entity against whom they have alleged wrongdoing is not a party to the action, Plaintiffs cannot use an alter ego theory as a panacea.

BCS Reply at 9-10 with n.9 (paragraph break added, footnote 10 omitted).

**BCS's reply brief also returns to its argument that the complaint simply fails to allege any specific wrongdoing by BCS and BCSI:**

> Plaintiffs allege wrongdoing by BCSHR staff and nobody else, and BCSHR is no longer a party. Realizing their predicament, Plaintiffs now baldly assert that "all facts relating to the fraud and negligent misrepresentations [sic] claims took place in Michigan." *See* [P's Opp] at 19. Plaintiffs fail to cite anything in the record to support this new assertion; worse yet, they make the opposite assertion on the immediately preceding page of their brief:
>
> •  Page 18: "[I]t is undisputed that the actions relied on by the Harshaws to impose liability against Bethany took place in **Virginia**."
>
> •  Page 19: "All facts relating to the . . . misrepresentation claims took place in **Michigan**.
>
> Plaintiffs' bizarre assertions aside, it remains undisputed that everything Plaintiffs complain about allegedly occurred in Virginia [and was done] by staff of BCSHR. The claims against the defendants should be dismissed.

BCS Reply at 8 (boldface in original). BCS Reply at 9-10**.**

In a supplemental brief, then, it is the Harshaws' burden to do one of the following: **(1)** identify specific allegations in their complaint of actionable wrongdoing by at least one of these defendants or their officers, agents, or employees, **or (2)** prove that defendant BCS and/or defendant BCSI is the *alter ego* of non-party BCS-HR so as to give this court the authority (under Virginia

law)[8] to hold BCS and/or BCSI potentially liable for the alleged wrongdoing of BCS-Hampton Roads.

If the Harshaws fail to file this brief or it fails to make one of these two showings, the court may dismiss their entire complaint for failure to state a claim on which relief can be granted.

But if the Harshaws either identify allegations in their complaint that BCS and/or BCSI committed actionable wrong of the sorts described in counts 1-4, or show that they can be held liable as alter egos for BCS-Hampton Roads' alleged wrongdoing, the court would reject that basis for dismissal and move on to the other grounds asserted for dismissal, and finally to the fact-based battle

---

[8]

Any suggestion by the plaintiffs that the substantive tort laws of Michigan and Virginia are not meaningfully different as to their claims – i.e., that there is a "false conflict" of laws here – is belied by the effort they have devoted to avoiding the application of Virginia law (first the Virginia limitations periods and now Virginia's substantive tort law). If the plaintiffs truly believe that there is no meaningful difference between applying Michigan law and Virginia law, the parties should be able to reach agreement stipulating that Virginia law applies.

Moreover, BCS provides examples where Virginia tort law appears to differ meaningfully, perhaps markedly, from Michigan tort law. For one, Virginia adheres to the doctrine of contributory negligence as a bar to recovery, *see Fultz v. Delhaize America, Inc.*, 278 Va. 84, 89-90, 677 S.E.2d 272, 275 (Va. 2009),while Michigan does not. "The doctrine of contributory negligence has been abandoned in Michigan and replaced with a rule of comparative fault." *Jimkoski v. Shupe*, 282 Mich. App. 1, 763 N.W.2d 1, 8 n.3 (Mich. App. 2008) (P.J. Hoekstra, Bandstra, Donofrio) (citing *Placek v. Sterling Heights*, 405 Mich. 638, 650, 275 N.W.2d 511 (Mich. 1979)).

"From 1979 until the tort reforms of 1995, Michigan courts accepted the common-law concept of 'pure comparative negligence.' Under this scheme the plaintiff was entitled to a damages award against a negligent defendant reduced by plaintiff's relative portion of negligence." *Romain v. Frankenmuth Mut. Ins. Co.*, 483 Mich. 18, 32 n.23, 762 N.W.2d 911, 919 n.23 (Mich. 2009) (Young, J., dissenting on other grounds) (citing *Placek*, 405 Mich. 638). "The 1995 tort reform package * * * abolished joint and several liability, imposed damages caps on pain and suffering . . .." *Harbour v. Corr. Med. Servs., Inc.*, 266 Mich. App. 452, 461, 702 N.W.2d 671, 677 (Mich. App. 2005), *app. denied*, 475 Mich. 859 (Mich. 2006). Today in Michigan, "'[d]amages shall be assessed on the basis of cooperative fault, except that damages shall not be assessed in favor a party who is more than 50% at fault.'" *Barton v. Gayer*, 2008 WL 649785, *3 (Mich. App. Mar. 11, 2008) (per curiam) (P.J. Meter, Sawyer, Wilder) (quoting MICH. COMP. LAWS § 3135(2)(b)).

over summary judgment on the merits.

## ORDER

The defendants' motion to declare the applicable law [**doc #207] is GRANTED**.

The court **DECLARES** that Virginia substantive law governs all four tort claims.

**No later than Monday, March 15, 2010, Plaintiffs SHALL FILE a brief which (1)** identifies specific allegations in their complaint of actionable wrongdoing by these defendants or their officers, agents or employees, or concedes that there are no such allegations; **(2)** identifies allegations or contentions in their complaint that defendants BCS and/or BCSI are alter egos of (or a single entity with) non-party BCS-Hampton Roads, or concedes that there are no such allegations or contentions[9]; **and (3)** prove, with citation to evidence, that defendants BCS and/or BCSI are alter egos of non-party BCS-Hampton Roads *under Virginia law*.

**No later than Monday, March 29, 2010, Defendants SHALL FILE** a response brief.

The Court will not entertain further briefing on this issue.

The parties **SHALL** attach all cited items as exhibits rather than citing exhibits attached to previous filings.

The oral argument is **re-scheduled** for Monday, April 19, 2010 at 9:00 AM, at the U.S. Courthouse, 410 West Michigan Avenue, in Kalamazoo, Michigan.

This is <u>not</u> a final and immediately appealable order.

---

[9]

The defendants contend that if the Harshaws wish to pursue an *alter ego* / single-entity theory, "they would have to amend their complaint because their current complaint does not assert such a theory." Defs' Choice-of-Law Reply at 3 n.4. **The plaintiffs' alter ego brief should address this contention.**

**IT IS SO ORDERED** this 25th day of February 2010.[10]

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

---

[10]

Plaintiffs' motion for summary judgment on counts 2, 3 and 4 [# 132] and Defendants' motion to dismiss or for summary judgment [#130] remain pending.

The outcome of the *alter ego* issue may provide an independent basis for dismissal of the complaint without reference to the other arguments advanced in the dispositive motions. *See, e.g., Hamlett v. Virginia Vascular Assocs.*, 61 Va. Cir. 468, 2003 WL 22382792, *4 (Va. Cir. Ct. City of Norfolk, Apr. 21, 2003) (Morrison, J.) (treating claim for "negligent misrepresentation", which Virginia law does not recognize, as claim for constructive fraud and noting, "The pleading for constructive fraud, like actual fraud, must show specifically what the fraud consists of. *Plaintiffs have failed to identify the agents, officers or employees of Medtronic [who] allegedly perpetrated the fraud. * * * Therefore, Defendant's demurrer to [negligent misrepresentation" claim] is sustained*, and it is unnecessary to consider Defendant's other grounds for its demurrer to Plaintiffs' constructive fraud claim.") (emphasis added).