UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

―――――――――――――――――――――――――――――――

| 
WILLIAM G. and JULIE A. HARSHAW, | Case No. 1:08-cv-104
Husband and Wife, individually and as Guardian of |
ROMAN A. HARSHAW, a minor, |
 |
Plaintiffs, |
 |
v. | HONORABLE PAUL L. MALONEY
 |
BETHANY CHRISTIAN SERVICES, |
A Michigan corporation, and |
BETHANY CHRISTIAN SERVICES INT'L, INC., |
a Michigan corporation, |
 |
Defendants. |
 |

―――――――――――――――――――――――――――――――

**OPINION and ORDER**
*" Harshaw 6 "*

**Granting Plaintiffs' Motion to Reinstate BCS-Hampton Roads as a Party Defendant**
(Finding that, under *Hertz* (U.S. 2010), BCS-HR's Principal Place of Business is Michigan)

**Denying Plaintiffs' Motion to Reconsider *Harshaw 5*, 2010 WL 774321 (W.D. Mich. Feb. 25, 2010)**
(Adhering to Determination that Virginia Substantive Law Governs All Claims and Issues)

**Denying Plaintiffs' Motion for Leave to File Late Reply Brief**

**Declining to Decide Whether BCS-HR is *Alter Ego* of BCS and/or BCSI**

**Taking Under Advisement the Parties' Cross-Motions for Summary Judgment on the Merits**


This is a diversity tort case brought by Virginia citizens with respect to a Virginia adoption,

and governed by the substantive law of Virginia. Plaintiffs William and Julie Harshaw ("Harshaw"),

a married couple, adopted their son Roman from a Russian orphanage under the auspices, and with

the services of defendants Bethany Christian Services of Hampton Roads, Bethany Christian

Services and Bethany Christian Services International, Inc., all of whom are Michigan corporations with principal places of business in Grand Rapids, Michigan. The Harshaws proceed individually (counts 1-3) and as Roman's guardians (count 4).

In response to a BCS advertisement, the Harshaws attended an informational meeting at BCS's regional office in Virginia Beach, Virginia on June 12, 2003, and the next day they submitted a preliminary application to adopt through BCS in Russia, China or Guatemala. The application stated that they would accept a child with "very minor medical problems and would not consider a child with moderate to severe medical problems." They submitted an Application for International Adoption to BCS on June 18, 2003 which stated that they were "interested in parenting a child that has a positive prognosis for both mental and physical development." *Id.* ¶¶ 11-15 and Exs A & B.

The Harshaws underwent a pre-adoption family assessment conducted by BCS's regional office in Virginia, during which they signed an International Adoption Services Agreement. Comp ¶¶ 17-18 & Ex C. Relying on BCS's claimed experience and expertise in international adoption, the Harshaws understood that if the assessment was favorable, BCS would act as intermediary and/or fiduciary on their behalf to effectuate an adoption. *Id.* ¶¶ 16 & 19. On August 22, 2003, BCS issued an assessment stating that the Harshaws "feel equipped to parent a child who may have a minor, correctable problem with a good prognosis for normal development." It approved them to adopt a Russian child aged 12 to 36 months who had (at most) a "minor, correctable problem with a good prognosis for normal development." *Id.* ¶¶ 20-22 & Ex D. They paid BCS $16,000. *Id.* ¶ 24.

BCS representative Jeannie Walton initially referred a Russian child for the Harshaws, but the child had been severely burned by his mother and suffered medical problems as a result. The

Harshaws declined and emphasized to BCS that they could only accept a child with minor, correctable conditions and a prognosis for normal development. Next, BCS provided them with Roman's name, age, sex, and photograph; a two-page document said to be an English translation of Roman's medical records at his orphanage; and an untranslated videotape showing what appeared to be Roman interacting with his caregivers in Russia. *See* Comp ¶¶ 25-29 and Ex E.

Relying on the video and the purported summary of Roman's medical records, the Harshaws told BCS they were willing to adopt Roman so long as BCS first provided any additional medical information about the boy. *See* Comp ¶ 30. At Walton's invitation, the Harshaws visited a BCS office to discuss the adoption. When they asked Walton whether Roman and the other Russian children they were considering were medically healthy, Walton responded that they were healthy,

> and explained that a medical doctor associated with Bethany, referred to as "Dr. D," had specific expertise in the evaluation of Russian children for the purposes of adoption and that Dr. D regularly examined the children in Russia on trips from his home in New York. Ms. Walton stated that Dr. D had examined Roman and that Roman was O.K. The Harshaws learned that the individual referred to as "Dr. D", is Dr. Michael Dubrovsky.

Comp ¶ 31. Relying on Walton's assurances regarding Dr. Dubrovsky's purported regular examination of Roman *et al.*, the Harshaws traveled to the orphanage in Krasnoyarsk, Russia in December 2003, with BCS representatives Aleksandr "Alex" Vladimirovich and Yelena Vladimirovna acting as interpreters and guides. They were permitted to see Roman for only about one hour. Noting that Roman looked thin and perhaps ill, the Harshaws asked interpreter Alex if Roman was okay; after consulting orphanage staff, Alex told the Harshaws that Roman had had bronchitis. The Harshaws asked for more information about Roman and his mother's social and medical background, but Alex said none was available. They saw Roman for an hour the next day, then returned to America and met again with BCS's Jeannie Walton. *See* Comp ¶¶ 32-38.

When Walton asked how Roman looked and the Harshaws responded that he "appeared as if he might have been sick but otherwise appeared okay", she reassured them that what they saw was common in institutionalized children, and his issues were minor and often resulted from malnutrition and crowded conditions. Walton asked if they wished to proceed, and they said yes. *Id.* ¶¶ 38-40.

The next month, January 2004, the Harshaws returned to Russia to attend the final adoption hearing. When they took physical custody of Roman at the orphanage, they asked if there were any more medical records regarding Roman or his mother and were told there were none, and BCS never provided any additional medical information from then until after the adoption. *See* Comp ¶¶ 41-44.

After the Krasnoyarsk Regional Court entered an Order of Adoption on January 27, 2004, the Harshaws took Roman home to America, where they soon noticed that he was not developing and acting normally for his age and reported health. They spent about a year and a half taking Roman to physicians and mental-health professionals to figure out what might be wrong, leading to a January 2006 examination by neurodevelopmental pediatrician Dr. Frank Aiello III, M.D., who suggested Roman might be suffering from fetal alcohol syndrome and ordered more testing. *See* Comp ¶¶ 45-49. Following three days of examination and tests in June 2006, Dr. Ronald S. Federici, Psy.D., clinical director of a "neuropsychological and family therapy" clinic in Virginia, who diagnosed Roman with an alcohol/drug-related birth defect, identified as a fetal alcohol spectrum disorder causing neurocognitive and psychiatric abnormalities. *See* Comp ¶¶ 50-51.

The Harshaws allege that throughout the 24 months following the January 2004 adoption, they expressed concerns to BCS's social worker, during post-placement visits, about Roman's medical, emotional and psychological condition and behavior. The BCS social worker responded that Roman's problems were frequently associated with being institutionalized and that children

adopted from such settings could "grow out of" the problems with a loving family. *See* Comp ¶ 59.

At an unspecified time in or after June 2006 (when Dr. Federici examined Roman), the Harshaws informed BCS of Federici's diagnosis and asked for more medical information, which BCS stated would be difficult to retrieve. *See* Comp ¶¶ 52-53. After the Harshaws repeated their requests, in October 2006 BCS provided two items which they had not previously provided: a ten-page Russian-language extract of Roman's medical records and history, and a six-page English translation. *See* Comp ¶¶ 54-55 and Ex F. The Harshaws allege that BCS either had these two documents in its possession all along (i.e., before the adoption was completed) or could and should have obtained them for review, translation and delivery to the Harshaws before they made their decision whether to adopt Roman. *Id.* ¶¶ 56-57. The Harshaws allege that they relied on BCS to provide all information reasonably available to it and if BCS had done so, they would not have pursued Roman's adoption. *Id.* ¶¶ 58 and 64-66. They also state that if BCS had provided complete, accurate medical information and appropriate post-placement assistance, they could have diagnosed Roman's condition earlier and started providing more-appropriate treatment earlier. *Id.* ¶ 67.

The Harshaws assert three claims on their own behalf:

| Count 1 | Fraud / intentional misrepresentation | (Comp ¶¶ 68-83) |
| Count 2 | Negligent misrepresentation | (Comp ¶¶ 84-94) |
| Count 3 | Negligent failure to disclose | (Comp ¶¶ 95-99) |

They assert one claim on behalf of Roman, who is still a minor: count four, negligence (Comp ¶¶ 100-104). They allege that after Roman's adoption, BCS admitted it had "misinformed" the Harshaws by providing "unclear" medical information during the adoption process, and that Dr. Dubrovsky never examined Roman as it had represented. *Id.* ¶¶ 60-61. On each count, the Harshaws seek $75,000 in compensatory damages plus punitive damages, interest, and attorneys'

fees, and demand a jury trial.  *Id.* at 15-19 (prayers for relief).

The Harshaws filed the instant complaint in January 2008, and the defendants answered in April 2008.  *See* Docs. 1, 6 & 8.  From October 2008 through June 2009, the parties conducted discovery and the Magistrate resolved discovery disputes, *see* Docs. 17-78.  In September 2009, the Harshaws filed a motion to compel production of documents requested in their second and third sets of requests for production, BCS filed an opposition brief, and pursuant to 28 U.S.C. § 636(b)(1)(A) the matter was referred to the Magistrate, who held a hearing and granted in part the Harshaws' motion to compel.  *See* Docs. 112, 113, 125 & 128.  On October 21, 2009, the Harshaws served the reports of experts Julian Davies M.D., and Andro Zangaladze, M.D., Ph.D., *see* Docs. 135-136.

In September 2009, BCS filed a motion to dismiss or for summary judgment on counts one, two and three – the parents' common-law claims for fraud/intentional misrepresentation, negligent misrepresentation, and negligent failure to disclose – on the ground that they are barred by the statute of limitations in Michigan and Virginia.  This court denied BCS's unjustifiably late request for leave to amend their answer to assert the defense that counts 1-3 are barred by statutes of limitation, determining that BCS did not show good cause for failing to move for leave to amend before the deadline which the CMSO imposed.  In January 2010, this court denied the defendants' motion for reconsideration as untimely and meritless.  *See Harshaw v. Bethany Christian Servs., Inc.*, No. 1:08-cv-104 Doc. 179, 2009 WL 5149925 (W.D. Mich. Dec. 15, 2009) (Maloney, C.J.) ("*Harshaw 2*"), *recon. denied*, Doc. 205, 2010 WL 331708 (W.D. Mich. Jan. 22, 2010) ("*Harshaw 3*").

On October 1, 2009, BCS moved to dismiss for failure to state a claim and/or for summary judgment on the *merits* of all four claims, urging application of Virginia substantive law; the

Harshaws filed an opposition, and BCS replied. *See* Docs. 130-31 and 138 & 166. The Harshaws cross-moved for summary judgment on the *merits* of claims 2-4, urging application of Michigan substantive law; BCS filed an opposition, and the Harshaws replied. *See* Docs. 132-33, 139 and 166. Separately, the defendants moved for an order declaring that Virginia substantive law governs all the Harshaws' claims.

## CHOICE OF LAW

In *Harshaw 5*, issued in March 2010, this court granted that motion and held that Michigan choice-of-law precedents call for application of Virginia substantive law to the Harshaws' claims. This court wrote as follows:

> "Because this is a diversity action, the law of the forum State, including the choice-of-law rules, apply." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). "Generally speaking, a tort claim filed in a Michigan court will be governed by Michigan law 'unless a rational reason exists to displace it.'" *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425 (6th Cir. 2009) (citing *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 611 (6th Cir. 2001) (quoting *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W.2d 292, 303 (Mich. 1987))).

> More precisely, "Michigan choice of law principles provide that Michigan law applies absent a rational reason – *such as another State's interest* – to apply other law." *Daimler-Chrysler Servs. North America, LLC v. Summit Nat'l, Inc.*, 289 F. App'x 916, 921 (6th Cir. 2008) (citing *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 562 N.W.2d 466, 471 (Mich. 1997)) (emphasis added), *cert. denied*, – U.S. –, 129 S.Ct. 2009 (2009).[1]

> "Michigan choice of law provisions favor allowing Michigan residents to bring suit in Michigan courts under Michigan law", *Gass v. Marriott Hotel Servs., Inc.*, 558

---

[1]

For Michigan's choice-of-law rule governing *contract* claims, *see Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008) and *Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 71, 704-705 (6th Cir. 2002) (discussing *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 528 N.W.2d 698 (Mich. 1995) and RESTATEMENT 2D OF CONFLICT OF LAWS §§ 6 and 188).

F.3d 419, 425 (6th Cir. 2009) (citation omitted), and our Circuit has recognized a State's interest in "protecting its residents from injury and providing just compensation to its citizens" as a legitimate, relevant interest in a choice-of-law analysis. *See Williams v. Toys 'R' Us*, 138 F. App'x 798, 803 (6th Cir. 2005) ("Pennsylvania may have an interest in having its law applied because the accident occurred there. Pennsylvania's interest, however, does not outweigh Michigan's competing interest in protecting its residents from injury and" providing just compensation to its citizen, like Williams); *Imaging Fin. Servs., Inc. v. Lettergraphics Detroit, Inc*., No. 97-1930, 178 F.3d 1294, 1999 WL 115473, *3 (6th Cir. Feb. 9, 1999) (Boggs, Siler, <u>Moore</u>) ("Although there may be a reason to displace Michigan law on the contract claims (i.e., a choice of law provision in the contract itself), there is no reason to displace it on the tort claim here. The alleged injury occurred in Michigan to a Michigan company.").

By contrast, when the plaintiff is not a Michigan resident, these interests are absent and the analysis is no longer so strongly presumptively tilted in favor of applying the forum State's substantive law. *See, e.g., Ruffin-Steinbeck v. dePasse*, 267 F.3d 457 F.3d 463-64 (6th Cir. 2001) (because plaintiff was a Mississippi resident when she filed the complaint and a Mississippi or Alabama resident when she died, "[t]he district court did not err in determining that Michigan law did not apply to her cause of action, and under Mississippi law, Earline Ruffin's defamation claim was properly dismissed.").

To determine whether there is a rational reason to displace Michigan law, the court undertakes a two-step analysis. First, the court determines whether any foreign State has an interest in having its law applied: "if no State has such an interest the presumption that Michigan law applies cannot be overcome . . . ." *Miller v. Airborne Express, Inc.* , 2008 WL 2782921, *3 (E.D. Mich. July 17, 2008) (Steeh, J.) (citing *Sutherland*, 454 Mich. at 286, 562 N.W.2d 466) (citing *Olmstead v. Anderson*, 428 Mich. 1, 24, 29-30, 400 N.W.2d 292 (Mich. 1987))).

Second, if a foreign State does have an interest in having its substantive law applied, the court must determine whether Michigan's interests mandate that its law be applied despite the foreign State's competing interests. *See Sutherland*, 454 Mich. at 286, 562 N.W.2d 466 (citing *Olmstead*, 428 Mich. at 24, 29-30, 400 N.W.2d 292); *see also Hall v. GMC*, 229 Mich. App. 580,587, 582 N.W.2d 866 (Mich. App. 1998) (describing this "interest analysis").

Here the State of Virginia clearly has a strong interest in having its substantive law applied: the aforementioned interest in protecting its citizens and, where necessary, helping them obtain just monetary compensation and other judicial relief for damages unlawfully. Therefore, the court must consider whether the Michigan appellate courts would consider Virginia's interest in having its substantive law applied to its citizens' claims to be greater than Michigan's interest in having its

substantive law applied to these non-residents' claims against its corporate domiciliaries.

Michigan precedent suggests that the Michigan Supreme Court would apply Virginia law here. While residing in Virginia, the Harshaws reviewed, signed, and submitted their BCS international adoption agreements in Virginia, to a Virginia corporation (Bethany Christian Services - Hampton Roads). The office presentation and discussions before they entered this contract took place in Virginia, as did the communication and contact between the parties for the family adoption assessment (conducted by BCS-*Hampton Roads* social worker Jeanne Walton). When the Harshaws brought Roman into the United States from Russia, the three of them entered into Virginia; so far as the record reflects, the Harshaws and their son remain residents of Virginia.

And significantly, the Harshaws do not seem to allege that any tortious conduct was committed in Michigan. *Contrast Inland Waters Pollution Control Inc v. Jigawon, Inc.*, 2008 WL 205209, *7-8 (E.D. Mich. Jan. 22, 2008) (Lawson, J.) ("The defendants suggest that Texas law should apply to the claims of fraud . . . because they are citizens of Texas and that is where the tort took place. Neither of these reasons constitute[s] sufficient interest by a foreign state in having its law apply. [A]t least some of the tortious activity occurred in Michigan . . . ."), *recon. denied*, 2008 WL 373430 (E.D. Mich. Feb. 12, 2008).

In all, our case presents a compelling rationale for application of Virginia law: this was a contractual relationship which began in Virginia, with a Virginia corporation (BCS-Hampton Roads) playing at least an important tole (BCS-Hampton Roads), and the damages inflicted have been (and are being) suffered by the Harshaws and Roman in Virginia, where they continue to reside. *See, e.g., Radeljak v. Daimlerchrysler Corp.*, 475 Mich. 598, 610-11,719 N.W.2d 40 (Mich. 2006) (holding that Croatian law would apply to a tort claim where the injury occurred in Croatia and the plaintiffs were residents and citizens of Croatia); *Hernandez v. Ford Motor Co.*, 280 Mich. App. 545, 567-68, 760 N.W.2d 751 (Mich. App. 2008); *Munic. High Income Fund, Inc. v. Goldman, Sachs & Co.*, No. 264224, 2006 WL 361149, *2-3 (Mich. App. Feb. 16, 2006) ("An injury state always has an interest in the conduct within its borders . . . .") (New York substantive law applied because the alleged misrepresentations and the resultant injury both occurred there); *accord German Free State of Bavaria v. Toyobo Co., Ltd.*, 480 F. Supp.2d 948, 957 (W.D. Mich. 2007) (Enslen, Sr. J.) ("'The place of the wrong will never be dispositive in a given case, but it remains a factor to be considered in weighing the interests of the involved states . . . [however], the plaintiff's residence is a paramount consideration in determining which state's law to apply in a [Michigan] tort case.'") (quoting *Olmstead*, 428 Mich. at 24, 400 N.W.2d 292 (citing *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 328, 343 N.W.2d 164 (Mich. 1984))); *Drooger v. Carlisle Tire & Wheel Co.*, 2006 WL 1008719, *2 (W.D. Mich. Apr. 18, 2006) (Enslen, Sr. J.)

("Defendant's only interest in having its home state's law apply . . . is that Defendant is a South Carolina resident. Mere corporate citizenship is not a weighty enough interest to tip the scales in Michigan's choice-of-law analysis.").

Accordingly, this court finds that a Michigan appeals court would apply Virginia substantive law to the Harshaws' claims, obligating this court to do so as well. "Michigan has no interest in affording greater rights of tort recovery to . . . [Virginia] resident[s] than those afforded by" their own State. *Hall v. GMC*, 229 Mich. App. 580, 585, 582 N.W.2d 866, 868 (Mich. App. 1998) (fact that plaintiff sustained his injury in North Carolina due to a defective auto part and was a NC citizen at the time of that injury, outweighed the fact that plaintiff had moved to Michigan before bringing suit); *see also Farrell v. Ford Motor Co.*, 199 Mich. App. 81, 502 N.W.2d 567 (Mich. App. 1993); *accord LL NJ, Inc. v. NBC-Subsidiary (WCAU-TV), L.P.*, 2008 WL 1923261, *12-13 (E.D. Mich. Apr. 13, 2008) (Lawson, J.) ("These decisions [*Farrell* and *Hall*] lead ineluctably to the conclusion that Michigan's choice-of-law rules favor application of NJ law to the trespass claim. Michigan has no real interest in this claim or the facts underlying it. The alleged trespass took place in NJ, and any harm that did occur happened there. [T]he undercover footage was never publicly disclosed. Moreover, the individuals involved in the undercover operation were citizens of either NJ or PA, not Michigan. The only interest that Michigan can claim with respect to the trespass count stems from the fact that the plaintiffs . . . are Michigan corporations. However, as the decisions in *Farrell* and *Hall* make clear, that alone is an insufficient basis on which to apply Michigan law. Because NJ has a significant interest in having its laws applied, and Michigan's interest is negligible, there is a rational basis to displace Michigan law and apply NJ law in its stead.") (NJ abbreviated) (citing *Farrell*, 199 Mich. App. at 94, 502 N.W.2d 567, & *Hall*, 229 Mich. App. at 587, 582 N.W.2d 866).

The Harshaws try to evade the Michigan Court of Appeals' decisions in *Hall* and *Farrell* by invoking *Mahne v. Ford Motor Co.*, 900 F.2d 83, 86 (6th Cir. 1990). As the Harshaws explain it,

> In *Mahne*, the Sixth Circuit reviewed Michigan's approach to choice of law, beginning with *Sexton v. Ryder Truck Rental, Inc.*, 413 Mich. 406, 320 N.W.2d [sic] (1982), and culminating with *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W.2d 292 (1987). In *Olmstead*, a Minnesota victim and a Michigan defendant were involved in a fatal accident in Wisconsin. Wisconsin law limited the recovery of damages for wrongful death; Minnesota law did not. The Michigan Supreme Court held that Michigan law as the law of the forum applied. According to the Sixth Circuit in *Mahne*, "After formulating a few generalizations from *Sexton*, *lex fori* rather *lex loci* is the presumptive rule of thumb for choice of law issues in tort cases, but that the issue must be decided on a case-by-case basis." [no citation

to *Mahne* provided]

\* \* \*

The Sixth Circuit's exposition of Michigan's *lex fori* approach to choice of law in *Mahne*, based on the Michigan Supreme Court's decision in *Olmstead*, was confirmed in . . . *Sutherland* . . . , 454 Mich. 274, 286 . . . (Mich. 1997), where that Court stated as follows: "We will apply Michigan law unless a 'rational reason' to do otherwise exists. \* \* \*"

\* \* \*

[I]n *Mahne*, the Sixth Circuit, applying Michigan conflicts law, held that where an accident took place in Florida, severely injuring a Florida resident, in a vehicle designed and manufactured in Michigan by Ford Motor Company, the Florida statute of repose would not be applied and recovery would be allowed under Michigan law. The [Sixth Circuit panel] stated that:

> We think it is very clear from the lengthy discussion in *Olmstead* that the Michigan Supreme Court would hold, in a suit brought in a Michigan court by a party who is not a citizen of Michigan against a Michigan resident, arising out of an accident that occurred outside of Michigan and in the state of the plaintiff's residence, that Michigan law as the law of the forum presumptively controls the litigation; and further, that there must be a rational reason to displace Michigan law. \* \* " [*Mahne*,] 900 F.2d at 87 (citing *Olmstead*, 428 Mich. at 30.

P's Opp at 12-15 with n. 33 (other footnotes omitted) (citing *Ammend v. Bioport, Inc.*, 322 F. Supp.2d 848 (W.D. Mich. 2004) (applying *Mahne* to hold that MI law applied where non-residents were injected outside MI with an anthrax vaccine that had been made in MI by a MI corporation).

[footnote: The Harshaws acknowledge that the Circuit's interpretation of Michigan choice-of-law principles in *Mahne* calls for the opposite result from the Michigan Court of Appeals's published decisions in *Hall* and *Farrell*. The Harshaws accurately state that BCS relied on *Hall*, which

> "held that a foreign state had a greater interest in the application of its law where the plaintiff resided in the foreign state, the injury occurred there, and the plaintiff's claim would have been barred if litigated in the foreign state."

> *Hall* was based on the Michigan Court of Appeals's earlier decision

-11-

in *Farrell* . . . (1993). *Farrell* was a complete replay of *Mahne* . . .
. In *Farrell*, a NC resident was killed there when a Ford vehicle
manufactured and designed in Michigan rolled from neutral to
reverse and backed over her. NC had a statute of repose; Michigan
did not. Although, as in *Mahne*, Ford did not conduct any
manufacturing activities in NC, the Michigan Court of Appeals flatly
disagreed with the Sixth Circuit in *Mahne*, and held that NC did have
an interest in protecting Ford and that NC's interest was greater than
Michigan's interest.

*Hall* involved the identical situation as *Farrell* and *Mahne*, and the
Court of Appeals held that the result was controlled by *Farrell*. As
the Sixth Circuit made clear in *Mahne*, Michigan follows a *lex fori*
approach, not a "greater interest" approach. Under the *lex fori*
approach, Michigan law presumptively applies . . . .

* * *

[T]he court in *Mahne* strongly rejected the view of the Michigan
Court of Appeals that Michigan law does not apply whenever the
plaintiff resides in a foreign state, the injury occurred there, and the
claim is barred by the law of that state.

P's Opp at 17. The Harshaws go on to say that "[f]or federal courts sitting in
Michigan, *Mahne* is controlling in its analysis and application of Michigan choice
of law . . . ." P's Opp at 15. That is precisely the *opposite* of the law. This court's
task is only to consider how the Michigan Supreme Court would likely rule in the
matter. An interpretation of state law by a federal court – even a Court of Appeals
– has no bearing on that question. A federal court's interpretation of state law
neither binds the State's lower courts nor predicts the decisions of its supreme court.
As our Circuit acknowledged, "No federal court has the final say on what [state] law
means. Even the decision of the highest federal court, the United States Supreme
Court, about the meaning of [a state] law has no more binding authority on the [state]
Supreme Court than the decision of [another State's] Supreme Court or for that
matter any other court." *Ohio v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008); *see also
Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1042 (6th Cir. 1992) ("the district
court's reliance on federal cases interpreting Ohio law is only correct if those cases
accurately reflect the law of Ohio").

To the extent that *Mahne*'s interpretation of Michigan choice-of-law is inconsistent
with the Michigan Court of Appeals's published decisions in *Hall* and *Farrell*, this
court must follow the latter. After the Michigan Supreme Court's own decisions, the
precedential decisions of the State's Court of Appeals are the next-best legitimate
and relevant predictor of how the Supreme Court would likely rule – not the
decisions of a foreign court (in this case, a federal court).]

*Harshaw v. Bethany Christian Services, Inc. et al.*, No. 1:2008-cv-104 Document 229, 2010 WL 774321, *8-11 with n.6 (W.D. Mich. Feb. 25, 2010) (Maloney, C.J.) ("*Harshaw 5*") (some ¶ breaks added) (footnote 5 omitted).

**The Harshaws have filed two motions which the court will dispose of today.** First, the Harshaws move to reinstate BCS-HR as a party defendant; they rely on the U.S. Supreme Court's recent *Hertz* decision, which held that the "nerve center" test governs the determination of a corporation's principal place of business ("PPB"), rather than the total-activities test which our Circuit previously applied. The court agrees with the Harshaws that *Hertz* applies and that BCS-HR's "nerve center" for this purpose is Michigan, not Virginia as it might have appeared under the former total-activities test. Second, the Harshaws move to reconsider *Harshaw 5*'s determination that Michigan choice-of-law rules call for the application of Virginia substantive law to all their claims. The court finds that the addition of a third Michigan corporation (BCS-HR) to the roster of defendants adds little weight to the Michigan side of the scale, still leaving Virginia with the greater interest in having its substantive law applied to its citizens' suit regarding an adoption which was effectuated most directly and substantially by personnel in a Virginia office – an office operated by a Bethany subsidiary or affiliate which itself was licensed to arrange adoptions only in Virginia – which was approved by a Virginia state court, and which has allegedly caused harm in Virginia.


**The Harshaws' Motion to Reinstate BCS-Hampton Roads as a Defendant**

In June 2009, the Harshaws moved to voluntarily dismiss without prejudice a third defendant, Bethany Christian Services of Hampton Roads, Inc. ("BCS-Hampton Roads"), on the ground that its presence as a seemingly non-diverse, non-indispensable party would defeat this

court's jurisdiction. This court granted the Harshaws' motion, but conditioned the dismissal of

BCS-Hampton Roads on the Harshaws reimbursing the defense for the legal fees and costs incurred

due to the erroneous inclusion of that party in this lawsuit. Based on the information then presented

by the parties, the court reasoned as follows:

> The Harshaws filed the instant complaint in January 2008, and with an extension of time the three BCS defendants jointly filed an answer in April 2008. *See* Doc. Nos. 1, 6 and 8. On April 17, 2008, BCS counsel (Perrin Rynders, Esq. of Varnum, Riddering LLP in Grand Rapids, Michigan) sent an e-mail to one of the Harshaws' counsel (Kevin A. Rynbrandt, Esq. of Rymbrandt & Associates, PLLC in Grand Rapids) regarding the basis for federal diversity jurisdiction in Michigan. BCS's e-mail stated, in its entirety:

>> Kev[in], I'm putting the answer together and I just realized that we might not have a diversity jurisdiction case. Isn't Bethany of Hampton Roads a citizen of Michigan and also Virginia? For sure it's a citizen of Michigan, but my understanding is that corporations have dual citizenship (where they're incorporated and where they have their principal place of business). Before I spend time digging into that issue too deeply, let me know if you've looked into it already.

>> I'll be in all morning.

> Brief of Defendants BCS, BCSI and BCS-Hampton Roads filed June 29, 2009 in Opposition to Plaintiffs' FED. R. CIV. P. 41 Motion to Voluntarily Dismiss BCS-Hampton Roads ("Defs' Opp"), Ex A. The record does not reflect the response, if any, from the Harshaws' counsel.

> From about October 2008 through June 2009, the parties conducted discovery and the Magistrate Judge resolved discovery disputes, *see* Docs. 17-78.

> **On June 15, 2009 the Harshaws moved for voluntary dismissal without prejudice of defendant Bethany Christian Services of Hampton Roads alone, pursuant to Federal Rule of Civil Procedure 41(a);** BCS filed an opposition brief on June 29 and the Harshaws filed a reply brief on July 13, 2009. *See* Docs. 79-82. BCS's opposition brief recognizes the court's authority to dismiss BCS-Hampton Roads without prejudice to maintain complete diversity. But BCS contends that the court should dismiss the complaint without prejudice as to *all three* defendants; it emphasizes the uncontested fact that they alerted the Harshaws' counsel in writing to BCS-Hampton Roads' Virginia citizenship in April 2008, even before it filed the

answer.

<u>Alternately, BCS asks that if the court permits the Harshaws to voluntarily dismiss only BCS-Hampton Roads without prejudice, third conditions be attached.</u> First, BCS contends that the Harshaws' re-filing of claims against BCS-Hampton Roads should be conditioned on them reimbursing BCS-Hampton Roads for the expense it incurred due to its erroneous inclusion in this action.

Second, BCS contends that the remaining BCS defendants should be required to file an amended complaint to appropriately re-state its allegations given that only BCS and BCSI remain as defendants. BCS admits that the filing of an amended complaint would enable it to assert additional affirmative defenses – defenses which, it admits, it could have raised earlier, but deliberately delayed raising because they expected this case to be dismissed for lack of diversity jurisdiction. *See* Defs' Opp at 17 ("Although Defendants uncovered additional affirmative defense some months ago, they did not move to amend their answer at that time (although such amendments are freely granted as justice so requires) since Defendants had every expectation that Plaintiffs' complaint would be dismissed for lack of subject-matter jurisdiction.").

Third, BCS asks the court to require that if the Harshaws re-file these claims against BCS-Hampton Roads, they bring suit in the courts of Kent County, Michigan.

**For the reasons that follow, the court will only conditionally grant the Harshaws' motion to voluntarily dismiss BCS-Hampton Roads, but will also reject BCS's attempt to impose further conditions and to require the Harshaws to amend the complaint.**

As a factual matter, it is undisputed that the Harshaws are both Virginia citizens and that defendant BCS-Hampton Roads is incorporated in Michigan but has its principal place of business in Virginia. As a legal matter, the parties agree that by federal statute, this renders BCS-Hampton Roads a citizen of both Michigan and Virginia. *See Leys v. Lowe's Home Ctr., Inc.*, 601 F. Supp.2d 908, ___ (W.D. Mich. 2009) (Maloney, C.J.) (citing *Wolf v. Bankers Life & Cas. Co.*, 519 F. Supp.2d 674, 676 n.1 (W.D. Mich. 2007) (citing 28 U.S.C. § 1332(c)(1))). * * *

The parties also agree that this court has jurisdiction only if the parties are completely diverse. *See . . . Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999))), and that the presence of a Virginia defendant destroys complete diversity, which "exists only when no plaintiff and no defendant are citizens of the same state." . . . *Jerome Duncan, Inc. v. Auto-by-Tel, LLC*, 176 F.3d 904, 907 (6th Cir. 1999) . . . .

Finally, the parties agree that the court has the authority and discretion to preserve diversity by dismissing a non-diverse party without prejudice, so long as that party

is not an indispensable party as defined by Federal Rule of Civil Procedure 19. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 834 n.7 (1989) (noting with approval, "Other courts have remanded the case to the district court with mandatory instructions to allow an amendment dismissing the nondiverse party in order to preserve diversity jurisdiction.") (citations omitted) . . . .

 Neither party contends that BCS-Hampton Roads is indispensable, and the court determines that it is not indispensable. *See generally Republic of Philippines v. Pimentel*, – U.S. –, 128 S.Ct. 2180, 2191-94 (2008) . . . (discussing Rule 19(b)(1)'s four factors for determining whether a party is indispensable: . . . ). If the Harshaws ultimately prevail on their claims against BCS and BCSI, this court will be able to afford them complete relief without BCS-Hampton Roads in the case, because they seek only monetary damages from BCS and BCSI for their alleged torts; they do not seek any equitable, injunctive or declaratory relief which cannot be issued without also entering judgment against BCS-Hampton Roads. *Contrast Soberay Mach. & Equip. Co. v. MRF LTd., Inc.*, 181 F.3d 759 (6th Cir. 1999) . . . .

Therefore, the court has authority and discretion to dismiss BCS-Hampton Roads without prejudice. *See Curry v. US Bulk Transport, Inc.*, 462 F.3d 536, 543 n.4 (6th Cir. 2006) ("It is not disputed that Priddy and Susman, as joint tortfeasors, are dispensable parties to this litigation.") (citing *Casas Office Mach., Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 675-76 (1st Cir. 1994) ("'it is well-established that joint tortfeasors and co-conspirators are generally not indispensable parties" because of joint and several liability)) . . . .

The Harshaws will still have an adequate remedy against BCS-Hampton Roads, because they can presumably file these claims against BCS-Hampton Roads, a Michigan corporation with at least one office in Virginia, in the state courts of Michigan or Virginia. [footnote omitted] *See DeGidio v. Centicor, Inc.*, 2009 WL 1867676, *3 (N.D. Ohio June 29, 2009) (James Carr, C.J.) ("DeGidio retains an adequate remedy against the [nondiverse, dispensable] Healthcare Defendants as he can proceed with his claims in state court. While fighting on two fronts will no doubt be inconvenient, and probably more expensive, I do not find the maintenance of two lawsuits unfairly or unduly prejudicial.") (citing *PaineWebber*, 276 F.3d at 204).

The question, then, is only whether the court *should* exercise its discretion to dismiss the non-diverse part, BCS-HR, without prejudice, rather than taking a course of action less favorable to the Harshaws. **In its entirety, the Harshaws' brief in support of their motion for voluntary dismissal without prejudice of BCS of Hampton Roads reads as follows:**

On May 29, 2009, Defendants stated that they believed that Defendant Bethany Christian Services of Hampton Roads ("Bethany-

Hampton Roads") was a Virginia corporation [sic, citizen] for purposes of diversity of jurisdiction analysis under 28 U.S.C. § 1332. In response, Plaintiffs, *inter alia*, requested that Defendants produce certain documents related to the business structure and operations of Bethany-Hampton Roads. Defendants produced responsive documents on June 12, 2009. On review of these documents, Plaintiffs concluded, for the first time, that the principal place of business of Bethany-Hampton Roads was located in Virginia, and not Michigan. Plaintiffs brought this motion [on] the first business day after receipt of voluminous supplemental documents detailing the business of Bethany-Hampton Roads.

Discovery in this matter is still ongoing. There are no motions pending. Furthermore, as to all three defendants are jointly represented, there is no prejudice to any defendant. *See, e.g., Bosteve Ltd. v. Marauszwki*, 110 F.R.D. 257, 259 (E.D.N.Y. 1986); *Harvey Aluminum, Inc. v. American Cyanamid Co.*, 15 F.R.D. 14, 18 (S.D.N.Y. 1953); *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109, 114 (2nd Cir. 1985).

Therefore, because Plaintiffs have concluded that Bethany-Hampton Roads is not a proper defendant in this case pursuant to 28 U.S.C. § 1332, Plaintiffs ask this Court to dismiss Defendant Bethany Christian Services of Hampton Roads as a party to this case and to do so without prejudice. Plaintiffs additionally request an expansion of time to file supporting documents in furtherance of this motion.

The Harshaw counsel assert that they did not realize until just last month that their inclusion of BCS-Hampton Roads destroyed diversity. The Harshaw counsel assert that only after they reviewed BCS's last batch of discovery documents (produced on June 12, 2009) did they conclude "for the first time, that the principal place of business of Bethany-Hampton Roads was located in Virginia, and not Michigan." The court finds that this assertion is untenable.

The Harshaws do not contest the authenticity, admissibility, or accuracy of the April 2008 e-mail advising them that BCS-Hampton Roads was not only a Michigan citizen but also probably a Virginia citizen. The short, clear e-mail began by stating, "we might not have a diversity jurisdiction case" and asking "Isn't Bethany of Hampton Roads a citizen of Michigan and also Virginia?" Defs' Opp, Ex A. The e-mail reminded the Harshaws' counsel of the unremarkable proposition that for purposes of diversity jurisdiction, a corporation is a citizen of its state of incorporation (Michigan) and the state where it maintains its principal place of business (Virginia). *See* Defs' Opp, Ex A ("For sure it's a citizen of Michigan, but my understanding is that corporations have dual citizenship (where they're

incorporated and where they have their principal place of business).").

It strains credulity to suggest that it took the Harshaw counsel more than fourteen months to realize that "Bethany Christian Services *of Hampton Roads [Virginia]*" had its principal place of business *in Virginia* – particularly after defense counsel reminded them of this likelihood as soon as the complaint was filed. The Harshaw counsel identify nothing which allegedly led them to believe that BCS *of Hampton Roads*, a region which is in Virginia, would have its principal place of business not in Virginia but in Michigan.

Reasonable investigation would have led the Harshaws' counsel not to name BCS-Hampton Roads in this lawsuit at all, or at least to drop that party sometime shortly after being alerted and cautioned by defense counsel in *April 2008*. After all, before the defendants filed an answer, the Harshaws were entitled to amend their complaint without seeking leave of court or the consent of the opposing parties. * * *

Because of Harshaw counsel's lack of care, they heedlessly sued BCS-Hampton Roads here, where jurisdiction was fairly plainly lacking, and then unreasonably delayed the inevitable. Even without inferring a lack of forthrightness and good faith, Harshaw counsel's manner of proceeding warrants some reimbursement, however minor, for the defendants.

"Traditionally, a plaintiff . . . had an unqualified right, upon payment of costs, to take a nonsuit in order to file a new action after further preparation, unless the defendant would suffer some plain legal prejudice other than the mere prospect of a second lawsuit." *Cone v. West Va. Pulp & Paper Co.*, 330 U.S. 212, 217 (1947) . . . . Federal Rule of Civil Procedure 41(a)(1) "preserves this unqualified right of the plaintiff to a dismissal without prejudice *prior to the filing of defendant's answer.*" *Cone*, 330 U.S. at 217 (emphasis added). S*ee* FED. R. CIV. P. 41(a)(1)(A):

> (a)     **Voluntary Dismissal**
>
>   (1) *By the Plaintiff*
>
>     (A)     *Without a Court Order.* Subject to Rules 23(e), 23.1(c), 23.2 [governing class actions], and 66 [governing receivers], and any applicable federal statute, the plaintiff may dismiss an action without a court order by filing:
>
>       (i)     a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or

(ii)     a stipulation of dismissal signed by all
         parties who have appeared.

Boldface and italics in original. * * *

Here, however, all three BCS defendants jointly filed an answer on April 23, 2008, *see* doc. No. 8, more than one year before the Harshaws filed the instant motion to voluntarily dismiss without prejudice their claims against BCS-Hampton Roads. Once the defendants filed their answer, the Harshaws' request for voluntary dismissal of a party was governed no longer by Rule 41(a)(1) but by Rule 41(a)(2), Voluntary Dismissal- By Court Order.  The latter provides, in pertinent part, "Except as provided in Rule 41(a)(1), an action may be dismissed at plaintiff's request *only by court order, on terms that the court considers proper*."  Emphasis added.  *See Albright v. Upjohn Co.*, 788 F.2d 1217, 1222 (6th Cir. 1986) (Ralph B. Guy, J., dissenting o.g.) ("Rule 41(a) provides that after a party has filed either an answer or a motion for summary judgment a plaintiff may not dismiss as to that party without order of the court or by stipulation with [sic] all parties who have appeared.").

Outright dismissal of the entire case, however, would be too extreme a measure on this record.  It is undisputed that defendants BCS and BCSI are properly before this court, and neither they nor BCS-Hampton Roads have been egregiously prejudiced by the Harshaws' admittedly unwise inclusion and retention of the latter in this action.  First, the parties have not filed dispositive motions yet, [footnote omitted] so the defense has not incurred the expense of a Rule 12(b)(1) motion to dismiss the claims against BCS-Hampton Roads for lack of subject-matter jurisdiction.

Moreover, because BCS-Hampton Roads has not moved to dismiss or for summary judgment, it cannot be said that the Harshaw's request to voluntarily dismiss BCS-Hampton Roads without prejudice is an attempt to avoid an adverse judgment on the merits. * * * Second, all three defendants are represented by the same counsel, and it does not appear that their answer was rendered appreciably lengthier (or its preparation appreciably more expensive) by the need to answer on behalf of Hampton Roads too.

Accordingly, the court will permit the Harshaws to dismiss only BCS-Hampton Roads without prejudice *if* they first reimburse the defendants for the cost of responding to the instant motion including attorney's fees.  But at this time, the court will not require the Harshaws to reimburse any portion of the expense incurred in preparing the joint answer.

"This middle course[2] is equitable because it adequately protects the rights and interests of [all] parties." *Yetman v. CSX Transportation, Inc.*, 2009 WL — at *– (W.D. Mich. 2009) (Maloney, C.J.) (citing *Martin v. City of Daytona Beach*, 2008 WL 4938347, *1 (M.D. Fla. Nov. 18, 2008) ("In exercising this 'broad equitable discretion under Rule 41(a)(2)', . . . the Court must weigh the relevant equities and do justice between the parties in each case, imposing such costs and attaching such conditions to the dismissal as are deemed appropriate.") (quoting *McCants*, 781 F.2d at 856)).

Under the disposition contemplated by today's opinion, the Harshaws will not need to pay BCS-Hampton Roads's share of the defense costs in the instant case unless they sue BCS-Hampton Roads again regarding this same controversy. Nothing in the record suggests that such a limited fee award would unduly burden the Harshaws or excessively deter them from re-filing those claims; for example, she is not proceeding *in forma pauperis* or *pro se*. *Yetman*, 2009 WL — at *–; *contrast Eaker v. Miller*, 2008 WL 4820361, *3 n.6 (M.D.N.C. Sept. 15, 2008) ("Courts sometimes condition Rule 41(a)(2) dismissal upon payment of costs (including attorneys fees) to the defendants who are being dismissed. Such a condition would be futile here since plaintiff is proceeding *in forma pauperis*.") (internal citations omitted).

*Harshaw v. Bethany Christian Services et al.*, No. 1:2008-cv-104 Doc 85 slip op. at 6-17, 2009 WL 2232740, *3-9 (W.D. Mich. July 22, 2009) (Maloney, C.J.) ("*Harshaw I*") (some ¶ breaks added, other internal citations omitted). On August 17, 2009, the defendants filed an itemized list of the fees and costs they incurred due to the seemingly erroneous inclusion of BCS-Hampton Roads in

---

[2]

The most lenient of the three options would be to let the Harshaws abandon their claims against BCS-Hampton Roads without imposing *any* conditions on their right to bring a repeat suit on those claims. *See, e.g., King v. St. Lawrence*, 2008 WL 4559384, *1 and n.2 (S.D. Ga. Oct. 10, 2008). But that would insufficiently protect BCS-Hampton Roads's rights, imposing no consequence on the Harshaws if they choose to subject their adversary to suit a second time, choosing a suitable forum as they should have done the first time around.

That would upset Hampton Roads's reasonable expectation that, as a matter of equity, it will be haled into court and suffer the inconvenience, distraction, apprehension, possible adverse publicity, and expense of litigation only once per controversy. *See Yetman*, 2009 WL 35351 at *4 n.2 ("Such an action would insufficiently protect the defendant's rights, imposing no consequence on the plaintiff if he chose to subject his adversary to suit a second time on claims he could have litigated now. That would upset CSX's reasonable expectation that, as a matter of equity, it will be haled into court and suffer legal expenses *only once* for each controversy.") (emphasis in original).

this suit, *see* Doc 108.  On August 28, 2009, the Harshaws filed a notice stating that they agreed to

the condition and would electronically transfer $14,805.00 to the account of defense counsel on

August 31, 2009, *see* Doc 110.  On September 3, 2009, the defendants filed a notice confirming that

the plaintiffs had paid the amount promised, *see* Doc 117.  Accordingly, on December 15, 2009, the

court entered the parties' joint stipulation dismissing BCS-HR without prejudice, *see* Doc 180.

**About two months later, however, in February 2010, the United States Supreme Court**

**held that for purposes of diversity jurisdiction, a corporation's principal place of business**

**("PPB") is its "nerve center."**  *See Hertz Corp. v. Friend*, – U.S. –, –, 130 S.Ct. 1181 (2010).  **That**

**expressly overruled our circuit's "total business activities" test,** as stated in *Gaffney v. General*

*Electric Co.* (6th Cir. 1993).[3]  Accordingly, all the pre-*Hertz* case law which the parties previously

---

[3]

A commentator notes that *Hertz* swept aside all contrary tests for diversity PPB analysis:

> Before 1958, the state of incorporation was deemed the corporation's citizenship, but this was found to lay too much emphasis on the mere technical place of incorporation, facilitating unrealistic manipulations to portray its headquarters as one place even though the corporation's real headquarters were at another.  The court [in *Hertz*] documents some eccentric results.  Congress's remedy, in a 1958 amendment of [28 U.S.C.] § 1332(c), was to deem the corporation – additionally (not alternatively) to place of incorporation – a citizen of the state of its "principal place of business."

> Alas, that also turned into a can of worms because the statute didn't define what made a place of business a "principal" one.  Thus the circuits . . . went off in their own directions, producing several different standards of measurement, usually built on the quantity of corporate business done in a state.

> *All of these the court now rejects*, adopting instead the so-called "nerve center" test, which only the Seventh Circuit had been using before.  * * *

219 Siegel's Practice Review 2, "Resolving Dispute Among Circuits, U.S. Supreme Court Says Corporation's 'Principal Office' (for Diversity Measure) is Place Where Key Corporate Decisions are Made" (March 2010).

cited, or which this court relied on in *Harshaw 1* (which granted the Harshaws' motion to voluntarily

dismiss BCS-HR without prejudice due to the apparent need to preserve diversity), applying the

total-activities test, are now irrelevant to the PPB determination. *See Miller v. Swiss Re*

*Underwriters Agency, Inc.*, 2010 WL 935697, *1 n.1 (C.D. Cal. Mar. 15, 2010) (Dean Pregerson,

J.) ("Plaintiff field her Motion to Remand *before* the Supreme Court decided *Hertz Corp.* In light

of that decision, the Court treats Plaintiff's arguments regarding SRAC's citizenship under pre-*Hertz*

*Corp.* and (now overruled) Ninth Circuit precedent as moot.").

The plaintiffs in *Hertz* were two California citizens, Friend and Nhieu, who sued the Hertz

rental-vehicle company in California state court on behalf of a putative class of California citizens.

Hertz was incorporated in Delaware – not California, as stated by the Harshaws – making it a

Delaware corporation under 28 U.S.C. § 1332(c) and, thus far, diverse from the California plaintiffs.

*See Hertz v. Friend*, 2008 WL 7071465, *1 (N.D. Cal. Jan. 15, 2008) ("Plaintiffs do not dispute that

the amount in controversy exceeds [jurisdictional minimum], that each class member is a citizen of

California, and that defendant is incorporated in Delaware."), *aff'd*, 297 F. App'x 690 (9th Cir. 2008),

*vac'd and cert. granted o.g.*, 129 S.Ct. 2766 (2009). Hertz removed the case to federal court on the

basis of diversity, contending that its PPB was New Jersey, where it maintained its headquarters.

*Applying a standard later rejected by the Supreme Court*, the district court reasoned as follows:

> Where the majority of a corporation's business activity does not take place in one
> state, the state in which the corporation's business activity is significantly larger than
> any other state in which the corporation conducts business is the corporation's
> principal place of business. In determining whether a corporation's business activity
> substantially predominates in a given state, a district court must make a comparison
> of that corporation's business activity in the state at issue to its business activity in
> other individual states.

> In making such a comparison, the court employs a number of factors, including the
> location of employees, tangible property, production activities, sources of income,

-22-

cited, or which this court relied on in *Harshaw 1* (which granted the Harshaws' motion to voluntarily

dismiss BCS-HR without prejudice due to the apparent need to preserve diversity), applying the

total-activities test, are now irrelevant to the PPB determination. *See Miller v. Swiss Re*

*Underwriters Agency, Inc.*, 2010 WL 935697, *1 n.1 (C.D. Cal. Mar. 15, 2010) (Dean Pregerson,

J.) ("Plaintiff field her Motion to Remand *before* the Supreme Court decided *Hertz Corp.* In light

of that decision, the Court treats Plaintiff's arguments regarding SRAC's citizenship under pre-*Hertz*

*Corp.* and (now overruled) Ninth Circuit precedent as moot.").

The plaintiffs in *Hertz* were two California citizens, Friend and Nhieu, who sued the Hertz

rental-vehicle company in California state court on behalf of a putative class of California citizens.

Hertz was incorporated in Delaware – not California, as stated by the Harshaws – making it a

Delaware corporation under 28 U.S.C. § 1332(c) and, thus far, diverse from the California plaintiffs.

*See Hertz v. Friend*, 2008 WL 7071465, *1 (N.D. Cal. Jan. 15, 2008) ("Plaintiffs do not dispute that

the amount in controversy exceeds [jurisdictional minimum], that each class member is a citizen of

California, and that defendant is incorporated in Delaware."), *aff'd*, 297 F. App'x 690 (9th Cir. 2008),

*vac'd and cert. granted o.g.*, 129 S.Ct. 2766 (2009). Hertz removed the case to federal court on the

basis of diversity, contending that its PPB was New Jersey, where it maintained its headquarters.

*Applying a standard later rejected by the Supreme Court*, the district court reasoned as follows:

> Where the majority of a corporation's business activity does not take place in one
> state, the state in which the corporation's business activity is significantly larger than
> any other state in which the corporation conducts business is the corporation's
> principal place of business. In determining whether a corporation's business activity
> substantially predominates in a given state, a district court must make a comparison
> of that corporation's business activity in the state at issue to its business activity in
> other individual states.

> In making such a comparison, the court employs a number of factors, including the
> location of employees, tangible property, production activities, sources of income,

-22-

and where sales took place. *See* . . . (holding that although corporation did not employ plurality of employees in California, but did have plurality of manufacturing and retail locations in California, and generated plurality of sales in California, California was principal place of business).

If, however, no state contains a substantial predominance of a corporation's business activities, the corporation's principal place of business is its nerve center, which is the state where the majority of its executive and administrative functions are performed.

* * * As to every one of these factors, the plurality of activity occurs in California, and the next greatest amount of activity occurs in Florida. * * *

Where, as here, a plurality of each of the relevant business activities is in one state, and the differential between the amount of those activities in that state and the next closest state is "significant," the former state is the corporation's principal place of business. As the Ninth Circuit observed in *Tosco*, a corporation that is a major employer and business operator in California, even though it conducts business in most states and does not conduct the majority of its operations in California, is not the type of litigant that diversity jurisdiction was designed to protect.

* * *

In sum, the court finds that Hertz has failed to meet its burden to show [that] its principal place of business is [somewhere] other than California.

*Hertz*, 2008 WL 70714665 at *1-2 and *3 (internal citations & quote marks omitted, ¶ breaks added).

Ultimately, the Supreme Court rejected the district court's reasoning, and the Ninth Circuit precedent which the district court followed. The Supreme Court unanimously stated as follows:

In an effort to find a single, more uniform interpretation of the statutory phrase, we have reviewed the Court of Appeals' divergent and increasingly complex interpretations. Having done so, we now return to, and expand, Judge Weinfeld's approach, as applied in the Seventh Circuit. [citations omitted]

**We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board**

**meetings (for example, attended by directors and officers who have traveled there for the occasion).**

\* \* \*

A corporation's "nerve center," usually its main headquarters, is a single place. The public often (though not always) considers it the corporation's main place of business. And it is a place within a State. By contrast, the application of a more general business activities test has led some courts, as in the present case, to look not at a particular place within a State, but incorrectly at the State itself, measuring the total amount of business activities that the corporation conducts there and determining whether they are "significantly larger" than in the next-ranking State. 297 Fed. Appx. 690.

This approach invites greater litigation and can lead to strange results . . . . \* \* \*

Second, administrative simplicity is a major virtue in a jurisdictional statute. *Sisson v. Ruby*, 497 U.S. 358, 375 . . . (1990) (Scalia, J., concurring in judgment) (eschewing "the sort of vague boundary that is to be avoided in the area of subject-matter jurisdiction wherever possible"). Complex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims. Complex tests produce appeals and reversals, encourage gamesmanship, and, again, diminish the likelihood that results and settlements will reflect a claim's legal and factual merits. Judicial resources too are at stake. Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it.

Simple jurisdictional rules also promote greater predictability. Predictability is valuable to corporations making business and investment decisions. Predictability also benefits plaintiffs deciding whether to file suit in a state or federal court.

A "nerve center" approach, which ordinarily equates that center with a corporation's headquarters, is simply to apply *comparatively speaking*. The metaphor of a corporate "brain," while not precise, suggests a single location. By contrast, a corporation's general business activities more often lack a single principal place where they take place. That is to say, the corporation may have several plants, many sales locations, and employees located in many different places. If so, it will not be as easy to determine which of these different business locations is the "principal" or most important place."

Third, the statute's legislative history, for those who accept it, offers a simplicity-related interpretive benchmark. The Judicial Conference provided an initial version of its proposal that suggested a numerical test. A corporation would be deemed a citizen of the State that accounted for more than half of its gross income. The Conference changed its mind in light of criticism that such a test would prove too complex and impractical to apply. That history suggests that the words "principal

place of business" should be interpreted to be no more complex than the initial "half of gross income" test. A "nerve center" test offers such a possibility. A general business activities test does not.

We recognize that the use of a "nerve center" test may in some cases produce results that seem to cut against the basic rationale for 28 U.S.C. § 1332, *see supra*, at 1188. For example, if the bulk of a company's business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York [City], the "principal place of business" is New York. One could argue that members of the public in New Jersey would be *less* likely to be prejudiced against the corporation than persons in New York – yet the corporation will still be entitled to remove a New Jersey state case to federal court. And note too that the same corporation would be unable to remove a New York state case to federal court, despite the New York public's presumed prejudice against the corporation.

We understand that such seeming anomalies will arise. However, in view of the necessity of having a clearer rule, we must accept them. Accepting occasionally counterintuitive results is the price the legal system must pay to avoid overly complex jurisdictional administration while producing the benefits that accompany a more uniform legal system.

The burden of persuasion for establishing diversity jurisdiction, of course, remains on the party asserting it. When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof. And when faced with such a challenge, we reject suggestions such as, for example, the one made by petitioner that the mere filing of a form like the [SEC]'s Form 10-K listing a corporation's "principal executive offices" would, without more, be sufficient proof to establish a corporation's "nerve center." Such possibilities would readily permit jurisdictional manipulation, thereby subverting a major reason for the insert of the "principal place of business" language in the diversity statute.

Indeed, if the record reveals attempts at manipulation – for example, that the alleged "nerve center" is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat – the courts should instead take as the "nerve center" the place of actual direction, control, and coordination, in the absence of such manipulation.

*Hertz*, – U.S. at –, 130 S.Ct. at 1192-95 (boldface and ¶ breaks added) (other internal citations to case law and legislative history omitted).

The defendants assert confidently that "*Hertz* applies only when the party at issue is a single corporation, and *only* to corporations with a presence in multiple states." Defendants' Brief in

Opposition to the Plaintiffs' Motion to Reinstate Bethany Christian Services of Hampton Roads, Inc. as a Party Defendant ("Defs' Opp") at 2. Yet the defendants fail to identify any actual words in the Supreme Court's unanimous opinion which state, or even reasonably suggest, that it intended to so narrowly confine its holding's application. Rather, the defendants simply resort to opining that "[t]o suggest otherwise", i.e., to suggest that *Hertz* applies to corporations which do not have a presence in multiple states, "borders on the frivolous." Def's Opp at 2. Nor do the defendants point to any subsequent decisions which intimate such a restrictive view of *Hertz*. The court finds no such limitation in *Hertz*'s language or rationale, and the defendants' attempt to avoid application of the new PPB test is unavailing.

Applying the nerve-center test as described in *Hertz*, the court finds that BCS-HR's principal place of business is Michigan, not Virginia as it appeared under the former total-activities test and the evidence presented to the court last summer.

The defendants emphasize that BCS-HR is "licensed to do adoptions in Virginia (not Michigan)" and has its own corporate board, directors/officers and employees. *See* Defs' Br at 3.[4] Defendants also emphasize that BCS-HR meets with prospective adoptive families only at its Virginia office and answers telephone calls only there as well, *id.* at 4. The court finds that whether BCS-HR was licensed to do business in Michigan (it was apparently not), whether it meets

---

[4] The defendants also emphasize that "BCS [National] had no contact with Plaintiffs prior to the adoption" and "did not provide any services directly to Plaintiffs at any time prior to this adoption." Defs' Br at 4. The defendants make the same allegations with regard to BCS International, *see id.* But even if true, these facts have limited relevance under a *Hertz* analysis. Whether or not BCS or BCSI had pre-adoption contact with, or directly provided services to, these particular adoptive parents, has little bearing on whether the Bethany Grand Rapids office generally "directs, coordinates and controls" BCS-HR's activities, which the Harshaws show it did, *see infra*.

prospective clients only in Virginia, and whether it answers telephone calls only in Virginia, are of little consequence to the *Hertz* inquiry, which focuses on the degree to which BCS coordinated, directed or controlled BCS-HR's activities (wherever the latter occurred). *Cf. IBEW v. ICC*, 832 F.2d 91, 92 (7th Cir. 1987) (applying nerve-center test, court stated, "That the rail interests of the IBEW are concentrated in Illinois is a detail. Many corporations have divisional structures, with the headquarters of the widget division [like the board of directors of BCS-HR in Virginia] on one coast and the corporate headquarters on the other [like the Bethany Grand Rapids headquarters in Grand Rapids, Michigan].").

One of the few significant, probative pieces of evidence on the defendants' side is the undisputed statement by BCS President William Blacquiere that BCS-HR retains responsibility for hiring and firing employees in the Virginia Breach branch office and that BCS-HR assets are segregated from BCS assets. *See* Defs' Opp to Reinstatement of BCS-HR, Ex B (Blacquiere Affidavit made March 19, 2010) ¶ 8. Nonetheless, while these facts might help the defendants avoid a finding that BCS-HR is an outright alter ego of BCS under state law, they are insufficient, when arrayed against the plaintiffs' evidence, to avert a finding that BCS exercise the lesser degree of direction, coordination or control required to treat Bethany's Grand Rapids office as BCS-HR's PPB for purposes of federal diversity jurisdiction under *Hertz*. In any event, the telling fact remains that BCS's organizational chart lists BCS-HR and other branch offices as part of BCS's own Operations, in a hierarchical vertical arrangement which depicts Operations reporting to BCS's President and COO and, ultimately, to BCS's National Board of Directors. At the least, that casts serious doubt on the defendants' notion, based on Blacquiere's affidavit, that BCS could not direct, coordinate or control hiring and firing at the Virginia Beach branch office if it chose to do so.

Indeed, in addition to the relative weakness of the defendants' argument, the Harshaws respond effectively and with much effectively unrebutted evidence of their own. Specifically, the Harshaws claim that in addition to the new PPB standard enunciated in *Hertz*, they now have "material evidence not disclosed by Bethany but acquired by the Harshaws after the Court had issued a conditional ruling on its diversity jurisdiction over BCS-HR earlier in the case ([Doc] 85 filed July 22, 2009) . . . ." Plaintiffs' Motion to Reinstate Bethany Christian Services of Hampton Roads, Inc. as a Defendant and to Vacate July 22, 2009 Order and to Vacate December 16 & 18, 2009 Orders of Dismissal ("P's Mot") at 2 ¶ 5. The Harshaws persuasively show that when evaluated under the new standard, the new evidence about BCS-HR and the other BCS entities support the finding that BCS-HR's PPB is Michigan, which means that BCS-HR is a citizen only of Michigan and can be retained in this action by Virginia citizens. *See id.* ¶ 6. The Harshaws explain their efforts at obtaining information relevant to BCS-HR's citizenship, and how they discovered the new information suggesting that BCS-HR's PPB (nerve center) is in Virginia:

> On July 16, 2008, Bethany served the Harshaws with Defendants' required initial disclosures. Not included in those disclosures were annual reports that BCS-HR filed with the Commonwealth of Virginia during each of the years that BCS-HR did business, including, but not limited to, the years 2001 through 2003 (hereinafter "Annual Reports"). Those Annual Reports, discovered much later by counsel for the Harshaws (*see infra* at 2-3), are attached hereto as Exhibit C. In June 2009, Bethany represented to this Court (in [Doc]1 at 1) that:
>
> > It is also undisputed that Bethany Hampton Roads' principal place of business is in Virginia. Although Defendants' counsel informed plaintiffs' counsel – prior to even answering the Complaint – that Bethany Hampton Roads' principal place of business is in Virginia, Plaintiffs' counsel contended that discovery would reveal that Bethany Hampton Roads' principal place of business was in Michigan.
>
> Based on documents that Defendants produced on June 12, 2009, *see* [Doc] 79, Defendants' representations about Bethany's operations in Virginia, and the

applicable Sixth Circuit law at the time, the Harshaws were left with no choice but to conclude that BCS-HR's principal place of business may indeed be in Virginia. In good faith, therefore, the Harshaws moved to voluntarily dismiss BCS-HR without prejudice based on lack of diversity on June 15, 2009. *See* [Doc] 79. This Court conditionally granted the motion on July 22, 2009. *See* [Doc] 85.

On or about August 13, 2009, as a result of several consecutive days of depositions of BCS *and* BCSI employees in Grand Rapids, Michigan, the Harshaws' counsel independently acquired the 2001-2003 Annual Reports of BCS-HR. Those Annual Reports were prepared by BCS-HR and were *filed with the Commonwealth of Virginia by BCS-HR*. Each report expressly states that BCS-HR's "Principal Office Address" is "**901 Eastern Ave., Grand Rapids, MI 49503**," *see* Exhibit C, the very same address of both BS and BCSI. *See* Blacquiere Dep. (Exhibit D hereto) at pp. 258-61. Each BCS-HR Annual Report also identifies that BCS-HR is incorporated in Michigan. *See* Exhibit C. [footnote 2: Counsel for the Harshaws presented those Annual Reports to counsel for Defendants and requested that they be authenticated and Bates numbered. Defendants then authenticated and produced the Annual Reports Bates-numbered BCS-2082, 2085, 2088.]

The Court dismissed BCS-HR without prejudice on December 18, 2009. [footnote 3 omitted] *See* [Doc] 184. Barely two months later, on February 23, 2010, the United States Supreme Court decided *Hertz*.

From 2000 through 2009, BCS-HR annually filed "Nonprofit Corporation Information Update" documents for itself with *the Michigan State Government* that identified the "Address of the Registered office" of BCS-HR as the 901 Eastern Avenue, Grand Rapids, Michigan address. *See* Exhibit E. The same filings identified BCS-HR's President as "Glenn DeMotts" from 2000 through 2005, and "William Blacquiere" from 2006 through 2009. DeMotts was the President of all of Bethany, not just BCS. Blacquiere, DeMotts' successor, was [President of all of Bethany] as well. Blacquiere Dep. (Exhibit D) at p. 26, lines 9-12. Moreover, each and every one of the filings – again from 2000 through 2009 – was signed, depending on the year, by either DeMotts or Blacquiere. In each instance, DeMotts/Blacquiere designated himself as the President of BCS-HR. [footnote 4: deMotts and Blacquiere each handwrote or typed their title as "President," "President/CEO," or "President/Exec. Director" of BCS-HR.] *See id.* None of these filings/documents w[as] ever produced by Defendants.

Additionally, from 2001 through the present, each and every Bethany branch office identified – precisely as BCS-HR did – "901 Eastern Avenue, Grand Rapids, Michigan" as its principal place of business in filings with other states. [footnote 5: *See, e.g.,* Annual Reports of BCS-Greater Delaware Valley, BCS-Central Pennsylvania, BCS-Western Pennsylvania, BCS-Colorado, BCS-East Tennessee, BCS-Middle Tennessee, BCS-West Tennessee (Exhibit F hereto).]

Third, those same branch offices filed "Nonprofit Corporation Information Update" documents with the government of *Michigan* representing the same "901 Eastern Avenue, Grand Rapids, Michigan" [as its] principal place of business address – exactly as BCS-HR did. DeMotts and Blacquiere, during their respective tenures, signed each of those filings as well, affirmatively designating themselves the president of the branch offices. *See, e.g.,* Corporation Information Update documents (Exhibit G hereto). [footnote 6: Because of the volume of these documents, the Harshaws include in this exhibit, by way of example only, 2003 and 2004 statements from the same seven . . . Bethany branches included in Exhibit F. Note also BCS-Greater Delaware Valley branch describing its "purposes and activities" as "Same as 'Bethany Christian Services.'" *See id.*]

Plaintiffs' Opening Brief in Support of their Motion to Reinstate Bethany Christian Services of Hampton Roads, Inc. as a Defendant and to Vacate July 22, 2009 Order and to Vacate December 16 & 18, 2009 Orders of Dismissal ("P's Br") at 2-4 (one ¶ break added).

This court of mindful that the Supreme Court's rejected "suggestions . . . that the mere filing of a form like the [SEC]'s Form 10-K listing a corporation's 'principal executive offices' would, without more, be sufficient proof to establish a corporation's 'nerve center.'" This admonition, however, does not undermine the court's conclusion that BCS-HR's nerve center actually is the location which it designated in official government filings – Grand Rapids, Michigan – because that conclusion based on much other probative evidence presented by the Harshaws, discussed below. In any event, under the posture of this case, the expressed concern behind the Supreme Court's disavowal of blind reliance on a corporation's own "principal office" proclamation is not implicated. The Supreme Court worried that, if a corporation knew that courts would always treat its "principal office" designation as conclusive, a corporation would strategically declare a location to be its principal office if it preferred to be amenable to suit in that State rather than others. The Court wrote, "Such possibilities would readily permit jurisdictional manipulation, thereby subverting a major reason for the insert of the 'principal place of business' language in the diversity statute."

*Hertz*, – U.S. at –, 130 S.Ct. at 1195. In our case, there is no possibility that BCS-HR stated its principal office to be Grand Rapids for purposes of jurisdictional manipulation. After all, it is BCS-HR which contends that its PPB is in *Virginia*, *instead of* its previous self-proclaimed "principal office" in Grand Rapids.

The Supreme Court's example of corporate jurisdictional manipulation is also inapposite here. The Court instructed that "if the record reveals attempts at manipulation – for example, that the alleged 'nerve center' is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat – the courts should instead take as the 'nerve center' the place of actual direction, control, and coordination, in the absence of such manipulation." *Hertz*, – U.S. at –, 130 S.Ct. at 1195. There is no suggestion that *either* alleged nerve center – Bethany's Grand Rapids office (favored by plaintiffs) or BCS-Hampton Roads' branch office in Virginia Beach (favored by defendants) – is a sham or a shell such as a mere "mail drop box, a bare office with a computer, or the location of an annual executive retreat", *id.* Nor would the record support such a characterization of Bethany's Grand Rapids or Virginia Beach offices: each side has colorable arguments in favor of its preferred PPB; the plaintiffs' arguments for Grand Rapids are somewhat more well-supported by the record.[5]

_____

[5]

The court notes that the defendants' brief opposing reinstatement of BCS-HR makes numerous assertions that are not supported by citation to evidence. For example, the defendants make all the following assertions without citing an affidavit, deposition testimony, or documentary evidence (tying only some of these assertions to the record later):

> The second corporation is BCS. BCS is located in Michigan and has its own corporate board, directors/officers and employees. BCS had no contact with Plaintiffs prior to the adoption. BCS has a contractual relationship with BCSHR and considers itself a parent corporation to BCSHR (as well as to all of the branch offices). * * * None of the services that BCS provides are delivered directly to prospective adoptive parents. Indeed, BCS did not provide any services directly to

Notwithstanding the Supreme Court's admonition, then, the court finds that by repeatedly officially declaring to the State of Michigan and numerous other state governments that its "principal office address" was in Grand Rapids, Michigan (the same address, in fact, which BCS and BCSI told the State of Michigan was *their* principal office address), BCS-HR effectively stated that it considered its headquarters to be in Grand Rapids, Michigan. The court accords greater weight to these official government filings than to the *pro forma* recitation in the BCS-BCSHR contract that "The Corporation [BCS-HR] is operating under this agreement as an independent corporate entity and nothing contained herein shall be interpreted or construed as creating any relationship of employment, partnership, joint venture, or agency", Defs' Ex A at unnumbered page 3 ¶ 12. For one thing, if BCS and BCS-HR truly considered BCS-HR to be independent – in the *Hertz* sense of *not* "controlled, directed, or coordinated" by BCS – then BCS-HR would not have filed official reports or forms declaring that its principal office was Grand Rapids (where BCS is headquartered and apparently has its principal place of business) rather than Virginia Beach (where BCS-HR meets and

---

Plaintiffs at any time prior to this adoption.

The third corporation is . . . BCSI. * * * BCSI had no direct contact with Plaintiffs prior to the adoption. BCSI provides services for a fee to BCSHR such as review and approval of adoption applications to ensure that they comply with requirements imposed by the country of origin. BCSI also provides training support through BCS, specifically with regard to the unique aspects of international adoptions.

Defs' Opp to Reinstatement at 3-4. While it may be appropriate to make statements without citation to the record in an introduction or conclusion which summarizes a party's position or version of events, counsel are reminded that their statements are not evidence, whether during pretrial proceedings or at trial. *See US v. Beasley*, 583 F.3d 384, 394 (6th Cir. 2009) (Richard Allen Griffin, J.) ("[T]he district court gave a proper curative instruction advising the jury . . . that statements, arguments, and questions by counsel were not evidence."), *reh'g denied* (6th Cir. Nov. 13, 2009); *Wilson v. Bell*, – F. App'x –, 2010 WL 785912, *4 (6th Cir. Mar. 9, 2010) (Guy, Clay, Kethledge) ("[T]he trial judge properly instructed the jury that . . . the attorneys' arguments were not evidence.").

interacts with actual and potential clients).

Secondly, merely accepting the BCS/BCS-HR contractual recitation of independent status, when it is supported by some evidence but contradicted by more, would elevate form over substance.[6]  Third, defendants present no authority for their notion that the significance of BCS-HR's designation of Bethany's Grand Rapids office as its principal office is somehow undermined by the fact that BCS-HR's annual reports listed a registered agent in Virginia, *see* Defs' Opp to Reinstatement at 6.  If BCS-HR considered its Virginia Beach office to be its principal office, again it would not have directly declared that Bethany's Grand Rapids office was its principal office, regardless of where its registered agent was located.

Fourth, the significance of BCS-HR's designation of Grand Rapids as its principal office is not undermined by the fact that BCS-HR's Nonprofit Corporation Information Update forms stated that the signatories (BCS officials) were signing as "authorized officer or agent", *see* P's Mot to Reinstate, Ex E.  The defendants simply *assert* that each BCS signatory was acting as a mere "agent"

---

[6]

*See In re FedEx Ground Package Sys., Inc., Employment Practices Lit.*, 662 F. Supp.2d 1069, 1090 (N.D. Ind. 2009) ("[E]ven if the contract recites that the parties have entered into an independent contractor relationship, that term isn't necessarily controlling where other terms in the contract establish an employee relationship.") (state-law citation omitted), *clarified on other grounds*, 2010 WL 597988 (N.D. Ind. Feb. 17, 2010);

*Morgart v. Union Mut. Life Ins. Co.*, 644 F. Supp. 934 (D.N.J. 1986) (although "[t]he general agency agreement recite[d] that 'the General Agent shall be an independent contractor, and nothing in this Agreement shall be deemed to create the relationship of employer and employee between the company and the General Agent," court found that "the exact nature of Morgart's relationship to Union Mutual . . . is not clear.").

*Cf. Michigan Elec. Employees Pension Fund v. encompass Elec. & Data., Inc.*, 556 F. Supp.2d 746, 771 n.14 (W.D. Mich. 2008) (when determining whether to disregard the putatively separate corporate form of two companies owned and operated by same men, court noted, "'Courts have without difficult[y] disregarded form for substance where ERISA's effectiveness would otherwise be undermined.'") (quoting *Hamilton v. Carrell*, 243 F.3d 992, 1004 (6th Cir. 2001));

of BCS-HR, rather than an "authorized officer"; such an assertion is arbitrary and untenable, given that the phrase on which defendants rely, standing alone, admits of both possibilities equally. As noted below, other evidence of record tends to favor the view that the BCS officials who signed the BCS-HR annual reports did so as authorized officers of BCS-HR (rather than simply agents of a corporation which did not control, direct or coordinate BCS-HR's activities).

Fifth, the defendants make much of the fact that BCS entities operating in other states, such as Pennsylvania, Colorado, and Tennessee, likewise had their annual reports prepared, signed, and filed by BCS officials. *See* Defs' Opp to Reinstatement at 6-7. But far from "proving" that BCS therefore must not be coordinated, directed or controlled by BCS, this fact has an equal or greater tendency to suggest that the other BCS entities too may be coordinated, directed, or controlled by BCS for purposes of a *Hertz* PPB analysis.

After holding that a corporation's PPB is its nerve center, which it defined as "the place where a corporation's officers direct, control, and coordinate the corporation's activities", the Supreme Court stated that the nerve center "in practice . . . should normally be the place where the corporation maintains its headquarters . . . ." *Hertz*, – U.S. at –, 130 S.Ct. at 1192. The court construes this language to erect only a rebuttable presumption, not a conclusive one. Thus, under *Hertz* this court must find that BCS-HR's nerve center is its headquarters in Grand Rapids, Michigan, unless the defendants can show that the headquarters was – contrary to the implication of some BCS-HR official filings (Nonprofit Corporation Information Updates filed with state governments) and records (unfiled IRS Form 1990 for 1994) – not "the actual center of direction, control, and coordination" for BCS-HR, *see id.* The court concludes that the defendants have not made that showing. In other words, they have not provided sufficient reason to believe that their

self-declared headquarters ("principal office") in Grand Rapids is not "the actual center of direction, control, and coordination, *i.e.*, the 'nerve center,' and not [for example] simply an office where the corporation holds its board meetings . . . ." *Hertz*, – U.S. at –, 130 S.Ct. at 1192.

On the contrary, the Harshaws submit uncontradicted evidence that from 2000-2009, the President of BCS signed and filed documents with the State of Michigan, and other state governments, holding himself out as the President of BCS-HR as well, *see* P's Br, Ex G. Similarly, BCS's then-Vice-President of Finance, Marv Auchtung (now COO), whose office is in Grand Rapids, Michigan, signed at least one BCS-HR federal tax form as *BCS-HR's* "V.P.-Finance", *see* P's Br, Ex K. The defendants point out that the form signed by Auchtung was not a "tax return" but an "IRS Form 990", which as it happened, was not filed with the IRS because BCS-HR was exempt from filing such a form in 2004. *See* Defs' Opp to Reinstatement at 9, citing Ex C (Auchtung Affidavit dated March 22, 2010) ¶¶ 7-8.[7] Nonetheless, the fact remains that BCS's VP of Finance signed an Internal Revenue Service form on behalf of BCS-*Hampton Roads* and listed himself simply as "VP of Finance," which certainly suggests that he was functioning as the VP of Finance of BCS-*Hampton Roads*.

Moreover, BCS-HR does not purport to have its own Chief Financial Officer ("CFO") or the equivalent; rather, that role for BCS-HR is fulfilled by *BCS's* CFO, who is located in Grand Rapids, *see* P's Br, Ex Q - Transcript of Videotaped Deposition of Judy Dalrymple ("Dalrymple Dep") 43:4-11 and Ex P - Transcript of Videotaped Deposition of Karen Elseroad conducted February 17, 2009

---

[7] Actually, the defendants merely cite the entirety of Blacquiere's affidavit and Auchtung's affidavit, leaving it to the court to find the pertinent paragraph(s) of each. *See* Defs' Opp to Reinstatement at 8-9. The court reminds counsel that they must identify the specific pages in judicial decisions, the specific paragraphs in affidavits, and the specific pages and lines in deposition transcripts, which they cite in support of their arguments.

("Elseroad Dep") at II/96:6-15. More broadly, BCS's corporate organizational charts dated August

1, 2003 and January 22, 2004, *see* P's Br - Ex L, show the following hierarchy:

**National Board of Directors**

**Corporate Administration**
President Glenn De Mots
Chief Operating Officer Bill Blacquiere

• Strategic Planning
• System Coordination
• Quality Assurance
• Accreditation
• Budget Implementation
• I.T. Supervision

P's Br - Ex L at 2. The August 2003 chart then divides into five branches: Advancement, Finance,

Informational Services, Human Resources, and Operations. *Id.* The Operations box further divides

into the Michigan Region, Western/Eastern Region & Lifeline & New Office Development

(covering locations n California, Iowa, Missouri, New England, Pennsylvania, and Washington

State), the Southeast Region & COA & Total Quality Management, and "Central Region & Project

Embrace", the last of which includes "Virginia, Virginia Beach" and other locations in Virginia,

Illinois, Indiana, Maryland, Minnesota, New Jersey, Tennessee and Wisconsin. *Id.* The BCS

organizational ("Corporate Management Structure") chart for January 2004 is materially identical

to the August 2003 chart, *see id.* at 1. In other words, the defendants' own records evince their view

that in practice, BCS-HR, then known as the "Virginia Beach" branch, was considered merely a part

of BCS's "operations." Indeed, the e-mail of Karen Elseroad, the director of BCS-HR, list her as

"*Branch* Director, Bethany Christian Services of Hampton Roads", *see* P's Br - Ex M.

Furthermore, BCS-HR (formerly known as the Virginia Beach branch) was part of the

Central Region. The Central Region's Director of Operations, Karen Helder, testified that while the

directors of the branches in that region give her information and she wrote their performance evaluations, she was <u>not</u> their "boss" and they did not report to her, and the evaluations, along with their overall personnel files, were always forwarded to and kept at the BCS office in Grand Rapids, Michigan, during her entire eight years with Bethany. *April 7, 2010See* P's Br - Ex U, Deposition of Karen Helder conducted in Grand Rapids, Michigan on August 11, 2009 ("Helder Dep") 11:3 to 12:24. Taking these items together, the court finds that the branch offices, including BCS-HR, ultimately report and are accountable to BCS's President and CFO, who in turn report to BCS's National Board of Directors.

Moreover, when Mr. Harshaw e-mailed "info@bethany.org" in August 2006 to request more complete medical information about his adopted son, entitling the e-mail "For miss Dalripple, Russian adoption coordinator", a BCS Administrative Assistant named Julie Studebaker – who listed a telephone number with area code (616), corresponding to Grand Rapids, Michigan – was the one who forwarded the e-mail to Judy Dalrymple. *See* P's Br - Ex N. The court does not attach great weight to this fact, but whatever weight it has is on the side of a Michigan PPB for BCS-HR.

More specifically, after the Harshaws filled out a Preliminary Application for Adoption (P's Br Ex O), BCS Central Region Director of Operations Karen Elseroad faxed it to "International - Russia / E. Europe" at (616) 224-7585, which is again a telephone number bearing a Grand Rapids area code, for approval, and deposition testimony reveals that BCS in Grand Rapids was responsible for deciding whether to approve, and in fact did issue the approval. *See* P's Br at Ex P (Elseroad Dep) 76:23 to 78:22 and 79:10-22, and Ex Q (Dalrymple Dep) 27:4 to 28:3 and 32:22 to 35:21, as well as Ex S (Walton Dep) pp. 54-55. The defendants deny that BCS had authority to approve or disapprove adoptions on which BCS-HR was working, but the court disagrees. The defendants state

as follows:

> BCSI centralized the information[-]gathering and updating process for international adoptions at BCSI's office [in Grand Rapids, Michigan]. This approach eliminated the need for each branch office to perform this labor intensive work. BCSI, having all this relevant, up-to-date information, would screen the applications to ensure that the prospective adoptive family met the requirements to be imposed by the court in the country where the child was to be adopted. This act is ministerial and/or clerical in nature and involves simply looking at the country's requirements, comparing them to the family's application, and communicating to BCSHR whether they are met. BCSI cannot make an adoption occur, nor can it prevent an adoption from occurring. The courts in the country where the child is placed for adoption play the exclusive role of either granting or denying an adoption. [citing Ex D (Dalrymple Dep) at 33:20-25 and 60:4-8] To suggest that BCSI's "approval" process constitutes direction, control or coordination of the activities of BCSHR portrays a fundamental misunderstanding of the international adoption process and the role of the adoption agency in the international and domestic legal systems.

Defs' Opp to Reinstatement at 10. But it stretches the terms "ministerial" and "clerical" beyond any commonly understood meaning to apply them to BCSI's quite *substantive* determination of whether a potential adoption was likely to satisfy the criteria of the adoptive parents and the criteria of the would-be adoptee's home government. And it is significant that the defendants do not allege that BCS-HR ever decided to proceed with a proposed adoption when BCSI declared that it did not meet either set of criteria. Nor, conversely, do they allege that BCS-HR ever decided not to proceed with a proposed adoption when BCSI declared that it *did* meet both sets of criteria. Rather than make those important determinations itself, BCS-HR deferred to and was completely directed by BCSI's decision. *See* Defs' Opp to Reinstatement, Ex D (Dep of BCSI Coordinator for Russia and Eastern Europe Adoptions, Judy Dalrymple) 32:22 to 33:3 (agreeing that BCSI would "approve" or "disapprove" prospective parents' preliminary international-adoption applications) and *id.* 33:4-13 (agreeing that BCSI would "approve" or "disapprove" prospective parents' "formal application, which has more complete information"). Taking that as another sign of BCS/BCSI's "directing,

controlling or coordinating" BCS-HR's activities is hardly "naive" or "disingenuous", as the defendants so dramatically charge, nor does such a logical inference reflect any "misunderstanding of the international adoption process and the role of the adoption agency . . .", Defs' Opp at 10.

In addition, when Roman was located as a possible adoption candidate for the Harshaws, it was BCS, not BCS-HR, which located and selected him. BCS Central Region Director of Operations Elseroad recorded the following, in a signed note, in October 2003:

> 10/30/03 TC [telephone call?] to Judy Dalrymple [BCSI's Adoption Coordinator for Russia, based in Grand Rapids, Michigan]. Through Dr. D's program, she has a referral for the Harshaws of an 18[-]month[-]old boy who is healthy, on target, and beautiful and who two families turned down because he was too old for one, and not blonde enough for the other family. Judy will fax referral information in order that this director may call the family.

P's Br - Ex T. Likewise, when would-be adoptive parents decided to travel to the foreign county to see the candidate child, it was the Grand Rapids office which gathered or developed information, advice and contacts regarding travel, schedule, and logistics for the parents' trip, not the branch office (such as BCS-HR). BCSI in Grand Rapids would sometimes communicate the information directly to the prospective adoptive parents and sometimes convey it through the branch office in the parents' locale, but either way it was Grand Rapids which gathered and developed the information provided to the parents. *See* P's Br - Ex Q (Dalrymple Dep) 96:4 to 97:15.

Next, when determining the extent to which BCS-HR's Grand Rapids "principal office" actually "direct[s], control[s] and coordinat[es]" BCS-HR's activities, the court also finds it significant that BCS-HR Branch Director Karen Elseroad stated that BCS-HR had *no choice* but to purchase administrative and organizational services from BCS (which the counsel and deponents sometimes refer to as "National"). Elseroad had this exchange with counsel:

A. Bethany Hampton Roads pays – is responsible for its own bills in terms of

> Bethany Hampton Roads' money is used to pay for any Bethany Hampton Roads expenses. So I just want to clarify that the check – Bethany Hampton Roads might ask that a check be written to a particular utility company by Bethany National accounting department, but it is Bethany Hampton Roads' funds and money that is paying for those utility bills.
>
> * * *
>
> Q. [W]e'll focus then on rent. Do you have to make a check request every month, or is that something that someone else in your office does, or is that something that National knows to do without you?
>
> A. Yeah. We've set it up with National that we give them – we have a system set up that they automatically pay our monthly rental bill at our request.
>
> * * *
>
> Q. *Okay. You said that you purchase services from Bethany National.*
>
> A. *Yes.*
>
> Q. *\* \* \* When you're purchasing services from Bethany National, I guess the first question is, can you can decline to purchase services? Could you use your own human resource arm? Could you use your own bank account to pay employees?*
>
> A. *No.*
>
> Q. *So you're required to purchase the services from National?*
>
> A. *Yes.*

P's Br Ex P (Elseroad Dep) 70:17 to 72:16 (emphasis added). Elseroad clarified that if BCS-HR wishes to have brochures printed by an entity other than BCS because a better price was available, it could do so, but she stated that she could not think of any other services which BCS-HR could choose to buy from anyone other than BCS. *See id.* 72:17 to 73:17.

Against all this documentary and testimonial evidence that the Grand Rapids office in fact directed, controlled and coordinated BCS-HR's activities in significant ways, and that BCS-HR and BCS themselves treated BCS-HR more like a branch office than a truly independent subsidiary or affiliate[8], the defendants offer insufficient counterweight. Accordingly, pursuant to FED. R. CIV. P.

---

[8]
The court speaks of corporate independence only in terms of *Hertz*'s "control, direction and coordination" test for PPB for purposes of corporate citizenship under 28 U.S.C. § 1332(c). The court intimates no opinion as to whether BCS-HR is an alter ego of BCS and/or BCSI, as the two

21, the court will grant the Harshaws' motion to reinstate Bethany Christian Services of Hampton Roads, Inc., as a party defendant.[9]

### Defendants Must Reimburse the Harshaws, With Interest, for Amount Previously Paid as Condition for Voluntary Dismissal without Prejudice of BCS-HR.

The court determines that Equity requires the defendants to reimburse the Harshaws for the amount which the Harshaws previously paid them as a condition for the voluntary dismissal without prejudice of BCS-HR. Equity also requires that the plaintiffs be compensated for the loss of the use of those funds. That leaves the question of an appropriate interest rate. Strictly speaking, today's order does not award "prejudgment" interest, as there has not yet been any judgment in favor of the plaintiffs. Nonetheless, having determined that Virginia substantive law governs all the plaintiffs' claims and all issues in this action, the court finds it appropriate to consult the Virginia prejudgment interest statute for a rate of interest which the Virginia courts would likely find suitable. VA. CODE ANN. § 8.01-382 provides, in its entirety:

---

standards are not necessarily the same. *Hertz* is federal precedent and will be applied and interpreted by federal courts determining federal diversity jurisdiction. In contrast, alter ego status is typically determined by *state* law. In developing its State's common law governing alter ego determinations, state courts would not be bound to consider *Hertz* or federal decisions interpreting it.

[9]

On Thursday, April 8, 2010 at 4:31 p.m., the Harshaws filed a motion for leave to file a belated reply brief in support of its motion to reinstate BCS-HR as a defendant. Because the court is already granting the Harshaws' motion to reinstate on the basis of the briefs and evidence previously submitted, the Harshaws cannot be prejudiced by the court declining to consider their reply brief. *Cf. Glass v. Kellogg co. Bakery, Confectionery, Tobacco Workers & Grain Millers Pension Plan*, 2009 WL 2567191, *1 n.3 (W.D. Mich. Aug. 17, 2009) ("Nonetheless, the Plan cannot be prejudiced by the court ruling on its motion without waiting for its reply brief, because the court is granting that motion and dismissing count two as requested."). The court will deny their motion for leave to file a late reply brief.

In any Administrative Process Act . . . action or action at law or suit in equity, the final order, verdict of the jury, or if no jury the judgment or decree of the court, may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence. The final order, judgment or decree entered shall provide for such interest until such principal sum be paid.

*If a final order, judgment or decree be rendered which does not provide for interest, the final order, judgment or decree awarded or jury verdict shall bear interest at the judgment rate of interest as provided for in § 6.1-330.54 from its date of entry or from the date that the jury verdict was rendered.*

Notwithstanding the provisions of this section, any judgment entered for a sum due under a negotiable instrument . . . shall provide for interest on the principal sum . . . . at the rate specified in the instrument. If no such rate is specified, interest on the principal sum shall be at the judgment rate provided in § 6.1-330.54.

Final orders may be recorded, enforced, and satisfied as orders or decrees of a circuit court upon certification of such orders by the agency head or his designee.

Emphasis added, paragraph breaks added. In turn, VA. CODE ANN. § 6.1-330.54 provides as follows:

*The judgment rate of interest shall be an annual rate of six percent*, except that a money judgment entered in an action arising from a contract shall carry interest at the rate lawfully charged on such contract, or at six percent annually, whichever is higher. *Whenever the contract or other instrument does not fix an interest rate, the court shall apply the judgment rate of six percent to calculate prejudgment interest* pursuant to § 8.01-382 and to calculate post-judgment interest.

The rate of interest for a judgment shall be the judgment rate of interest in effect at the time of entry of the judgment and shall not be affected by any subsequent changes to the rate of interest stated in this section.

Emphasis added, paragraph break added. *See, e.g., Virginia Prop. & Cas. Guar. Ass'n v. Chesapeake Hosp. Auth.*, No. CL07-1005, 75 Va. Cir. 396, 2008 WL 6759969, *2 (Va. Cir. Ct. Chesapeake Cty. Aug. 25, 2008) (Creekmore, Cir. J.) ("The court is further of the opinion that prejudgment interest should be awarded to the plaintiff at the rate of 6% per annum, in accordance with Virginia Code § 8.01-382 . . . .").[10]

---

[10]

This reimbursement directive implies no opinion as to whether any of the three defendants

**Nonetheless, bringing BCS-HR back into the case as a defendant has no substantial effect on the court's choice-of-law analysis.** The Harshaws' motion for reconsideration of *Harshaw 5* proffers no binding authority whatsoever for the notion that the addition of a third Michigan corporation undermines the court's conclusion that Virginia has the greater interest in having its substantive law applied to its citizens' tort claims. Rather, it cites only two district-court decisions, and offers little in the way of actual reasoning. Here is the *entirety* of the substance of the Harshaws' reconsideration argument for application of Michigan substantive law:

> Michigan's conflict of laws rule states that Michigan law applies "unless a 'rational reason' to do otherwise exists." *Sutherland v. Kennington Truck Serv., Ltd.*, 562 N.W.2d 466, 471 (Mich. 1997).
>
> To determine whether to displace Michigan law, a court must consider whether a foreign state has an interest in the application of its law and, if so, whether Michigan's interests mandate that Michigan's law applies, despite the interests of the foreign state. *Id.* (citing *Olmstead v. Anderson*, 300 N.W.2d 292, 301 (Mich. 1987)). "If no state has . . . an interest [in the application of its law], the presumption that Michigan law will apply cannot be overcome." *Id.* Factors to be considered in assessing whether Michigan's interests have priority over the interests of a foreign state include considerations of promoting certainty, predictability of results, ease of application, and preventing forum shopping. *See Olmstead*, 400 N.W.2d at 302.
>
> The fact that BCS-HR is a corporate citizen of Michigan, as well as all other Bethany entities, strongly suggests that Michigan law applies to all substantive issues in this litigation. *See, e.g., Stewart v. Geostar Corp.*, Not Reported in F. Supp.2d, 2008 WL 1882698 (E.D. Mich. 2008) (holding defendant's state of incorporation to be a rational reason to apply the law of that state); *Weckler v. Valley City Mill Co.* 93 F. Supp. 444 (D.C. Mich. [sic] 1950) (same).

Plaintiffs' Opening Brief in Support of Motion for Reconsideration of *Harshaw 5* Choice-of-Law

---

or their counsel did or said anything improper or misleading with respect to the conduct of discovery, or with respect to their communications with plaintiffs or the court, which led this court to conditionally grant the plaintiffs' motion to voluntarily dismiss BCS-HR without prejudice (or which then led the plaintiffs to accept that condition and pay fees and costs as the price of that dismissal).

Ruling, Doc 236 ("P's Recon Br") at 7.[11]  Although the complaint alleges some wrongdoing by BCS and BCSI, the wrongdoing is primarily under an agency theory, and the complaint *primarily* alleges specific wrongdoing by the Virginia branch office with respect to this Virginia adoption.

Lastly, the Harshaws' motion for reconsideration does not address this court's reasoning that the Michigan choice-of-law presumption in favor of Michigan law in the Michigan forum has little to no weight when the plaintiffs are from a foreign State and therefore not invoking their home forum.  The court's reasoning on that score stands unchallenged by the reconsideration motion:

"Michigan choice of law provisions favor allowing Michigan residents to bring suit

---

[11]

The Harshaws have not filed a reply brief in support of their reconsideration motion. Because they received the Notice of Electronic Filing of the defendants' opposition brief on Tuesday, March 30, 2010, the 14-calendar-day period for them to e-file a reply brief expires at midnight on Tuesday, April 13, 2010.  *See* W.D. MICH. LCIVR 7.2(a) (listing types of motions which are considered dispositive) and 7.2(b) (motion for choice-of-law determination is not listed as dispositive, so it is non-dispositive, and thus a motion for reconsideration thereof is nondispositive); W.D. MICH. LCIVR 7.2(c) (party has 14 days to file a reply brief on a non-dispositive motion); FED. R. CIV. P. 6(a)(1)(A) and (B) (when calculating a time period, the court excludes the day on which the triggering act or event occurred, then counts all days, including weekends and legal holidays).

Nonetheless, the court need not wait to see whether the Harshaws file a reply.  Their opening brief proffers no argument or theory which remotely undermines the court's conclusion that Virginia substantive law applies; a reply cannot rectify this deficiency, because replies are prohibited from raising arguments or theories not raised in the opening brief.  *See US v. Reyes*, No. 1:93-crim-16, slip at 15-16, 2010 WL _____, *__ (W.D. Mich. Mar. 27, 2010) ("Reyes first complains that his due process rights were violated because this court issued its opinion denying his motion . . . without waiting for his reply brief.  This is not a ground for reconsideration under the circumstances.  The court typically waits for the reply-brief deadline to elapse where there is any serious question about which party's arguments deserve to prevail.  Here, however, Reyes' motion . . . patently lacked merit, so a reply brief would be unable to avert the denial of those motions unless it raised an entirely new claim, argument or theory – which is not allowed in a reply brief.") (citing, *inter alia*, *US v. Lockett*, – F. App'x –, 2009 WL 5084096, *14 (6th Cir. 2009) ("These arguments were not made in Lockett's opening brief . . . so they are waived.") (citing, *inter alia*, *Am. Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004).  *Accord Teamsters Local 243 v. DHT Transp.*, 2007 WL 3026096, *2 (E.D. Mich. Oct. 12, 2007) ("[I]t was not proper for plaintiff to invoke relief pursuant to . . . a different legal theory in its reply brief.") (citing *US v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002)).

in Michigan courts under Michigan law", *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425 (6ᵗʰ Cir. 2009) (citation omitted), and our Circuit has recognized a State's interest in "protecting its residents from injury and providing just compensation to its citizens" as a legitimate, relevant interest in a choice-of-law analysis. *See Williams v. Toys 'R' Us*, 138 F. App'x 798, 803 (6ᵗʰ Cir. 2005) ("Pennsylvania may have an interest in having its law applied because the accident occurred there. Pennsylvania's interest, however, does not outweigh Michigan's competing interest in protecting its residents from injury and" providing just compensation to its citizen, like Williams); *Imaging Fin. Servs., Inc. v. Lettergraphics Detroit, Inc*., . . . 1999 WL 115473, *3 (6ᵗʰ Cir. Feb. 9, 1999) . . . ("Although there may be a reason to displace Michigan law on the contract claims (i.e., a choice of law provision in the contract itself), there is no reason to displace it on the tort claim here. The alleged injury occurred in Michigan to a Michigan company.").

By contrast, when the plaintiff is not a Michigan resident, these interests are absent and the analysis is no longer so strongly presumptively tilted in favor of applying the forum State's substantive law. *See, e.g., Ruffin-Steinback v. dePasse*, 267 F.3d 457 F.3d 463-64 (6ᵗʰ Cir. 2001) (because plaintiff was a Mississippi resident when she filed the complaint and a Mississippi or Alabama resident when she died, "[t]he district court did not err in determining that Michigan law did not apply to her cause of action, and under Mississippi law, Earline Ruffin's defamation claim was properly dismissed.").

*Harshaw 5*, 2010 WL 774321 at *11. The court adheres to this reasoning, and the remainder of the reasoning of *Harshaw 5*, with the corrections noted above (i.e., BCS-HR is both incorporated in and has its PPB in Michigan, not Virginia, and the complaint *does* allege some wrongdoing by BCS and BCSI in Michigan, although not much or in much detail).

**Finally, today's disposition obviates the need to determine , at this juncture, whether BCS-HR is the alter ego of BCS and BCSI.** The defendants had contended that because the complaint does not allege any specific wrongdoing by BCS and BCSI, only by BCS-HR, the complaint must be dismissed in its entirety because BCS-HR was no longer a party to this case. Now, however, BCS-HR is once again a party defendant, and the Harshaws may proceed on their complaint whether or not BCS-HR is the alter ego of BCS and/or BCSI. *See* P's Motion for

Reconsideration of *Harshaw 5* Choice-of-Law Ruling ("P's Mot for Recon Choice of Law") at 2 ¶ 4 (correctly noting that "If BCS-HR is reinstated as a defendant in this litigation, . . . the doctrines of 'alter ego' and 'agency' would be unnecessary for Plaintiffs to assert direct liability against all of Bethany . . . .").[12]  As the Harshaws urge, the court finds that while their complaint's most specific allegations of wrongdoing center on BCS-HR, it does sufficiently allege liability by BCS and BCSI (under an agency theory) that they could recover against BCS and BCSI without showing them to be alter egos of BCS-HR.  Specifically, the Harshaws properly call the court's attention to paragraph six of the complaint, which states, in pertinent part, that "Bethany Christian Services; Bethany Christian Services of Hampton Roads, Inc.,; and Bethany Christian Services International, Inc. *acted* together or *as agents of each other with respect to all actions complained of herein* . . . ." Furthermore, the defendants' own testimony led the court to find that BCSI – *instead of* BCS-HR – had, and exercised, the authority to approve or disapprove both preliminary and formal international-adoption applications.  If, as it appears, BCSI approved the Harshaws' applications and BCS-HR proceeded with the adoption in reliance on and deference to that approval, then the Harshaws can attempt to impose liability on BCSI directly for negligence – or any more culpable state of mind which they can establish through admissible evidence – for that approval, without regard to BCSI's alter ego relationship (or lack thereof) with BCS-HR.

---

[12]

For example, if the Bethany entities followed their stated usual practice in the Harshaws' case, that would mean that BCS-HR deferred to BCSI's approval of the Harshaws' preliminary application and BCSI's approval of their later "formal" application.  I.e., BCS-HR went ahead with the adoption because BCSI decided and assured BCS-HR not only that the Harshaws met the requirements of the Russian federal government or the Krasnoyarsk regional government, but also that Roman met the Harshaws' stated criteria.  As noted elsewhere, the Harshaws' criteria, conveyed to BCS-HR (and then, in turn, to BCSI), included the insistence that the adopted child have at most "minor, correctable" problems and a "positive prognosis" for normal development.

Accordingly, the upcoming hearing entertain counsels' argument only on the merits of the underlying controversy, which has been obfuscated by the jurisdictional and choice-of-law battles: defendants' motion to dismiss the complaint under Rule 12(b)(6) on other grounds, the Harshaws' motion for summary judgment on counts 2-4, and the defendants' motion for summary judgment on all 4 counts.

## ORDER

1. The court **DECLARES** that for purposes of diversity citizenship, Bethany Christian Services of Hampton Roads, Inc., has its principal place of business in Grand Rapids, Michigan.

   Plaintiffs' motion to reinstate Bethany Christian Services of Hampton Roads, Inc., as a defendant [**Doc #233**] **is GRANTED.**

   Bethany Christian Services of Hampton Roads, Inc., is **ADDED** as a party defendant.

   No later than Monday, May 17, 2010, defendants **SHALL PAY** to plaintiffs this amount:

   –   the amount which the defendants received from the plaintiffs by check on September 2, 2009 (as noted by defendants in Document 117 filed September 3, 2009), plus

   –   interest from September 3, 2009 through the date on which defendants deliver the refund check to the plaintiffs, inclusive, at the rate of 6.0% (six percent) per annum.

   Plaintiffs' motion for leave to file a late reply brief (in further support of its motion to reinstate BCS-HR as a defendant) [**Doc #245**] **is DENIED**.

2. Plaintiffs' motion for reconsideration of *Harshaw v. Bethany Christian Services, Inc. et al.*, No. 1:2008-cv-104 Document 229, 2010 WL 774321 (W.D. Mich. Feb. 25, 2010) ("*Harshaw 5*") [**Doc #235**] **is DENIED.**

   The court again **DECLARES** that Virginia substantive law governs all claims and issues.[13]

---

[13]<u>All four claims remain pending</u>:
Count 1, William Harshaw and Julie Harshaw's  claim for Fraudulent Misrepresentation
Count 2, William Harshaw and Julie Harshaw's claim for Negligent Misrepresentation
Count 3, William Harshaw and Julie Harshaw's claim for Negligent Failure to Disclose
Count 4**,** Roman Harshaw's claim for Negligent Failure to Disclose

This is not a final and appealable order.

**IT IS SO ORDERED** on this __26th__ day of April 2010.

/s/ Paul L. Maloney
Honorable  Paul L. Maloney
Chief United States District Judge

---

The following three motions remain pending:
–        Plaintiffs' motion for summary judgment on counts 2-4                    [Doc. 132]
–        Defendants' motion to dismiss or for summary judgment                [Doc. 130]
–        Defendants' Feb. 3, 2010 appeal from Magistrate Judges 's
         Jan. 25, 2010 denial of leave  to name an additional expert            [Doc. 212]

Oral argument on the two dispositive motions is scheduled for **Monday, May 10, 2010.**