UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
|
WILLIAM G. and JULIE A. HARSHAW,          |          Case No. 1:08-cv-104
Husband and Wife, individually and as Guardian of  |
ROMAN A. HARSHAW, a minor,               |
                                          |
    Plaintiffs,                           |
                                          |          HONORABLE PAUL L. MALONEY
        v.                                |
                                          |
BETHANY CHRISTIAN SERVICES,               |
a Michigan corporation, and              |
BETHANY CHRISTIAN SERVICES INT'L, INC.,   |
a Michigan corporation, and              |
BETHANY CHRISTIAN SERVICES                |
- HAMPTON ROADS, a Michigan corporation,  |
                                          |
    Defendants.                           |
                                          |
_____

## OPINION and ORDER
### *" Harshaw 7 "*

Denying Motion to Dismiss for Failure to State a Claim on Which Relief Can Be Granted

Denying Defendants' Motion for SJ on Count 1, Parents' Intentional Misrepresentation Claim
Denying Cross-Motions for SJ on Count 2, Parents' Negligent Misrepresentation Claim
Denying Cross-Motions for SJ on Count 3, Parents' Negligent Failure-to-Disclose Claim

Granting Summary Judgment to Defendants on Count 4, Minor's Negligent Failure-to-Disclose Claim;
Ending Roman Harshaw's Participation as a Party Plaintiff in this Action

## INTRODUCTION

This is a diversity tort case brought by Virginia citizens William "Chip" Harshaw and Julie

Harshaw ("the Harshaws") with respect to their adoption, initiated at a Virginia office and ultimately

approved by a Virginia court, of a Russian boy. Applying Michigan choice-of-law rules, all claims

and issues in the case are governed by the substantive law of Virginia. The Harshaws, a married couple, adopted their son Roman from a Russian orphanage under the auspices, and with the services of, defendants Bethany Christian Services of Hampton Roads ("BCS-HR"), Bethany Christian Services ("BCS") and Bethany Christian Services International, Inc. ("BCSI"), all of whom are Michigan corporations with principal places of business in Grand Rapids, Michigan. On their own behalf, the Harshaws assert counts 1-3, common-law claims for intentional misrepresentation, negligent misrepresentation, and negligent failure to disclose. In their capacity as Roman's parents and legal guardians, the Harshaws assert count 4, Roman's claim for negligent failure to disclose medical information both before and after the adoption.

After extensive motion practice regarding diversity citizenship, the statute of limitations, and choice of law, the parties have filed dispositive motions on the merits of the controversy. The defendants move to dismiss counts 3 and 4 on the ground that Virginia does not recognize a cause of action for negligent failure to disclose. For the reasons that follow, the court will deny the motion to dismiss on both grounds. The defendants also move for summary judgment on all four counts, and the Harshaws cross-move for summary judgment on counts 2, 3 and 4. For the reasons that follow, the court will grant summary judgment to the defendants only on count 4 (Roman's claim for negligent failure to disclose) and will otherwise deny the cross-motions for summary judgment.

**BACKGROUND**

In response to a BCS advertisement, the Harshaws attended an informational meeting at BCS's regional office in Virginia Beach, Virginia on June 12, 2003, and the next day they submitted a preliminary application to adopt through BCS in Russia, China or Guatemala. The application

stated that they would accept a child with "very minor medical problems and would not consider a child with moderate to severe medical problems." They submitted an Application for International Adoption to BCS on June 18, 2003 which stated that they were "interested in parenting a child that [sic] has a positive prognosis for both mental and physical development." Plaintiffs' Complaint filed February 2008 ("Comp") ¶¶ 11-15 and Exs A & B.

As part of a pre-adoption family assessment, BCS-HR interviewed the Harshaws together on July 11, 2003, then conducted individual interviews with Julie Harshaw on July 22, William Harshaw on July 25, and their six-year-old son Daniel on August 12, 2003. *See* P's MSJ Ex F (final Adoptive Family Assessment, dated August 22, 2003) at Bates Number BCS-000153. During this assessment period, the Harshaws signed an International Adoption Services Agreement, *see* Comp ¶¶ 17-18 & Ex C.

Allegedly relying on BCS's claimed experience and expertise in international adoption, the Harshaws understood that if the assessment was favorable, BCS would act as intermediary and/or fiduciary on their behalf to effectuate an adoption. *Id.* ¶¶ 16 & 19. On August 22, 2003, BCS issued an assessment stating that the Harshaws "feel equipped to parent a child who may have a minor, correctable problem with a good prognosis for normal development." It approved them to adopt a Russian child aged 12 to 36 months who had (at most) a "minor, correctable problem with a good prognosis for normal development." *Id.* ¶¶ 20-22 & Ex D. They paid BCS $16,000. *Id.* ¶ 24; *see also* Plaintiffs' Reply Brief in Support of Motion for Summary Judgment on Counts 2, 3 and 4 ("P's Reply") Ex FF (undated BCS document entitled "Fees Associated with International Adoption" and listing, *inter alia*, fees of $50 for preliminary application fee, $950 formal application, $800 adoptive family assessment, $750-$1500 Post-Placement Service, as well as $3,000 for "Processing of

adoption through Bethany's International Program").

BCS representative Jeannie Walton initially referred a Russian child for the Harshaws, but the child had been severely burned by his mother and suffered medical problems as a result. The Harshaws declined and emphasized to BCS that they could only accept a child with minor, correctable conditions and a prognosis for normal development. Next, BCS provided them with Roman's name, age, sex, and photograph; a two-page document said to be an English translation of Roman's medical records at his orphanage; and an untranslated videotape showing what appeared to be Roman interacting with his caregivers in Russia. *See* Comp ¶¶ 25-29 and Ex E.

### Doctor Dubrovsky's Role.

Relying on the video and the purported summary of Roman's medical records, the Harshaws told BCS they were willing to adopt Roman so long as BCS first provided any additional medical information about the boy. *See* Comp ¶ 30. At Walton's invitation, the Harshaws visited a BCS office to discuss the adoption. When they asked Walton whether Roman and the other Russian children they were considering were medically healthy, Walton responded that they were healthy,

> and explained that a medical doctor associated with Bethany, referred to as "Dr. D," had specific expertise in the evaluation of Russian children for the purposes of adoption and that Dr. D regularly examined the children in Russia on trips from his home in New York. Ms. Walton stated that Dr. D had examined Roman and that Roman was O.K. The Harshaws learned that the individual referred to as "Dr. D", is Dr. Michael Dubrovsky.

Comp ¶ 31. Dr. Dubrovsky earned his medical degree in Kiev, Ukraine, in the field of Adult Medicine, and he had no specialized knowledge or training in pediatrics, *see* P's MSJ E (Dubrovsky Dep) at 87:20 to 88:24. He stated that he received $9,500 for his work in Roman's case, but he claims that he never reviewed or commented on any documents going back and forth between

Russia and Bethany, never reviewed any medical information, and never translated any documents.

Dr. Dubrovsky initially seemed to say that his only function in the entire adoption process was to serve as a conduit (in the words of plaintiffs' counsel) or, as he put it, a "transfer person." *See* P's MSJ E (Dubrovsky Dep) at 67:12 to 69:8. But Dr. Dubrovsky then explained that it is difficult to find people in Russia "who will work close to Western manner of job," which means people, such as Yelena, who can bridge the gap between the "absolutely different mentality of United States people and Russian people and Russia[n] facilities," which to him means being trustworthy, reliable, and patient with certain questions from prospective adoptive parents visiting Russia, *see* P's MSJ E (Dubrovsky Dep) at 69:9 to 70:23.

Allegedly relying on Walton's assurances regarding Dr. Dubrovsky's purported favorable examination of Roman *et al.*, the Harshaws traveled to the orphanage in Krasnoyarsk, Russia in December 2003, with BCS representatives Aleksandr "Alex" Vladimirovich and Yelena Vladimirovna acting as interpreters and guides.[1] They were permitted to see Roman for only about one hour. Noting that Roman looked thin and perhaps ill, the Harshaws asked interpreter Alex if Roman was okay; after consulting orphanage staff, Alex told the Harshaws that Roman had had bronchitis. The Harshaws asked for more information about Roman and his mother's social and medical background, but Alex said none was available. They saw Roman for an hour the next day, then returned to America and met again with BCS's Jeannie Walton. *See* Comp ¶¶ 32-38.

When Walton asked how Roman looked and the Harshaws responded that he "appeared as if he might have been sick but otherwise appeared okay", she reassured them that what they saw was

---

[1]

According to Dr. Dubrovsky, Yelena was paid $4,000 for her work in the Harshaws' case, s*ee* P's MSJ E (Dubrovsky Dep) at 60:20 to 61:5.

common in institutionalized children, and his issues were minor and often resulted from malnutrition and crowded conditions. Walton asked if they wished to proceed, and they said yes. *Id.* ¶¶ 38-40.

**2004: The Adoption and its Immediate Aftermath.**

The next month, January 2004, the Harshaws returned to Russia to attend the final adoption hearing. When they took physical custody of Roman at the orphanage, they asked if there were any more medical records regarding Roman or his mother and were told there were none, and BCS never provided any additional medical information from then until after the adoption. *See* Comp ¶¶ 41-44.

After the Krasnoyarsk Regional Court entered an Order of Adoption on January 27, 2004, the Harshaws took Roman home to America, where they soon noticed that he was not developing and acting normally for his age and reported health.

Dr. Dubrovsky recalled that sometime in 2004, at the request of an unspecified doctor, Bethany's Judy Dalrymple asked him to check whether Roman had ever sustained a head injury; Dubrovsky conveyed the question to "a representative in Krasnoyarsk", who checked with the orphanage, which sent an official letter stating that Roman had never sustained a brain injury. *See* P's MSJ E (Dubrovsky Dep) at 24:11-24.

**December 2005: Two-Year Post-Placement Report**

In a notarized Two-Year Post-Placement Adoption Report issued on December 5, 2005, Bethany adoption caseworker Jeanne Walton, MSW, and Hampton Roads Branch Director Karen Elseroad, LCSW, stated as follows:

    A.     CHILD'S ADJUSTMENT TO PARENTS, SIBLINGS AND CULTURE:

This worker observed Roman at the Bethany office with his parents and siblings, Daniel and Grace. Roman has formed a healthy bond with his family, and appears very comfortable in their presence. He is affectionate with his family and interacts freely with them. He has adjusted well to his family and environment. Roman attends a private preschool center five days a week and has adjusted nicely to this program. He has made new friends at his preschool.

Recently, Roman has started hitting others and being defiant. His parents and preschool staff are using a reward system to encourage more positive behaviors and use a time-out for the misbehavior; these methods appear to be working. Roman goes to his parents for comfort, and they are responsive to his needs.

> B.  FAMILY'S ADJUSTMENT TO CHILD AND INCREASED RESPONSIBILITY; PARENTING SKILLS:

William and Julie are affectionate, approachable parents and they love their three children. Their daughter, Grace, was born December 10, 2004. William and Julie are employed, and work well together as partners to meet the needs of their family. They have two active boys and know that it is important for the boys to run and play. They like their new home, which has a fenced-in backyard and a playfort in the back. Roman loves sharing a bedroom with his older brother, Daniel. The boys like to play chase; they have learned to share their parents' time and attention with Grace and enjoy giving their baby sister good-night kisses.

William and Julie are aware that children of Roman's age want to be more independent. They add that Roman is a smart boy who tests the limits of acceptable actions. They talk with Roman about acceptable behaviors. They suspect that Roman's behavioral issues may be connected to William being gone on brief trips for work.

> C.  CHILD'S DEVELOPMENT AND HEALTH:

Roman is a healthy, 3 ½ -year old boy who weighs 30 pounds and is 37 ½ inches tall. Roman can be described as hyperactive, smart, happy, and fearless. Roman is current on his immunizations. This past summer, Roman had tubes put in his ears to reduce the number of ear infections; this procedure also improved his hearing and speech. Roman understands what is said to him and he can speak in eight-word sentences; however, many times it is difficult to understand what Roman is saying. Roman sucks his thumb for comfort and out of habit, and it could be causing a problem with his teeth and formation of his words. Roman did fine on his developmental assessment and will be evaluated for speech therapy on December 22 [presumably 2005].

Along with being defiant/hitting, Roman has started waking up in the middle of the night; his parents comfort him and put him back to bed. Roman enjoys healthy foods – his favorites are salads, raisins, and pineapples. Roman is potty-trained. He has excellent gross motor skills and is very athletic. Roman is a busy boy who enjoys soccer, playing outdoors

on the swingset, and playing in the water.

D.     RECOMMENDATION:

This worker provided the family with two local resources that can assist in addressing Roman's behavioral issues.  Continued supervision.

P's MSJ Ex M (some paragraph breaks added)


**January 2006:  Neurodevelopmental Pediatrician Aiello Examines Roman.**

In all, the Harshaws spent about a year and a half taking Roman to physicians and mental-health professionals to figure out what might be wrong, leading to a January 2006 examination by neurodevelopmental pediatrician Dr. Frank Aiello III, M.D., who suggested Roman might be suffering from fetal alcohol syndrome[2] and ordered more testing.  *See* Comp ¶¶ 45-49.

_____

[2]

The National Institutes of Health ("NIH") states that a child with FAS may have the following symptoms:

- Poor growth while the baby is in the womb and after birth
- Decreased muscle tone and poor coordination
- Delayed development and significant functional problems in three or more major areas: thinking, speech, movement, or social skills (as expected for the baby's age)
- Heart defects such as ventricular septal defect (VSD) or atrial septal defect (ASD)
- Structural problems with the face, including: narrow, small eyes with large epicanthal folds; small head; small upper jaw; smooth groove in upper lip; Smooth and thin upper lip

http://www.nlm.nih.gov/medlineplus/ency/article/000911.htm, Symptoms, retrieved May 11, 2010 (semicolons added, bullet-points in original).  For example, after performing MRIs on ten patients who met the criteria for FAS, one group of psychiatrists and pediatricians concluded in 1995 that

Patients with classic FAS have a high incidence of midline brain anomalies.  This finding is consistent with the concept that the midline CNS is a developmental field that is particularly susceptible to the teratogenic effects of alcohol.  Furthermore, patients with more severe facial dysmorphologic characteristics are more likely to

**June 2006: Neuropsychologist Federici Examines Roman.**

Following three days of examination and tests in June 2006, Dr. Ronald S. Federici, Psy.D., clinical director of a "neuropsychological and family therapy" clinic in Virginia, diagnosed Roman with an alcohol/drug-related birth defect, identified as a fetal alcohol spectrum disorder causing neurocognitive and psychiatric abnormalities. *See* Comp ¶¶ 50-51.

The Harshaws allege that throughout the 24 months following the January 2004 adoption, they expressed concerns to BCS's social worker, during post-placement visits, about Roman's medical, emotional and psychological condition and behavior. The BCS social worker responded that Roman's problems were frequently associated with being institutionalized and that children adopted from such settings could "grow out of" the problems with a loving family. *See* Comp ¶ 59.

At an unspecified time in or after June 2006 (when Dr. Federici examined Roman), the Harshaws informed BCS of Federici's diagnosis and asked for more medical information, which BCS stated would be difficult to retrieve. *See* Comp ¶¶ 52-53.

**September 2006:  The Harshaws' Communication with BCS's Dalrymple**

In September 2006, the Harshaws had an e-mail exchange with BCS in an attempt to learn more about Roman's medical and family history. William Harshaw initiated the exchange on September 9, 2006, writing as follows:

---

have midline brain anomalies in addition. In addition, we observed a high incidence of micrencephaly [sic] with a wide range of severity.

Summary of Swayze & Johnson et al., "Magnetic Resonance Imaging of Brain anomalies in Fetal Alcohol Syndrome," Pediatrics Vol. 99, No. 2 (Feb. 1997) at 232-240 (Defs' Reply Ex C).

I am following up on the attempt to gain the remaining medical / family history files on Roman's behalf through Dr. Dubrovsky. Roman has begun preschool and is already showing signs of being well behind other children.

I also have to ask this question. Why are they only given an extract of his history, when the complete file could end up being very helpful for a boy like Roman, or even for a couple during the initial decision making process of an adoption? I ask this because the extract that we have was obviously only a portion of a document because, at the top of the first page we received begins with the a [sic] continued sentence from a previous page that was not included. I understand the previous pages may not have key info, but maybe they do, at least for a physician.

We are worried about Roman's very excitable behavior and how far behind he is with his communication skills. As a result of this, [m]y wife and I have been doing a lot of research to help him. The more we research via the internet, the more we now understand that many many children out of the Russian orphanages have significant issues that are in many cases not correctable. These issues although very common, may not initially be obvious to persons like my wife and myself who have never been through [the] adoption process before.

On the other hand, these issues should be obvious to an experienced physician if he or she takes time with a child. I say this because *I clearly recall Je[a]nnie [Walton] conveying to my wife and I that Dr. Dubrovsk[i]y had visited Roman[']s orphanage and indicated that he had met with Roman and felt Roman was healthy.*

*Do you know if Dr. Dubrovsk[i]y actually sits down with the kids and speaks to them or spends any time with them? I ask this because we are getting the feeling that Roman[']s issues are a bit more than expected.*

Again, my wife and I are committed to doing everything possible to get this information to Roman['s] Dr. and he has again expressed his desire to review Roman[']s history. He explained that some treatments may or may not be appropriate for a young boy like Roman depending on his history.

Because Dr. Dubrovsk[i]y works through Bethany and screens these children, I have to assume I must assume [sic] Bethany has some influence on him to insist on obtaining all of the records?

Thank you again, and I look forward to hearing from you.

P's MSJ Ex I at Bates Number BCS-000441 (italics added for emphasis, some ¶ breaks added).

Four days later, on September 13, 2006, BCS's Judy Dalrymple responded as follows:

I was finally able to follow through with a contact with Michael Yurovich, Dr. Dubrovsk[i]y

and another family who also adopted from the same orphanage. I have not been very successful in getting a possible course of action for you.

Michael Yurovich (coordinator in Moscow) sees all the medicals [sic] that the children have from all regions as they come through Moscow and go to the clinic for their visa exam. His response was that the Embassy panel physicians require very little information and are satisfied with the short extract as long as it contains the information necessary for their purposes – tests that would make a child eligible or ineligible for a visa. Many children have the same short medical information [sic] that Roman had.

I contacted another family who adopted from this orphanage. She looked back at her information and it was the same as you had.

What the above two contacts tell me is that the amount of information you were given is considered "normal" or at least not unusual for a Russian adoption. I'm not saying it's the way it should be or what would be most helpful to the parents and child but only that it's not out of the ordinary. We do know from experience that prenatal records and hospital records are not transmitted to the orphanage in detail at the time a child is transferred to the orphanage. The same is true with family history. The information is most often simply not available at the orphanage. This is the best explanation that I have for why you were only given an extract of the medical file.

*You asked about Dr. Dubrovsk[i]y's role prior to Roman's adoption.* He is a coordinator of many of our Russian regions as well as Ukraine, Kazakhstan, and Uzbekistan. He is not an employee of Bethany but works with us to facilitate the adoption process. *He supervises the staff there and does review all the available medical records before we present children to the families. The advantage is his understanding of Russian medical terminology and culture.* When we first began to work in Russia, it did happen more often that he would see the children.

For the last two years, it has been prohibited for representatives to see the children. *He didn't personally examine the children as a physician even though he may have visited the orphanage and talked with the director.* As I look back on the pictures we received of Roman and the information available, there was no indication either to him or to us of more significant medical issues other than the normal risk with international adoption and the possibility of unknown or incorrect social/medical history on all children placed.

My conversation with Dr. Dubrovsk[i]y regarding your current situation did explain a bit more. He said [that] immediately after the adoption all the orphanage records and court records are sent to an archive and sealed. The court will not re-open this. It is considered impossible for this to be accessed. We (Krasnoyarsk staff) will try on our own to [contact] orphanage staff to see if anyone remembers Roman or any more information about him. Perhaps there is a copy of the original extract in Krasnoyarsk which would contain what appears to be a missing page. Dr. D will talk with Yelena (the coordinator who assisted you

in Krasnoyarsk) about this. If this is not successful, we will review with the Krasnoyarsk people any other possible options.

We are truly sorry for the challenges you are facing with Roman and pray that there will be some answers for you from the specialists. I know that you love him and it is out of this concern that you pursue these questions.

Allow me to express another thought. As you consider a holistic approach to meeting Roman's needs, it may be beneficial to consider having Roman evaluated by a counselor/therapist (someone knowledgeable about adoption issues of grief and loss) and by a team approach (occupational therapist, speech therapist, and the like, if you haven't recently had this done). There may be an emotional piece of the picture that could be addressed and a therapist could help shed light on this area. Roman experienced significant changes in his life at a time when he didn't have the verbal skills to express what he was feeling. These emotions can be manifested through behaviors, habits, and delays; special attention and assistance may be needed to address these issues. Please feel free to contact either [BCS-HR Adoption Caseworker] Jeanne [Walton] or myself. Jeanne would be a better source for recommendations in your area.

P's MSJ Ex I at Bates Number BCS-000440 (italics added for emphasis, some ¶ breaks added).


**October 2006: BCS Provides Additional Medical Information.**

After the Harshaws persisted in requesting more medical information, in October 2006 BCS provided two items which they had not previously provided: a ten-page Russian-language extract of Roman's medical records and history, and a six-page English translation. *See* Comp ¶¶ 54-55 and Ex F. The Harshaws allege that BCS either had these two documents in its possession all along (i.e., before the adoption was completed) or could and should have obtained them for review, translation and delivery to the Harshaws before they made their decision whether to adopt Roman. *Id.* ¶¶ 56-57. The Harshaws allege that they relied on BCS to provide all information reasonably available to it and if BCS had done so, they would not have pursued Roman's adoption. *Id.* ¶¶ 58 and 64-66. They also state that if BCS had provided complete, accurate medical information and appropriate post-placement assistance, they could have diagnosed Roman's condition earlier and started providing

more-appropriate treatment earlier.  *Id.* ¶ 67.

**June 2009 EEG and Neurologist White's Report Thereon.**

On June 1, 2009, Roman underwent a 19-channel electroencephalogram ("EEG")[3] at Children's Hospital of The King's Daughters in Norfolk, Virginia.  The EEG yielded the following report by Dr. L. Matthew Frank, M.D., and Larry E. White, M.D.:

> DESCRIPTION:  * * *  The awake state is characterized by an 8-9 Hz occipital[4] rhythm which is moderate in amplitude, bilaterally symmetric, and reactive to eye opening.  Photic stimulation elicits symmetric driving.  Hyperventilation for three minutes produces high amplitude slowing.
>
> During light sleep, spindles and vertex activity are seen as well as moderate-to-high amplitude right central-temporal biphasic spike-and-wave activity which is not associated with any clinical changes.  Occasionally, there is spread to the left hemisphere, but no independent epileptiform activity is seen in the left hemisphere.  No clinical spells are witnessed.

---

[3]

An electroencephalogram is "'a recording of the potentials on the skull generated by currents emanating spontaneously from nerve cells in the brain. Fluctuations in potential are seen in the form of waves, which correlate well with different neurologic conditions and so are used as diagnostic criteria.'"  *Butland v. HHS*, 2009 WL 1949059, *2 n.18 (Fed. Cl. June 19, 2009) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 596 (30th ed. 2003)).  The dominant frequency of these potentials is about 8-10 cycles per second, with an amplitude of 10-100 microvolts. *Boley v. HHS*, 2009 WL 4615034, *19 (Fed. Cl .Sept. 9, 2008) (Millman, Special Master) (citing DORLAND'S at 596), *aff'd*, 86 Fed. Cl. 294 (Fed. Cl. 2009).

A burst on an EEG is "any short wave form that has an abrupt onset and termination' and that differs from the background activity."  *Hazlehurst v. HHS*, 2009 WL 332306, n.219 (Fed. Cl. Feb. 12, 2009) (Campbell-Smith, Special Master) (quoting DORLAND'S at 266), *aff'd*, 88 Fed. Cl. 473 (Fed. Cir. July 24, 2009).

[4]

"Occipital refers to the area at the posterior of the head", *Johnston v. Hartford Life & Acc. Ins. Co.*, 2004 WL 1858070, *4 n.5 (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (28th ed. 1994)) (no page citation provided), more specifically "'located near the occipital bone, as the occipital lobe of the brain'", *Jones v. Principi*, 16 Vet. App. 219, 221 (Vet. App. 2002) (quoting same DORLAND'S at 1167).

INTERPRETATION: This EEG is compatible with central-temporal epilepsy.[5] It is not uncommon initially to see epileptiform discharges in only one hemisphere. Spikes of this type can be seen in the absence of clinical seizures, depending on the family situation. There is no slowing associated with the discharges, so it is unlikely that they are due to occult white matter injury, such as one might see in syndromes, former prematurus, or some other encephalopathy [any degenerative disease of the brain, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 610 (30th ed. 2003)].

Defs' Reply Ex A. Child neurologist Dr. White wrote this explanation of the June 2009 EEG on

---

[5]

Epilepsy generally is a transient "'paroxysmal disturbance in brain function'", and a single episode is called a seizure. *Loving v. HHS*, 2010 WL 1076124, *12 (Fed. Cl .Mar. 2, 2010) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 628 and 1676 (30th ed. 2003)). "The potential causes of epilepsy include, *inter alia*, 'head injury, birth trauma, brain infection (such as meningitis or encephalitis), brain tumor, stroke, drug intoxication, drug or alcohol withdrawal states, or metabolic imbalances in the body.'" *Deas v. River West, L.P.*, 152 F.3d 471, 478 n.17 (5th Cir. 1998) (quoting STEDMAN'S MEDICAL DICTIONARY 412 (26th ed. 1995)).

"'Grand mal epilepsy' is a 'symptomatic form of epilepsy often preceded by an aura; characterized by loss of consciousness and with generalized tonic-clonic seizures,'" *John Doe 21 v. HHS*, 88 Fed. Cl. 178, 183 n.6 (Fed. Cl. 2009) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 628 (27th ed. 1988)). Tonic convulsions are involuntary and are characterized by prolonged contraction of the muscles, while clonic convulsions are also involuntary and are characterized by alternating contraction and relaxation of the muscles. *Ames v. HHS*, 2005 WL 6120733, *3 n.14 (Fed. Cl. Oct. 18, 2005) (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 415-16 (30th ed. 2003)).

"Jacksonian-type epilepsy is 'characterized by focal motor seizures with unilateral clonic movements that start in one group of muscles and spread systematically to adjacent groups, reflecting the march of the epileptic activity through the motor cortex.'" *Pierce v. West*, No. 98-764, 17 Vet. App. 90, 1999 WL 757071, *1 (Vet. App. Sept. 21, 1999) (Nebeker, C.J.) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 567 (28th ed. 1994)), *rev. den.*, 17 Vet. App. 248, 1999 WL 1021890 (Vet. App. Nov. 3, 1999), *aff'd in part and rev'd in part o.g. sub nom Pierce v. Principi*, 240 F.3d 1348 (Fed. Cir. 2001). In turn, a focal motor seizure is a simple partial seizure consisting of a spasm of a muscle group. DORLAND'S 567 (30th ed. 2003).

By contrast, "petit mal" epilepsy or "absence epilepsy" involves absence seizures, which "'consist[s] of a sudden momentary break in consciousness of thought or activity, often accompanied by automatisms or clonic movements, especially of the eyelids,'" *Adams v. HHS*, 76 Fed. Cl. 23, 29 n.13 and 30 n.15 (quoting DORLAND'S 628 and 1676 (30th ed. 2003)).

October 22, 2009:

> His EEG showed centrotemporal spikes. Subsequent MRI[6] - brain was normal. To my knowledge, he has never had a clinical seizure.

> My opinion is still that the abnormal EEG does not constitute a diagnosis of epilepsy, which is a clinical diagnosis based on clinical seizure events, which this child has not had. I am not aware of any direct association between his EEG abnormality and fetal alcohol syndrome as an entity. I would consider the EEG abnormality and fetal alcohol syndrome two separate problems.

Defs' Reply Ex B. The record does not reflect whether Roman has undergone any additional EEGs since June 2009.

### Neuropsychologist Burns's September 2009 Report After Review of Medical Record.

More broadly, neuropsychologist Thomas Burns, Psy.D., ABPP/ABCN,[7] reviewed an

---

[6]

MRI stands for magnetic resonance imaging, which is

> a non-ionizing (non-x-ray) technique using magnetic fields and radio frequency waves to visualize anatomic structures. It is useful in detecting joint, tendon, and vertebral disorders. The patient is positioned within a magnetic field as radio wave signals are conducted throughout the selected body part. Energy is absorbed by tissues and then released.

*Bailey v. SSA*, 623 F. Supp.2d 889, 892 n.3 (W.D. Mich. 2009) (Maloney, C.J.) (quoting STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006) ("STEDMAN'S") at B13). A computer processes the energy released and forms an image, *see Pethers v. SSA*, 580 F. Supp.2d 572, 575 n.3 (W.D. Mich. 2008) (citing STEDMAN'S at B13).

[7]

Dr. Burns earned a B.A. in Biological Basis of Behavior from the University of Pennsylvania (1985-89), did graduate course work in Clinical Psychology at Fairleigh Dickinson University in New Jersey (1990-91), and earned both an M.A. and a Psy.D. from the Georgia School of Professional Psychology (1991-93 and 1993-95). *See* Doc 166-5 at 14. Dr. Burns is a diplomate of the American Board of Professional Psychology (ABPP), American Board of Clinical Neuropsychology (ABCN), and the American Board of Professional Neuropsychology (ABN), *see id.* at 14. Since 1996, Dr. Burns has worked both as an independent practitioner and as Director of Neuropsychology and Director of Training at Children's Healthcare of Atlanta, *see id.* at 14 and 16.

extensive medical file for Roman, depositions of the Harshaws and Dr. Holland, and photos and video of Roman. In September 2009, Dr. Burns provided a useful overview of Roman's medical records, examinations, testing, apparent condition, treatment, and the like over the course of his life in America, including the abnormal June 2009 EEG:

> Following a detailed review of the records in this case, R did not appear to have dysmorphic characteristics in his initial video that was taken in the orphanage. It is also surprising that R was functioning within the low average range of ability and then proceeded to experienced marked behavioral and cognitive deficits almost one year after his adoption. While R meets many of the criteria for FAS and this appears to be evidence for this diagnosis, there are other possible etiologies to consider as well.

> The medical records provide no information with regard to maternal alcohol use during the pregnancy. Medical records indicate that R['s] biological mother was incarcerated for theft. However, there is no information regarding whether she was incarcerated during or after the pregnancy. It is unlikely that she would have access to consuming alcohol if she was incarcerated during her pregnancy.

> Despite the absence of background information regarding R[']s mother, a diagnosis of FASD can still be considered given the fact that the other criteria are met. In review of the pediatric records by Dr. Deborah Holland, MD there is evidence for low weight ($< 5^{th}$ percentile) shortly after R was adopted at 2 years of age. His motor skills appeared well developed but there was evidence for speech delay that was noted following what was expected from inadequate stimulation in the orphanage. At R 3 year visit to the pediatrician, he was noted to be "in constant motion" with speech dysfluency and his height placed him at the 20th percentile and 10th percentile for weight. R also had myringotomy tubes inserted in his ears three times which may have exacerbated the hearing and speech issues that were identified.[8]

> By 4 years of age, R height was consistent but his weight had dropped $< 5^{th}$ percentile. It is notable that he was prescribed stimulant medication (Metadate & Dexadrine) by Frank Aiello, III, MD at that time. Stimulant medications are commonly associated with a side-

---

[8]

A myringotomy is the creation of a hole in the tympanic membrane, *John Doe 21 v. HHS*, 88 Fed. Cl. 178, 186 n.28 (Fed. Cl. 2009) (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1217 (27th ed. 1988)), which is "'a thin membrane separating the middle ear from the inner part of the external auditory meatus that vibrates in response to sound energy and transmits the resulting mechanical vibrations to the structures of the middle ear, also called eardrum'", *Yon v. Riley*, 2002 WL 1268394, *1 (M.D. Ala. May 29, 2002) (quoting MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY (Lexis.com)).

effect of decreased appetite and weight loss. Dr. Aiello provided a consultation to R in January of 2006, when he was almost four years of age and there was concern raised over the possibility of fetal alcohol effects as he noted mild facial dysmorphia, microcephaly, AD/HD and symptoms of oppositionality based on his mother's self-report of R behavior. He reported no problems with motor function, as he reported a normal motor exam on his initial evaluation. Subsequent genetic testing was negative for Fragile X and FISH analysis.

Dr. Aiello yielded the following diagnoses: (1) Manic Depressive Syndrome, (2) AD/HD Combined Type, (3) Fetal Alcohol Syndrome, (4) Speech Disorder, and (5) Microcephaly.

In a recent progress note (2008) by Eric Madren, MD, family practice doctor, R was followed for his behavioral and cognitive changes. There is reference to "Heavy Metal Toxicity as indicated by abnormal results on urine testing". There was also a reference to 6 metallic crowns on R teeth as well but no clarification for how these results were correlated. There was no mention of this differential consideration in any other notes, including reports from R other providers. It is unclear if there was ongoing concern regarding heavy metal toxicity again in the medical records.

Since 2006, R has been prescribed the following medications: (1) Metadate (Attention), (2) Risperdal (Behavior), (3) Depakote (Behavior/Mood), (4) Trileptal (Behavior/Mood), (5) Concerta (Attention), (6) Focalin (Attention), (7) Abilify (Agitation), (8) Zoloft (Mood Changes), (9) Melatonin (Sleep), and most recently there is consideration of (10) Lithium being utilized to this list of medications being prescribed for Roman.

Recently (06/01/09), there is a record of an abnormal EEG that was described in the Medical Records at Children's Hospital of the King's Daughters. The EEG was "compatible with central-temporal epilepsy." The epileptologist stated in the report: "It is unlikely that they [seizures] are due to occult white matter injury, such as one might see in syndromes, former prematurus, or some other encephalopathy."

This statement is in marked contrast to a recent note by Dr. [Ronald] Federici [Psy.D.] claiming that R suffered from "static encephalopathy." There is question as to whether there is more than one etiology affecting R[']s current condition. The exact etiology of his seizures is unclear. The National Institutes of Neurological Disorders and Stroke (2009) define a seizure disorders [sic] in the following way:

> "The developing brain is susceptible to many kinds of injury. Maternal infections, poor nutrition, and oxygen deficiencies are just some of the conditions that may take a toll on the brain of a developing baby. These conditions may lead to cerebral palsy, which often is associated with epilepsy, or they may cause epilepsy that is unrelated to any other disorders. About 20 percent of seizures in children are due to cerebral palsy or other neurological abnormalities. Abnormalities in genes that control development may also contribute to epilepsy. Advanced brain imaging has revealed that

some cases of epilepsy that occur with no obvious cause may be associated with areas of dysplasia in the brain that probably develop before birth."

There appear to be a number of diagnostic considerations across the many providers that have treated R. This has included mention of cerebral palsy as well as significant behavioral dysregulation. While [sic, should be "given that"] growth delays, language difficulties, and overall developmental delay is [sic, should be "are"] not uncommon to a child who lived in an orphanage and was exposed to another language in infancy, it is not surprising that some of these issues are present.

However, the fact that there has been dramatic decline in R ability across intellectual, cognitive, and emotional measures raises concern. While many of the cognitive symptoms and behavioral issues may be consistent with the reported ARND [alcohol-related neurological disorder?], it is not clear that all differential diagnostic considerations have been pursued. This could include neuroimaging studies (i.e., MRI of the brain), further genetic testing (i.e., microar[r]ay), neurological consultation and efforts to better understand R's inconsistent performance in school and at home.

**Baseline Psychological Assessment:**

There was a psychological assessment that was completed by the Virginia Beach Public School System when R was 38 months of age. R performed within the low average range of intellectual functioning (WPPSI-III) and he was not found eligible for special education services in preschool. His personal-social domain score was also low average on the Batelle Developmental Inventory-II. Adaptive and motor skill were average for age.

He did, however, display signs of inattention on the Behavior Assessment System for Children which was completed by his mother. No other cognitive areas were in the abnormal range. In fact, his articulation was normal for [his] age. Low average auditory comprehension was also consistent with intellectual testing. Borderline scores were found on measures of expressive communication which enabled R to be eligible for speech and language services at school.

A follow-up assessment was completed in May of 2006 after obtaining a diagnosis of FAS [Fetal Alcohol Syndrome] and AD/HD [Attention Deficit/Hyperactivity Disorder].[9] R

---

[9]

The American Psychological Association's DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL HEALTH DISORDERS, Fourth Edition ("DSM-IV") lists the following diagnostic criteria for Attention Deficit/Hyperactivity Disorder:

Six or more of the following symptoms of inattention have been present for at least 6 months to a point that is disruptive and inappropriate for developmental level

Inattention

1.  Often does not give close attention to details or makes careless mistakes in schoolwork, work, or other activities.

2.  Often has trouble keeping attention on tasks or play activities.

3.  Often does not seem to listen when spoken to directly.

4.  Often does not follow instructions and fails to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions).

5.  Often has trouble organizing activities.

6.  Often avoids, dislikes, or doesn't want to do things that take a lot of mental effort for a long period of time (such as schoolwork or homework).

7.  Often loses things needed for tasks and activities (e.g. toys, school assignments, pencils, books, or tools).

8.  Is often easily distracted.

9.  Is often forgetful in daily activities.

Six or more of the following symptoms of hyperactivity-impulsivity have been present for at least 6 months to an extent that is disruptive and inappropriate for developmental level:

Hyperactivity

1.  Often fidgets with hands or feet or squirms in seat.

2.  Often gets up from seat when remaining in seat is expected.

3.  Often runs about or climbs when and where it is not appropriate (adolescents or adults may feel very restless).

4.  Often has trouble playing or enjoying leisure activities quietly.

5.  Is often "on the go" or often acts as if "driven by a motor."

6.  Often talks excessively.

Impulsivity

1.  Often blurts out answers before questions have been finished.

2.  Often has trouble waiting one's turn.

performance dropped into the impaired range on tests of intellectual ability (DAS), as he performed consistently below the 1st percentile. Retesting with the WPPSI-III only days later yielded borderline-low average intellectual scores (which were consistent with initial baseline testing).

The school psychologist, Karen Jackson, NCSP noted variable performance from R based on his behavioral presentation. Further review of the records revealed that R teacher at his school were concerned over his attention, atypical behaviors, and anxiety. However, she noted average performance across the other behavioral scales.

In contrast, his parents reported clinically significant problems across most all [sic] of the behavioral rating scales. During this same time period, his speech pathologist at school stated: "It is unclear if R medication had any adverse effect on the results of his speech and language evaluation", as he was undergoing medication changes during this period of testing.

**Ongoing Assessments of Ability**

R was first evaluated with a neuropsychological evaluation in June of 2006 by Ronald Federici, Psy.D. He provided the following diagnoses regarding R: (1) Cognitive Disorder, (2) Severe Mixed Receptive-Expressive Language Disorder, (3) Phonological Disorder[10],

---

3.    Often interrupts or intrudes on others (e.g., butts into conversations or games).

Some hyperactive-impulsive or inattentive symptoms that caused impairment were present before age 7 years.

*Love v. Law School Admission Council, Inc.*, 513 F. Supp.2d 206, 210-11 (E.D. Pa. 2007). ADHD behavioral symptoms vary in extent and type depending on the individual's DSM-IV subtype, which include "inattentive", "hyperactive-impulsive", and "combined type", which implicates the symptoms of the first two types – and ADHD can be mild, moderate or severe. *Love*, 513 F. Supp.2d at 211 (record citations omitted). An ADHD diagnosis also requires that some impairments from the symptoms is present in two or more settings; that there is clear evidence of clinically significant limitations in social, academic, or occupational functioning; and that the symptoms do not occur exclusively during the course of another mental or developmental disorder. *See Taylor v. Barnhart*, 333 F. Supp.2d 846, 854 n.5 (E.D. Mo. 2004) (citing DSM-IV-TR 92-93 (4th ed. 2000)). "Although ADD and ADHD may interfere with a student's ability to perform effectively, they are not technically learning disabilities, in that the person's ability to acquire basic academic skills is not compromised." *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 131 (D. Mass. 1997).

10

Phonological disorder is "'a communication disorder of unknown etiology [cause or origin],

-20-

(4) Learning disorder NOS [not otherwise specified], (5) Developmental Motor Coordination Disorder, (6) Attention Deficit / Hyperactivity Disorder, (7) Pervasive Developmental Disorder.[11] He also diagnosed (8) Static Encephalopathy ["a non-progressing 'degenerative disease of the brain' in which the degeneration at issue has slowed or ceased"[12]].

Despite a very detailed report of scores, there is insufficient raw data to support the summary of scores that is provided in the report. For example, most of the self-report data that was completed in the assessment is available (Achenbach Behavior Checklist, Autism Behavior Checklist, Sensory Profile, the AD/HD Test); however, many of the cognitive tests were not made available to this reviewer. These test[s] included the following:

| | |
|---|---|
| Stanford Binet Intelligence Test-IV – | no supporting data produced |
| Preschool Language Scale-4 – | no supporting data produced |
| Test of Language Development-3 -- | no supporting data produced |
| Peabody Picture Vocabulary Test-III  -- | no supporting data produced |
| Token Test -- | no supporting data produced |
| Wide Range Assessment of Visual Motor Abilities | no supporting data produced |
| Test of Auditory perceptual Skills -- | no supporting data produced |
| NEPSY Developmental Assessment -- | no supporting data produced |
| Developmental Tasks for Kindergarten Readiness | no supporting data produced |

In sum, of the 21 tests that were scored and reported in the 2006 report, only 58% of the

---

characterized by failure to use age- and dialect-appropriate sounds in speaking, with error occurring in the selection, production, or articulation of sounds. The most common errors are omissions, substitutions, and distortions of speech sounds.'" *Means v. Astrue*, 2008 WL 2714187, *9 n.13 (S.D. Tex. July 10, 2008) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 531 (29th ed. 2000)).

[11]
    "The terms 'pervasive developmental disorder' [PDD] and 'autism spectrum disorder' are used interchangeably", *Dwyer v. HHS*, 2010 WL 892250, *1 n.4 (Fed. Cl. Mar. 12, 2010), and PDD is "an umbrella term encompassing all diagnoses on the autism spectrum." *Munoz v. HHS*, 2009 WL 2700214, *1 n.6 (Fed. Cl. Aug. 6, 2009) (citing, *inter alia*, DSM-IV-TR at 69-84). A PDD is a "severe and pervasive impairment in several areas of development: reciprocal social interaction skills, communication skills, or the presence of stereotyped behavior, interests and activities", and the "impairment must be 'distinctly deviant relative to the individual's developmental level or mental age.'" *Snyder v. HHS*, 2009 WL 332044, *31 with n. 88 (Fed. Cl. Feb. 12, 2009) (citing DSM-IV-TR at 69), *recon. denied*, 2009 WL 764611 (Fed. Cl. Mar. 16, 2009), *rev. denied*, 88 Fed. Cl. 706 (Fed. Cl. 2009).

[12]*Zeller v. HHS*, 2008 WL 3845155, *2 n.3 (Fed. Cl. July 30, 2008) (quoting Dorland's Illustrated Medical Dictionary 610 (30th ed. 2003)).

supporting data was present. This makes it extremely difficult to support the seven diagnostic categories described above. In forensic cases, it is not atypical to review the data from other neuropsychologists. While there appear to be obvious developmental concerns related to R, the absence of this data make[s] it difficult to interpret and understand how those diagnoses are supported.

In August of 2007, R was assessed by an occupational therapist and was noted to have sensorimotor delays. Despite previous assessments by his doctors that claim he had normal sensory and motor function, there appeared to be considerable decline in his ability.

R was reassessed by Dr. Federici again in 2008 and reportedly demonstrates continued cognitive decline. Despite parental concerns regarding global developmental delays, R was apparently not responsive to Metadate, Concerta, Adderall, or Zoloft. R was prescribed Risperdal and Depakote while he was examined and "was out of control much of the time," according to Dr. Ferderici [sic].

**The following diagnoses were added to the list from 2006 in Dr. Federici's 2008 report:**
(1) Dementia due to Encephalopathy related to Alcohol-Related Neurodevelopmental Disorder, and (2) Organic Mood Disorder, Bipolar type.

Many of the neurocognitive tests were not available from this [2008] testing as well. This included the following measures:

| | |
|---|---|
| Test of Language Development-3 | four subtests are missing from the data |
| Test of Auditory Perceptual Skills-Revised | no supporting data produced |
| NEPSY Developmental Assessment | no supporting data produced |
| Developmental Tasks for Kindergarten Readiness | no supporting data produced |

Again, it is difficult to support the scores in the [2008] report with raw data that is not able to be reviewed. In a packet that was sent to R teachers, there is a note from R mother which states:

> "Dr. Federici – There are many ratings the teacher gave R that I do not agree with at all. For example, speaking clearly and connected she said 'almost always.' This couldn't be further [from] the truth!"

This discrepancy between the teacher and parent report was not addressed in this assessment. The teacher provided the following comments:

> "R can verbally state our classroom rules and can tell you the consequences of not following class rules. He will go to our 'thinking chair' to think about the choices he makes when he does not follow class rules. He does not want to go to the thinking chair, so with a verbal reminder about our rules, he will adjust his behavior. R is like a sponge. He is able to absorb information and retains information."

R teacher goes on to explain that his behavior often gets in the way of his success and noted that her goal was to mainstream R with the general education students but this was not possible due to his behavioral acting-out. His diagnosis at school was Developmentally Delayed at that time. While there is [sic] inconsistent behavior and reports documented, it does not take away the fact that R is suffering from issues related to his cognitive decline and difficulty with behavioral control.

**R was assessed most recently in 2009 by Dr. Federici.** The protocols for the brief assessment were included and reviewed, with the exception of the NEPSY. Testing from the intellectual measures denotes impaired levels of functioning across the entire assessment. In a letter dated August 3rd, 3009, Dr. Federici explains to Mr. Totaro that he "saw no professional need to use a full scoring sheet, when there were no scores to report." [Federici] also highlights that "ALL actual raw data is included on the 'face scoring sheet['] and in the body of the report." However, even in the most recent assessment in 2009, there were 14 separate subtests administered with over 40 questions administered with no record of the response from R. Again, this has made it difficult to comment on the credibility of these measures. Since the data cannot be reviewed in this case, there is a need to pursue a neuropsychological assessment that can document the test findings which are in concert with the interpretations.

Defs' Reply Ex D (Report of Dr. Thomas Burns, Psy.D., dated Sept. 10, 2009) at 5-8.

Neuropsychologist Burns's September 2009 report summarized Roman's apparent condition and

prognosis as follows:

[I]t remains in question as to whether R H meets the necessary criteria to be diagnosed with Fetal Alcohol Syndrome. He seems to have many features of a central nervous system disorder, whether genetic and/or substance induced. Despite the neurological, genetic, and environmental factors that may be influencing his progressive decline in ability, there is considerable evidence that he has significant cognitive and emotional decline.

As discussed above, a direct link of developmental delays and behavioral difficulties can not be assumed based upon observation without other medical factors being ruled out. While there appears to be information that would support a diagnosis of ARND [alcohol-related neurological disorder?], R deserves the chance to rule out any other etiology or contributing factor. Regardless of etiology, it appears that R has developmental challenges that would not be atypical based upon his early exposure to a R[ussian] orphanage and the associated developmental issues that co-occur with this transition. However, from 2006 to the present, there has been evidence of significant cognitive and behavioral limitations that may not be entirely consistent with ARND.

It is important to note [that] the language issues are expected and often a challenge in the early years of the adoption process. At this point in time, more differential diagnostic work

needs to be completed.[13]

Defs' Reply Ex D (Report of Dr. Thomas Burns, Psy.D., dated Sept. 10, 2009) at 9-10.

Neuropsychologist Burns's September 2009 report concluded with these recommendations:

> 1.     R would benefit from a consultation with a pediatric neurologist / epileptologist who can provide expertise regarding his seizure disorder and [its] link to his behavior and cognitive function.  This individual needs to have expertise within the area of epilepsy so that recommendations for pharmacotherapy [prescription of yet more drugs] can be provided.
>
> 2.     An MRI of the brain is needed.  This can provide the structural data that may help to explain the progressive loss in R's cognitive capability.
>
> 3.     R would benefit from a microarray genetic test to rule out a genetic etiology to his current condition.
>
> 4.     A psychiatric consultation would be helpful in managing R's current medication regimen.
>
> 5.     A Neuropsychological evaluation is recommended.  Careful consideration of test-retest effect will have to be considered.  Given the inability to review the raw data from the past neuropsychological reports by Dr. Federici, I would recommend that I complete a comprehensive neuropsychological assessment of R.

Defs' Reply Ex D (Report of Dr. Thomas Burns, Psy.D., dated Sept. 10, 2009) at 11.


**PROCEDURAL HISTORY:  *Harshaw 1* through *Harshaw 6***

---

13

Differential diagnosis, "the basic method used in internal medicine", *US v. Fleet Mgmt., Ltd.*, 332 F. App'x 753, 755 (6th Cir. 2009), is 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.'" *Happel v. Wal-Mart Stores, Inc.*, – F.3d –, –, 2010 WL 1529010, *6 n.7 (7th Cir. Apr. 19, 2010) (quoting STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000)).  "The more precise but rarely used term is differential etiology . . . ." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252 (11th Cir. 2005).  Either way, a simpler way to describe differential diagnosis as "identifying external causes by a process of elimination."  Hennifin et al., Reference Guide on Medical Testimony in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 439 and 481 (Federal Judicial Center 2d ed. 2000).

In the January 2008 complaint, the Harshaws assert three claims on their own behalf:

| Count 1 | Fraud / intentional misrepresentation | (Comp ¶¶ 68-83) |
| Count 2 | Negligent misrepresentation | (Comp ¶¶ 84-94) |
| Count 3 | Negligent failure to disclose | (Comp ¶¶ 95-99) |

They assert one claim on behalf of Roman, who is still a minor: count four, negligent failure to disclose (Comp ¶¶ 100-104). They allege that after Roman's adoption, BCS admitted it had "misinformed" the Harshaws by providing "unclear" medical information during the adoption process, and that Dr. Dubrovsky never examined Roman as it had represented. *Id.* ¶¶ 60-61. On each count, the Harshaws seek $75,000 in compensatory damages plus punitive damages, interest, and attorneys' fees, and demand a jury trial. *Id.* at 15-19 (prayers for relief). The defendants answered in April 2008 (Docs 6 & 8).

From October 2008 through June 2009, the parties conducted discovery and the Magistrate Judge resolved discovery disputes, *see* Docs. 17-78. In September 2009, the Harshaws filed a motion to compel production of documents requested in their second and third sets of requests for production, BCS filed an opposition brief, and pursuant to 28 U.S.C. § 636(b)(1)(A) the matter was referred to the Magistrate, who held a hearing and granted in part the Harshaws' motion to compel, *see* Docs. 112, 113, 125 & 128. In October 2009, the Harshaws served the reports of experts Julian Davies M.D., and Andro Zangaladze, M.D., Ph.D., *see* Docs. 135-136.

In December 2009, the Harshaws moved to compel the deposition of Dr. Holland, BCS's John Wynbeek, BCS's Judy Dalrymple, and a BCS Executive Committee designee (Docs 172-175); after entertaining the defendants' opposition brief (Doc 177) and hearing oral argument (Doc 181), the Magistrate Judge granted the Harshaws' motion, and in January and February 2010 they noticed the deposition of those four individuals (Docs 187, 192, 196, 197, 213 and 214).

In September 2009, BCS filed a motion to dismiss or for summary judgment on counts one, two and three – the parents' common-law claims for fraud/intentional misrepresentation, negligent misrepresentation, and negligent failure to disclose – on the ground that they are barred by the statute of limitations in Michigan and Virginia. This court denied BCS's unjustifiably late request for leave to amend their answer to assert the defense that counts 1-3 are barred by statutes of limitation, determining that BCS did not show good cause for failing to move for leave to amend before the deadline which the CMSO imposed. . *See Harshaw v. Bethany Christian Servs., Inc.*, No. 1:08-cv-104 Doc. 179, 2009 WL 5149925 (W.D. Mich. Dec. 15, 2009) (Maloney, C.J.) (**"Harshaw 2"**). In January 2010, this court denied the defendants' motion for reconsideration because it was both untimely and meritless. *See Harshaw v. Bethany Christian Servs., Inc.*, No. 1:08-cv-104 Doc. 205, 2010 WL 331708 (W.D. Mich. Jan. 22, 2010) (**"Harshaw 3"**).

On October 1, 2009, BCS moved to dismiss for failure to state a claim and/or for summary judgment on the *merits* of all four claims, urging application of Virginia substantive law; the Harshaws filed an opposition, and BCS replied. *See* Docs 130-31 and 138 & 166. The Harshaws cross-moved for summary judgment on the *merits* of claims 2-4, urging application of Michigan substantive law; BCS filed an opposition, and the Harshaws replied. *See* Docs 132-133, 139 and 166. Those are the motions dealt with today, below.

Separately, in January 2010, the defendants moved for an order declaring that Virginia substantive law governs all the Harshaws' claims (Doc 207); as ordered by the court (Doc 210), the Harshaws filed an opposition (Docs 215-216). In February 2010, this court granted the defendants' motion and held that Michigan choice-of-law precedents call for application of Virginia substantive law to the Harshaws' claims. *See Harshaw v. Bethany Christian Services, Inc.*, No. 1:2008-cv-104

Doc 229, – F. Supp.2d –, 2010 WL 774321(W.D. Mich. Feb. 25, 2010) (Maloney, C.J.) (**"Harshaw 5"**). The Harshaws filed a motion for reconsideration (Docs 235-236); after receiving an opposition brief (Doc 244), the court denied reconsideration in April 2010, adhering to the determination that Virginia substantive law applies. *See Harshaw v. Bethany Christian Services, Inc.*, No. 1:2008-cv-104 Doc 249, – F. Supp.2d –, 2010 WL 1692833 (W.D. Mich. Apr. 26, 2010) (Maloney, C.J.) (**"Harshaw 6"**).

Finally, that same April 2010 opinion ("*Harshaw 6*") resolved a dispute over the citizenship, for diversity purposes, of defendant BCS-HR. In 2009, the Harshaws had moved to voluntarily dismiss BCS-HR without prejudice, on the ground that its presence as a seemingly non-diverse, non-indispensable party would defeat this court's jurisdiction. This court granted the Harshaws' motion, but conditioned the dismissal of BCS-Hampton Roads on the Harshaws reimbursing the defense for the legal fees and costs incurred due to their erroneous inclusion of that party in this lawsuit. *See Harshaw v. Bethany Christian Services*, No. 1:2008-cv-104 Doc 85, 2009 WL 2232740, *3-9 (W.D. Mich. July 22, 2009) (Maloney, C.J.) ("*Harshaw 1*"). However, in February 2010, the United States Supreme Court held that for purposes of diversity jurisdiction, a corporation's principal place of business ("PPB") is its "nerve center." *See Hertz Corp. v. Friend*, – U.S. –, 130 S.Ct. 1181 (2010). The Court expressly overruled our circuit's "total business activities" test. Applying the nerve-center test as described in *Hertz*, the court found that BCS-HR's principal place of business is Michigan, not Virginia as it appeared under the former total-activities test and the evidence presented to the court the previous year:

> Against [substantial] documentary and testimonial evidence that the Grand Rapids office in fact directed, controlled and coordinated BCS-HR's activities in significant ways, and that BCS-HR and BCS themselves treated BCS-HR more like a branch office than a truly independent subsidiary or affiliate, the defendants offer

insufficient counterweight. Accordingly, pursuant to Fed. R. Civ. P. 21, the court will grant the Harshaws' motion to reinstate Bethany Christian Services of Hampton Roads, Inc., as a party defendant.

*Harshaw 6*, – F. Supp.2d at –, 2010 WL 1692833 at *____ (footnotes 2 and 3 omitted). The court stressed that when it spoke of BCS-HR's relative lack of corporate independence from BCS and BCSI, it did so

> only in terms of *Hertz*'s "control, direction and coordination" test for PPB for purposes of corporate citizenship under 28 U.S.C. § 1332(c). The court intimates no opinion as to whether BCS-HR is an alter ego of BCS and/or BCSI, as the two standards are not necessarily the same. *Hertz* is federal precedent and will be applied and interpreted by federal courts determining federal diversity jurisdiction. In contrast, alter ego status is typically determined by *state* law. In developing its State's common law governing alter ego determinations, state courts would not be bound to consider *Hertz* or federal decisions interpreting it.

*Harshaw 6*, – F. Supp.2d at –, 2010 WL 1692833 at *____ n.3. Finally, the court required the defendants to reimburse the Harshaws – with interest at the rate specified in Va. Code Ann. § 6.1-330.54, for the amount which the Harshaws previously paid the defendants as a prerequisite to the voluntary dismissal without prejudice of BCS-HR. *Id.* at *___


### Motion to Dismiss the Entire Complaint for Failure to State a Claim

The defendants have moved to dismiss the entire complaint for failure to state a claim, or in the alternative for summary judgment on all four counts; the Harshaws have cross-moved for summary judgment as to counts 2, 3 and 4 only. For the reasons that follow, the court will deny BCS's motion to dismiss, but will grant summary judgment to the defendants on count 4 (Roman's claim for negligent failure to disclose).

Preliminarily, when the defendants filed this motion, there were only two defendants in the case, BCS and BCSI. The Harshaws, who are Virginia citizens, had voluntarily dismissed BCS-

Hampton Roads without prejudice because it appeared that BCS-HR (a Michigan corporation) had its principal place of business in Virginia, destroying diversity. BCS and BCSI sought to dismiss the entire complaint on the premise that it contained no allegations of specific wrongdoing by them, only by BCS-HR personnel, and BCS-HR was no longer in the case. Subsequently, the Harshaws obtained additional information in discovery relevant to the determination of BCS-HR's PPB, and the Supreme Court in *Hertz* (Feb. 2010) overruled our Circuit's PPB standard. Applying the new legal standard and taking into account the new information, this court recently reconsidered and determined that BCS-HR's PPB is Michigan, making it diverse from the Harshaws. Accordingly, the court granted the Harshaws' motion to reinstate BCS-HR as a party defendant, negating the aforementioned argument for dismissal of the entire complaint.

### MTD Counts 3 and 4 for Lack of Cause of Action under Virginia Law

The defendants then moved to dismiss counts 3 and 4 (the parents' claim for negligent failure to disclose, and minor Roman's claim for negligence / negligent failure to disclose) for failure to state a claim, on the premise that Virginia does not recognize such a cause of action. A review of Virginia state case law defeats this argument. The court will hold that Virginia does recognize a cause of action for negligent failure to disclose in other contexts, and that the Virginia Supreme Court would most likely recognize a legal duty to disclose which runs from the adoption agency to the adopted child, i.e., it is judicially redressable by and for the adopted child in his own right.

<u>Precedential Value of Virginia Decisions.</u>

Before investigating Virginia's substantive law, the court must discern its rules on the

precedential value of decisions, because a federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts. *See Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law."); *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

In Virginia, unpublished Court of Appeals decisions generally lack precedential value. *See Sheets v. Castle*, 559 S.E.2d 616, 263 Va. 407 (Va. 2002) (citing VA CODE ANN. § 17.1-413A, which provides in pertinent part, "Opinions designated by the court of appeals as having precedential value or otherwise having significance for the law or legal system shall be expeditiously reported in separate Court of Appeals reports in the same manner as the decisions and opinions of the Supreme Court."). In certain circumstances, however, an unpublished Court of Appeals decision can acquire precedential value when the Virginia Supreme Court denies the losing party's petition for review. The Virginia Supreme Court has explained its reasoning in this area as follows:

> With the exception of cases with procedural defects and the limited number of cases for which appellate review by the Supreme Court of Virginia is dependent upon a substantial constitutional question as a determinative issue or matters of significant precedential value (Code § 17.1-410 and -411), the refusal of a petition for appeal constitutes a decision on the merits. *See . . . Dodson v. Director . . .* 355 S.E.2d 573, 576 n.5 (1987) ("[i]n Virginia, aside from appeals from a capital murder conviction, criminal appeals to both the Court of Appeals and to this Court are discretionary, and "a decision to grant or refuse a petition [for appeal] is based upon one equally-

applied criterion – the merits of the case.").

While a decision "on the merits", including a denial of a petition for appeal, may have precedential value, discerning the grounds that formed the basis for denial is indispensable in assessing its potential applicability in future cases. Most often the refusal of a petition for appeal merely recites:

> Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to granting an appeal, the Court is of [the] opinion [that] there is no reversible error in the judgment complained of. Accordingly, the Court refuses the petition for appeal.

From such an order, the grounds upon which the Court relied as a basis for denial cannot be determined. While it may be that there is simply no error found, there are several other possibilities. To name but a few of the several possible grounds, the trial may have been in error, but the error was harmless. The trial court may have been in error, but the court reached the correct result . . . for the wrong reason. The trial court may have [been] in error, but that there exists an independent basis for the trial court's judgment that has not been argued as error. * * *

* * *

We restate that, *with the exceptions previously mentioned, the refusal of a petition for appeal is based upon the merits of the case. However, unless the grounds upon which the refusal is based is discernible from the four corners of the Court's order, the denial carries no precedential value.*

To hold otherwise would result in bench and bar sifting through the records of cases buried in the office of the Clerk of the Supreme Court of Virginia or the clerk of the circuit court to affirm or contradict speculative assertions of the reason for the Court's denial of petitions for appeal. Such unreliability and lack of clarity is not countenanced in our jurisprudence.

*Sheets*, 559 S.E.2d at 619-20, 263 Va. at 412 (emphasis added) (internal citations and quotation marks omitted). Thus, like Virginia trial courts, this court in interpreting Virginia law will be bound by (1) the decisions of its Supreme Court, (2) the published decisions of its Court of Appeals, and (3) any unpublished Court of Appeals decisions where the Virginia Supreme Court denied a petition for appeal, and it is possible from the face of its order to discern that the basis for the denial was endorsement of some or all the lower court's reasoning. The court will consult other unpublished

Virginia Court of Appeals decisions, as well as Virginia circuit court and trial-court decisions, particularly if there is a dearth of published precedent on point, but will not be bound by them. Less still will the court be bound by any federal court's interpretation of Virginia law.

<u>Substance of Virginia Law on Cause of Action for Negligent Failure to Disclose.</u>

BCS contends that Virginia does not recognize a cause of action for merely-negligent failure to disclose. This court disagrees and holds that the Virginia Supreme Court would likely recognize such a cause of action. The recognition would be premised on recognizing an adoption agency's common-law duty to disclose medical and family records which the agency possesses or has reasonable ability to obtain or request. This duty would manifest itself differently as time passed and events occurred in the life of the adopted child. First, the agency would have a duty to disclose such information to prospective adoptive parents, at the latest, before they legally finalize an adoption. Second, after the adoption, the agency would still have a duty to "disclose", i.e. furnish, any records which have come into its possession in the time since its latest disclosure of information to the adoptive parents. As suggested by U.S. District Judge Lawson in the *Dresser* decision, a State Supreme Court lacking precedent governing the matter would, for tort policy reasons, run the duty to the adopted child himself. In other words, it appears more likely that Virginia's Supreme Court would allow children such as Roman to assert the same equal claim to recovery for negligent breach of that duty as would their adoptive parents.

On the other hand, BCS contends broadly that "Virginia does not recognize a claim for negligent failure to disclose." MTD at 9. BCS argues as follows:

> Virginia recognizes a claim for intentional fraud. Additionally, Virginia law provides a cause of action for constructive fraud, which, unlike intentional fraud, only requires proof that a false representation of a material fact was made, innocently

or negligently. Furthermore, Virginia recognizes fraud by omission, sometimes called concealment. The Virginia Supreme Court has explained, however, that "concealment, whether accomplished by word or conduct, may be the equivalent of a false representation, *because concealment always involves deliberate nondisclosure.*"

MTD at 9-10 (other internal citations, quotation marks, and alterations omitted)) (quoting *Norris v. Mitchell*, 255 Va. 235, 240, 495 S.E.2d 809 (Va. 1998) (emphasis in original)).

It is true that, in a somewhat similar context, a Virginia trial court confronted a case where the patient alleged that the defendant negligently failed to diagnose or disclose his medical condition. *See Reynolds v. Riverside Healthcare Ass'n*, 60 Va. Cir. 322, 2002 WL 3192785 (Va. Cir. Ct. Nov. 7, 2002). The Virginia judge held that the alleged negligent non-diagnosis or negligent non-disclosure could not constitute "concealment" as state statute defines the term. Therefore, the limitations period governing concealment, VA. CODE ANN. § 8.01-243(C)(2), was not available. The judge reasoned cogently as follows:

> Plaintiff c[ontend]s Defendant's concealment need not rise to the level of an intentional act, but may be only negligent concealment, as appears here, to trigger the saving provision of [Va. Code §] 8.01-243(C)(2) and Plaintiff in this regard relies on the language of *Hernandez v. Amisub*, 714 So.2d 539 (Ct. of App. Fla. 1998), a case involving a foreign object left inside a surgery patient.

> The court is familiar with the *Hernandez* case and would note the particular fact situation in *Hernandez* relative to the language quoted by plaintiff as supportive of his case. In the *Hernandez* case, the laparotomy pad was left inside the plaintiff following a surgical procedure. The hospital report and the nurse employee involved indicated a pad count was made and it indicated [that] all pads were accounted for. The hospital argued . . . that it must have actual knowledge that the foreign object was left in the patient before a concealment could be found.

> The court ruled that the word concealment did not involve a *scienter* element and that the word conceal did not necessarily i[mply] intent or deliberation and, moreover, even under an "intentional misrepresentation" claim, the misrepresentation need not be deliberate. Misrepresentation may also be shown by carelessness or recklessness as to the truth of the matter asserted.

-33-

The concealment in the *Hernandez* case was found to be the assertion by a hospital employee that all pads were accounted for; however, the employee admitted that she sometimes signs off without actually doing the count, and in this case she must not have done the actual count, and she signed another person's name to the count who had not actually participated. The court stated that there was *more than mere negligence* here. (emphasis added)

It is clear to the court that the concealment in the *Hernandez* case was exactly as noted by the court[:] more than mere negligence. It was an assertion of a falsehood and in that situation, it is understandable that concealment was found.

In the present case, nothing more than mere negligence has been plead. Plaintiff's argument for application of 8.01-243(C)(2) is that Defendant's mere negligence in not reporting the test results amounts to concealment under the statute[,] as the inaction of the Defendant should be judged by the result and not the state of mind of the Defendant. The court is not persuaded by Plaintiff's argument based on the *Hernandez* case[,] as the court does not feel that case addressed situation as here where no positive assertions were made and nothing more than simple negligence has been plead.

Having basically found the *Hernandez* case inapposite to the present issue, the court notes that Plaintiff also argues that 8.01-243(C)(2) is applicable [because] Defendant's negligent failure to disclose [constituted] concealment of the results from Plaintiff . . . . [Plaintiff reasoned that] the word *concealment* used in 8.01-43(C)(2) has no modifier and, hence, would include negligent concealments.

The court finds the maxim *noscitur a sociis* persuasive here. As stated in *Turner v. Com.*, 226 Va. 456 (1983), quoting M.J., and *Andrews v. American Health & Life Insurance Co.*, 236 Va. 221 (298), "the meaning of a word takes color and expression from the purport of the entire phrase of which it is a part, and it must be in harmony with its context." The word in question, *concealment*, is found in subsection 2. of 8.01-243(C) and appears as follows:

> 2. In cases in which fraud, concealment or intentional misrepresentation prevented the discovery of the injury within the two-year period, for one year from the date the injury is discovered . . . .

There is no negligent fraud and there is no negligent intentional misrepresentation and it seems entirely unlikely that the legislature would have placed a "negligent" concealment between these two obviously intentional acts. It appears to the court from the purport of the entire phrase of which the word *concealment* is a part and reading the phrase in harmony with its context, the word concealment does not include mere negligence. Words in a statute should also be construed in the sense

in which they are popularly used (17 M.J., Statutes, Sec. 61) and the popular use [understanding] of "concealment" when used with "fraud" and "intentional misrepresentation" usually signifies an intent that something not be known.

*Reynolds*, 2002 WL 3192785 at *2-3, 60 Va. Cir. 322 (some ¶ breaks and quotation marks added).

The Virginia circuit court's decision in *Reynolds*, although not precedential itself, was consistent with, and a sound application of, Virginia precedent governing claims in the nature of fraud or concealment. Amidst that precedent, BCS relies most heavily on *Norris v. Mitchell*, 255 Va. 235, 240, 495 S.E.2d 809 (Va. 1998) (Whiting, Sr. J.), where the Supreme Court unanimously held that "concealment, whether accomplished by word or conduct, may be the equivalent of a false representation, because *concealment always involves deliberate nondisclosure*." *Norris*, 255 Va. at 240, 495 S.E.2d 809 (quoting *Van Deusen v. Snead*, 247 Va. 324, 328, 441 S.E.2d 207, 209 (Va. 1994)) (emphasis added).

In *Norris*, plaintiff bought a house from defendants; he sued them, claiming that they had concealed limitations on the permitted use of the house's septic tank. The Supreme Court affirmed the dismissal of the claim, stating as follows:

> The purchasers recognize that one of the essential elements of their cause of action for fraud is "a false representation." *Van Deusen*, 247 Va. at 327, 441 S.E.2d at 209. The purchasers allege that the sellers "committed an act of fraud when they concealed from [them] the reservations noted on the septic Permit which information [the purchasers] had a right to expect disclosure [sic]." Thus, the purchasers equate concealment with a failure to perform a duty to disclose.
>
> However, we have held that
>
>> [f]or purposes of an action for fraud, concealment, whether accomplished by word or conduct, may be the equivalent of false representation, *because concealment always involves deliberate nondisclosure designed to prevent another from learning the truth.* A contracting party's *willful* nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to commit actual fraud.

> Therefore, we have required either an allegation or evidence of a knowing and a deliberate decision not to disclose a material fact [to sustain a claim for fraud based on nondisclosure].

*Norris*, 255 Va. at 240-41, 495 S.E.2d at 812 (quoting *Van Deusen*, 247 Va. at 328, 441 S.E.2d at 209 (quoting *Spence*, 236 Va. at 28, 372 S.E.2d at 598-99)) (emphasis added).  The Supreme Court held that because Norris's claim did not allege that defendant *deliberately* concealed the tank's permit limitations, there was "no error in the action of the trial court in holding that the purchaser had not alleged a cause of action for fraud."  *Norris*, 255 Va. at 241, 495 S.E.2d at 813.

Defendant BCS also points to federal decisions interpreting Virginia law in the same fashion after *Norris*, namely:  *Bank of Montreal v. Signet Bank*, 193 F.2d 818,827 (4th Cir. 1999) (under Virginia law, "unlike fraud or affirmative misrepresentations," "concealment requires a showing of *intent* to conceal a material fact; *reckless* nondisclosure is not enough."); *Potocka v. Ali*, 589 F. Supp. 631, 642 (E.D. Va. 2008) ("Fraud by concealment requires actual intent to conceal a fact and reckless non-disclosure is not actionable."); *Rambus, Inc. v. Infincom Tech. AG*, 164 F. Supp.2d 743, 750 (E.D. Va. 2001) (recognizing that Virginia law does "not permit a claim for negligent omission").

But *Norris* (Va. 1998) and the persuasive authorities cited by BCS are of no avail to them here; they are simply inapposite.  In count three, William and Julie Harshaw plainly are not attempting to state a claim for fraud; in addition to the language of count three, any such notion is dispelled by the fact that the Harshaws have already asserted a fraud / intentional misrepresentation claim in count one.  The same is true of count four, where Roman Harshaw asserts a claim merely for negligence, not fraud of any variety, whether by concealment or otherwise.  A Virginia circuit court showed how easily it is to precisely distinguish claims such as the Harshaws' counts 3-4 from

*Norris*-type claims under Virginia law.  The court wrote as follows:

> Counts I and VI respectively charge Reliable and seller in fraud and deceit, charging them with intentional misrepresentations and [intentional] failures to disclose the material facts of the transaction relating to the boundaries of the lot upon all of which Sullivan justifiably relied.  * * *
>
> In Counts II and III Reliable is charged in the former with negligent misrepresentation of fact and negligent nondisclosure of fact, and in the latter count with innocent misrepresentation and nondisclosure.  [T]hese two counts are distinguishable from the count in fraud and deceit or actual fraud by the absence of any allegation of intent to defraud or deceive [like the Harshaws' Counts 3 and 4].

*Sullivan v. Reliable Realty*, Law No. 2121, 16 Va. Cir. 118, 1989 WL 646273, *2 (Va. Cir. Ct. Clarke Cty., May 22,1989) (Robert Woltz, Cir. J.).  In short, *Norris* and the other decisions cited by BCS tell us nothing about whether Virginia appellate courts do or would recognize a cause of action for negligent failure to disclose.

Moreover, contrary to BCS's confident assertion that Virginia does not recognize a cause of action for negligent failure to disclose, a search of the Virginia case law readily yields decisions which actively entertain the merits of claims for negligent non-disclosure (or note without comment that a lower court did so) – including the Supreme Court.  *See, e.g., Alexander v. Hill*, 174 Va. 248, 6 S.E.2d 661, 664 (Va. 1940) (dentist allegedly knew, but intentionally or negligently failed to disclose to his patient, that his surgery had left nerve root fragments after extracting six teeth) ("There is not the slightest evidence in the record to sustain the contention of the plaintiff that Dr. Alexander knew after the operation that the broken roots were left in her jaw.  If he had no knowledge of such a condition he could be under no obligation to disclose it.  Nor can it be said that he wrongfully concealed from her a condition of which he had no knowledge."); *Ell v. Moss*, Chancery No. 131226, 39 Va. Cir. 8, 1995 WL 1055919 (Va. Cir. Ct. Fairfax Cty., July 10, 1995) (Jane Roush, J.) (negligent failure to disclose dangerous condition to home-buyer, namely

improperly installed drainpipes and downspout and improper soil compaction).  *Cf. Hodge v. US*, 443 F. Supp.2d 795, 797 (E.D. Va. 2006) (Ellis, J.) ("Hodge seeks a declaratory judgment holding that under state law (i) Dr. Bhuller's actions constitute negligent failure to disclose . . . .") (dismissing action for lack of subject-matter jurisdiction because it did not come within the FTCA's waiver of the government's sovereign immunity), *aff'd*, 224 F. App'x 235 (4th Cir. 2007).

Finally, as the Harshaws' adoption-agency standard-of-care expert opined, there is strong public-policy and equitable reasoning supporting the imposition on adoption agencies of a duty to use due care and diligence in finding medical information and promptly turning it over to prospective parents before they decide whether to pursue adoption of a particular child.  The standard-of-care expert, Dr. Hollinger, opined as follows:

> * * *  [A] resounding consensus . . . has emerged since the 1970's among adoption and child welfare experts that disclosure of information about a child's medical and social history before an adoptive placement is always in the best interest of the child and serves to strengthen adoptive families.  The Child Welfare League of America (CWLA), for example, has long favored the disclosure of all pertinent health and background information about an adoptive child, as has the National Association of Social Workers (NASW), the American Academy of Pediatrics, the Donaldson Adoption Institute, and many other professional organizations. [footnote 6 omitted]

> Research has found that providing information to prospective adoptive parents allows them to make an informed, intelligent decision about adoption and enables them to avoid the financial and emotional stress that may occur if they inadvertently adopt a child with extraordinary special needs.

> Disclosure promotes parental confidence in adoption, and increases the likelihood of making an appropriate placement for the child.  [footnote 7:  *See* R. Barth & M. Berry, Adoption and Disruption: Rates, Risks, and Responses 107-113 (1988); Belkin, *Adoptive Parents Ask States for Help with Abused Young*, N.Y. TIMES, Aug. 22, 1988, A1, at B8; http:www.adoptionagency.com/agencies/wrongful-adoption-and-agency-liability.5.html.]

> *Accurate and early disclosure also facilitates early diagnosis and treatment for conditions that, as in the Harshaw child's case, can have much more serious and potentially devastating consequences if diagnosis and treatment are delayed.*

Greater access to information helps strengthen the bonds between children and their adoptive parents who are under fewer illusions about the kinds of special care and attention their children may need. Several studies suggest that, while some prospective parents decide not to adopt upon receiving a more accurate assessment of a particular [child]'s needs, most welcome being able to proceed with an adoption with their eyes open to the range of needs their child may have . [footnote 8: V. Groze et al., *Families Adopti[ng] Children with or at Risk of HIV*, 9 CHILD & ADOLESCENT SOC. WORK J. 490 (1992); K.A. Nelson, On the Frontier of Adoption: A Study of Special Needs Adoptive Families (1985).]

The research findings and recommendations for improving the disclosure to adoptive parents of reliable information about their children are consistent with, and indeed, are often referred to by the courts that have concluded, as a matter of law, that traditional common law requirements for imposing a duty to exercise reasonable care to make accurate representations and a duty to disclose information completely and accurately[,] apply to the relationship between adoption service providers and prospective adoptive parents and adoptive children.

In the context of adoption, the requirements for imposing a duty of care are the magnitude and foreseeability of the harms of risks of harm that will occur if accurate health information is not provided, the resulting benefits of full disclosure to adoptive families and the entire society, and the minimal burden that exercising reasonable care imposes on an adoption service provider. As many courts have observed, the societal consequence of disclosure is positive: adopted children will receive appropriate placement and medical treatment and "adoptive parents can assume the awesome responsibility of raising a child with eyes wide open," *Roe v. Jewish Children's Bureau of Chicago*, . . . 790 N.E.2d 882 (Ill. App. 2003).

The Pennsylvania Supreme Court in *Gibbs v. Ernst* . . . 647 A.2d 882 (1994), summed up these best practice and public policy justifications for full and accurate disclosure of health and other relevant information about adoptive children as follows:

> "Adoption experts are virtually unanimous in the belief that complete and accurate medical and social information should be communicated to adopting parents. [footnote 9: D. Marianne Brower Blair, *Getting the Truth and Nothing But the Truth: The Limits of Liability for Wrongful Adoption*, 67 NOTRE DAME L. REV. 851, 862 (1992)] Providing full and complete information is crucial because the consequences of non-disclosure can be catastrophic; ignorance of medical or psychological history can prevent the adopting parents and their doctors from providing effective treatment, or any treatment at all.

> Moreover, full and accurate disclosure ensures that the adopting
> parents are emotionally and financially equipped to raise a child with
> special needs. Failure to provide adequate background information
> can result in the placement of children with families unable or
> unwilling to cope with physical or mental problems, leading to failed
> adoptions. For these reasons, a policy in favor of full and accurate
> disclosure of a child's medical history improves the chances of a
> successful placement and promotes public confidence in the
> institution of adoption,["] 647 A.2d at 887. *See also* the nearly
> identical statement in the more recent case . . . , *Dresser v. Cradle of
> Hope Adoption Center, Inc.*, 358 F. Supp.2d 620 (E.D. Mich. 2005).

P's Opp, Ex N (Expert Report of University of California-Berkeley Law Professor Joan Heifetz

Hollinger)[14] at 9-11 (some ¶ breaks added, italics added for emphasis) (going on to discuss *Burr v.

Board of Cty. Comm'rs*, 491 N.E.2d 1101 (Ohio 1986) (adoption-agency personnel could be held

liable for making blatant misrepresentations about a prospective adoptive child's health and medical

history upon which the parents relied in deciding to adopt him, unaware that he had serious physical

and mental ailments) and *Meracle v. Children's Serv. Soc'y*, 437 N.W.2d 532 (Wis. 1989)).

Finally, the Virginia Supreme Court has expressly adopted, albeit outside the adoption

context, the Restatement Second of Torts section 551, which provides, in pertinent part,

---

[14]

Professor Hollinger previously was a Visiting Professor at the University of Michigan,
Stanford and Hastings law schools, and a Professor at the University of Detroit School of Law. *See*
P's Opp, Ex N at 4. She is the main author and editor of the three-volume treatise <u>Adoption Law
and Practice</u> (Matthew Bender/Lexis 1988-2008), "the only work on contemporary adoption law and
practice that is international as well as national in scope." *Id.* Chapter 16 therein contains "an
extensive discussion of the liability of adoption agencies for misrepresentation and for failures to
disclose information about the health and prior experiences of adopted children." *Id.*

Since 1989, Hollinger has served as Reporter for the proposed Uniform Adoption Act
("UAA") promulgated by the Uniform Law Commissioners in 1994 and approved by the ABA in
1995. P's Opp, Ex N at 4. She explains that "[t]he UAA standards, Sec. 2-106, for obtaining and
providing health and other information about a child to prospective adoptive parents has served as
a model for the mandatory disclosure statutes enacted by most states in the past twenty years." *Id.*

(1)     One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction[,] is subject to the same liability to the other as though he had represented the non-existence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

*Ware v. Scott*, 220 Va. 317, 320-21 with n.3, 257 S.E.2d 855, 858 with n.3 (Va. 1979) (holding that when seller breaches duty to correct a mutual mistake about a fact material to the transaction, "the breach constitutes fraudulent inducement to perform, and the vendee may recover damages resulting from such fraud").

For these reasons, the court finds that the Virginia Supreme Court would likely apply its existing precedent – bolstered by persuasive public-policy and equitable rationales such as those articulated by Professor Hollinger, the Pennsylvania Supreme Court in *Gibbs* (1994), and the Eastern District of Michigan in *Dresser* (2005)– to recognize an adoption agency's common-law duty to use reasonable diligence to obtain and disclose medical records and information to prospective adoptive parents.


**Granting Motion to Dismiss Roman's Claim (Count 4) for Lack of Proof of Damage**

Pre-Adoption Negligent Failure to Disclose.

As to count four alone, BCS tries to dismiss Roman's claim on the premise that he cannot show legally-cognizable damages. Considering only the parties' customary briefs – the defendants' opening brief, the Harshaws' opposition, and the defendants' reply – Roman did not identify legally-cognizable damages which he suffered as a result of any of the defendants' alleged negligent failure to obtain and disclose medical and family records to his adoptive parents in a reasonably timely fashion prior to his adoption. The defendants properly rely simply on the deposition testimony of

the Harshaws themselves.  Mr. Harshaw had this exchange with defense counsel:

> Q.    Would you agree with me that, irrespective of your decision, R is better off today than he was before you adopted him?
> A.    Yes.

> Q.    And he's better off being here in the United States than in Russia?
> A.    Yes.

> Q.    He's better off being in a two[-]parent home than in the orphanage?
> A.    Yes.

> Q.    He's even better in your two[-]parent home with two other kids than in the orphanage?
> A.    Yes.

> Q.    Can you think of any way in which Roman would be better off back in Russia than he is today?
> A.    No.

Defs' MTD/MSJ Ex H (Wm. Harshaw Dep) at pp. 9-10.  Likewise, Mrs. Harshaw made the same critical concession in this exchange with defense counsel:

1.

> Q.    You would agree that Roman is better off in your home than being in Russia?
> A.    Correct.

> Q.    He is better off being in the United States than in Russia
> A.    Correct.

> Q.    The treatment he is getting now is better than he would have gotten in Russia?
> A.    Correct.

Defs' MTD/MSJ Ex C (Julie Harshaw Dep) at pp. 102-105.

The defendants appropriately rely on the Virginia Supreme Court's statement that "there is no damage where the position of the complaining party is no worse than it would be had the alleged fraud not been committed."  *Klaiber v. Freemason Assocs., Inc.*, 266 Va. 478, 485-86, 587 S.E.2d 555, 558 (Va. 2003) (citing *Community Bank v. Wright*, 221 Va. 172, 175, 267 S.E.2d 158, 160 (Va.

1980) (Idaho citation omitted))). *See, e.g., Torrez v. Comacho*, 66 Va. Cir. 161, 2004 WL 3132012, *6-7 (Va. Cir. Ct. Fairfax Cty., Oct. 26, 2004) (Thacher, Cir. J.) (quoting *Klaiber* and *Community Bank*) ("While the Court finds that the complainants have, indeed, pled a positive misrepresentation of fact, specifically, that the Defendants . . . could, and would, effect the transfer of the lease, the complainants have not pled damages that put them worse off than they would have been if the Defendants had not committed the alleged fraud. * * * For this reason, the Court sustains the Demurrer on Count IV.").

Under this definitive principle of Virginia law, the court must dismiss Roman's claim for negligent failure to disclose (count four) to the extent that it seeks damages for that alleged tort's role in inducing the Harshaws to adopt him. In other words, Roman has no claim under Virginia law for *pre*-adoption negligent failure to disclose because he cannot prove damages from such a tort: he cannot say that he would have been better off if the BCS had made the additional or earlier disclosures which their duty of care putatively required before the adoption, because negative medical information disclosed to the Harshaws at that time (on their own view) would have caused them not to pursue Roman's adoption any further. That, in turn, would have left him in the orphanage in Siberia, with no guarantee of ever being adopted, and likely receiving medical care that was far inferior to that available in the United States.

Post-Adoption Negligent Failure to Disclose.

That does not end the inquiry, however, regarding the motion to dismiss Roman's claim in count four. If the defendants negligently failed to disclose medical information *after* the adoption was finalized (approved by the Russian and Virginia courts), the analysis is different than if they

-43-

negligently failed to disclose such information *before* the adoption was finalized.  As a matter of basic logic, BCS cannot argue that "Roman cannot recover for post-adoption negligence because it left him better off than if BCS had not committed the alleged negligence."  As the Harshaws aptly put it,

> Bethany completely misstates or miscomprehends the gravamen of Roman's claim.  Count IV of the Complaint is Roman's claim or damages he himself incurred as a result of Bethany's breach of its duty to furnish his adoptive parents with the "medical and family records pertaining to [him] that were in Bethany's possession or control or that were reasonably available to Bethany *in a reasonable amount of time*."  (emphasis added).

P's Opp at 21 (citing Comp ¶¶ 55-59 and 101-104).  After this point, however, the Harshaws make an allegation which may not withstand scrutiny in terms of Virginia law, and certainly does not withstand *evidentiary* scrutiny on this record.  The Harshaws claim that "[d]ue to this delay [in disclosing medical information after the adoption], Roman has suffered further injury in that his parents and his doctors were prevented from providing Roman effective treatment."  P's Opp at 21.

The Harshaws do not identify any Virginia precedent holding or suggesting that an adoption agency has a duty of care which encompasses providing an adoptee's medical records to his adoptive parents with reasonable dispatch.  They rely instead on the reasoning of persuasive authority, *Dresser v. Cradle of Hope Adoption Ctr., Inc.*, 358 F. Supp.2d 620 (E.D. Mich. 2005).  In *Dresser*, adoptive parents sued a Maryland adoption agency for failure to provide their adopted child's medical records within a reasonable period of time, alleging that that failure had adverse consequences for the child's medical treatment.  Tasked with applying Michigan state law but finding no forum-State decisions on point, the federal district court in Eastern Michigan reviewed the statutory and public-policy reasons for imposing tort liability on adoption agencies for breach of such a duty to disclose.  The federal judge wrote,

The evidence in this case provides some heft to plaintiff's causation theory: Dr. Robinson testified that had she known in advance that Mikhail had suffered spinal trauma at birth, a prior diagnosis of perinatal encephalopathy, slow development and speech difficulties, and birth defects, she would have determined that Mikhail has neurological pathology and was not a good candidate for vincristine treatment. Dr. Robertson said that she would have considered Mikhail's "cervical spine trauma, the perinatal encephalopathy with delayed development and neurologic problems and a history of possible seizures" when selecting Mikhail's chemotherapy treatment.

The critical issue, however, is whether the law recognizes a duty of an adoption agency to the adoptee to provide the child's medical records to the adopting parents within a reasonable time. [T]he existence of a general duty is a question to be decided by the court. [Michigan citation omitted]

The Court is not aware of any Michigan case that addresses the issue of whether a duty exists between such parties. [T]herefore, this Court's task is to determine, based on "all relevant data", whether Michigan would recognize a duty to furnish a child's medical records to the adopting parents arising from the relationship between the adoptee and an adoption agency such as Cradle of Hope. That determination will involve to some extent consideration of public policy because of the need to balance the utility of the actor's conduct [operating an adoption agency] and the magnitude of the risk involved [to the adoptee]. The factors that courts consider in striking that balance include "the foreseeability of the harm, the degree of certainty of injury, the closeness of connection between the conduct and injury, the moral blame attached to the conduct, the policy of preventing future harm, and the burdens and consequences of imposing a duty and liability for breach." [Michigan cites omitted.]

Other states have followed these same common law principles, and found that traditional tort remedies apply in the adoption context. *See Burr v. Board of Cty. Comm'rs* . . . 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986). In that case, adoption agency personnel made blatant misrepresentations about a child's current health and medical history upon which the parents relied in deciding to adopt him. The child turned out to be quite ill and suffered from a variety of physical and mental ailments. The parents eventually obtained the child's records, discovered that they had been deceived, and were allowed to bring a fraud claim against the agency.

Three years later, Wisconsin held that an adoption agency could be found liable for negligence by misinforming prospective parents about the risk of an adopted child contracting Huntington's Disease. *Meracle* . . . , . . . 437 N.W.2d 532 (1989).

Since then, **a majority of jurisdictions that have considered the question have extended traditional fraud and negligence theories to provide relief to parents who sought to bring claims against adoption agencies for failure to disclose accurate histories of their adopted children.** *See, e.g., Wolford* . . . , 17 F. Supp.2d

577 (S.D.W.Va. 1998) (holding that state would recognize claims for fraud and negligence in adoption setting); *Michael J. . . , . . .* 247 Cal. Rptr. 504 (1988) (allowing parents' claim against adoption agency for intentional misrepresentation and fraudulent concealment); *Roe . . . , . . .* 588 N.E.2d 354 (1992) (holding fraud can vitiate adoption order, and approving negligen[ce] claim based on breach of duty to disclose child's medical information in agency's possession; *Mohr . . . ,* 421 Mass. 147 . . . (1995) (holding agency has duty to disclose to adoptive parents child's historical information that will enable them to make informed adoption decision; *M.H. . . .,* 488 N.W.2d 282 (Minn. 1992) (holding that adoption agency has duty to make full disclosure based on adoptive parents' need to secure timely and appropriate medical care and make critical family decisions); *Jackson v. State*, 287 Mont. 473, 956 P.2d 35 (1998) (recognizing adoptive parents' claim against adoption agency for negligent nondisclosure and holding full disclosure necessary to allow parents to obtain timely medical for the child and to enable parents to decide whether to adopt); *Juman . . .*, 663 N.Y.S.2d 483 (N.Y. Sup. Ct. 1997) (recognizing adoptive parents' fraud claim against adoption agency); *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994) (holding adoption agency has duty to disclose fully and accurately all nonidentifying information in its possession concerning adoptee); *Mallette . . .*, 661 A.2d 67 (R.I. 1995) (holding that when agency undertakes to furnish family and medical history of adoptee[,] it has duty to do so accurately, the breach of which constitutes negligent misrepresentation); *McKinney . . .*, 134 Wash.2d 388, 950 P.2d 461 (1998) (recognizing adoptive parents' claim against adoption agency for negligent failure to disclose statutorily mandated information) . . . .

The few cases in which claims were rejected did not find the adoption agency immune or that no duty existed; rather, the claims failed for want of proof of one or more of the elements of a traditional tort. *See Engstrom v. State*, 462 N.W.2d 309 (Iowa 1990) . . . ; *MacMath . . .*, 635 A.2d 359 (Me. 1993) . . . ; *Foster v. Bass*, 575 So.2d 967 (Miss. 1990) . . . .

The nature of the relief sought in those cases has ranged from voiding the adoption order to money damages or extraordinary expenses incurred in meeting the special needs of the child. In a few cases, damages were sought because the failure to provide an accurate medical history caused a delayed or erroneous diagnosis or improper medical treatment. In all the cases, however, the damages were awarded to the parents.

**The Court has found no case in which an adopted child has recovered damages for the adoption agency's failure to convey accurate medical information to the new parents.** Of course, such a claim could not be based on fraud because no misstatement could be made to the adoptee and there would be no reliance by the child.

In the three cases that the court found in which a negligence theory was

advanced, two were dismissed because there were no damages to the child flowing from the agency's failure to turn over medical records in its possession, *see Siler v. Lutheran Soc. Servs. . .* , 782 N.Y.S.2d 93 (Sup.Ct. 2004) (dismissing negligence action by adopted twins alleging failure to disclose results of HIV testing because "[d]amages are a necessary element of a negligence claim" and "the defendant conclusively demonstrated that the twins sustained no damages proximately caused by the defendant's alleged failure to apprize their parents of the twins' HIV statu; *Roe*, 588 N.E.2d at 358-39 (holding that children's claim for fraudulent misrepresentation failed when they alleged that absent fraud the agency, not the parents, would have dealt with their health problems since the children did not allege "identifiable injury in either fraud or negligence"); and in the other [case] a federal court declined to consider a novel state law theory. [cite omitted]

**Nonetheless, the Court believes recognition of a duty of an adoption agency to the adopted child to furnish to the new parents the medical records available to it is both a logical and incremental extension of well-recognized and firmly-rooted tort principles, and consistent with established state policy.** The Michigan legislature plainly has ordained a policy of full disclosure by adoption agencies of the medical history of prospective adoptees. The pertinent statute states:

> (1)   Before placement of a child for adoption . . .a child placing agency . . . shall compile and provide to the prospective adoptive parent a written document containing all of the following non-identifying information that is not made not confidential by state or federal law and that is reasonably obtainable from the parents, relatives, or guardian of the child; from any person who has had physical custody of the child for 30 days or more; or from any person who has provided health, psychological, educational, or other services to the child:
>
> > (a)   Date, time, and place of birth of the child including the hospital, city, county, and state.
> >
> > (b)   An account of the health and genetic history of the child, including . . . .

MICH. COMP. LAWS § 710.27.

Although Cradle of Hope may not fall precisely within the definition of a state child placement agency . . . and therefore may not be bound by the statute, the legislature nonetheless has made clear its preference for disclosure, and **the Court believes that**

-47-

**Michigan courts would recognize that an adoption agency like Cradle of Hope has a legal duty to furnish the adopted child's medical information within its control or reasonably available to it to the new parents**.

The question whether that duty would extend to protect the child calls for an evaluation of foreseeability. * * * The question is whether one reasonably might anticipate that the failure to furnish historical medical information of a child who has had an eventful and stormy medical course form birth could jeopardize future medical care. To answer that question the Court need only turn to other jurisdictions that have endorsed a duty of full disclosure. The Pennsylvania Supreme Court's observation is representative:

> Adoption experts are virtually unanimous in the belief that complete and accurate medical and social information should be communicated to adopting parents. Providing full and complete information is crucial because the consequences of non-disclosure can be catastrophic; ignorance of medical or psychological history can prevent the adopting parents and their doctors from providing effective treatment, or any treatment at all.

*Gibbs*, 647 A.2d at 886-87 (footnotes omitted).

Requiring full disclosure creates no undue burden on the adoption agency. The duty recognized today does not create an obligation upon the agency to conduct a comprehensive investigation of a child's physical and mental health. *See Neierengarten* . . . , 209 Wis.2d 538, 563 N.W.2wd 181, 188 (1997) . . . . Nor will such an obligation unduly inhibit the agency's ability to place children or reduce the number of successful adoptions. *See Gibbs*, 647 A.2d at 887 (rejecting such concerns).

*Dresser*, 358 F. Supp.2d at 638-42 (some paragraph breaks added).

The Harshaws's summary-judgment briefs rely only on their position that Michigan law applies – a position which this court has now twice rejected, first *without* Michigan citizen BCS-HR in the case (*Harshaw 5*, February/March 2010) and then *with* Michigan citizen BCS-HR in the case (*Harshaw 6*, April 2010). Therefore, the Harshaws' briefs did not attempt to show that the *Virginia Supreme Court* would likely impose a duty on an adoption agency to disclose all reasonably-available medical and family records to the adoptive parents within a reasonable time – and that that

Court would likely make a breach of that duty compensable in monetary damages to the adopted child himself.

Absent the Harshaws identifying even persuasive authority on point from the *Virginia* state courts, this court must predict a logical, just course for that Court to follow when confronted by situations like these. Like Judge Lawson in *Dresser*, this court consults out-of-state decisions to discern sound reasoning or a practical approach which a Michigan court might adopt.

Judge Lawson was applying Michigan substantive law, while our controversy is governed by Virginia law. One salient difference between the cases is that the *Dresser* party apparently presented the court with concrete evidence that the state Legislature generally strongly favored fuller and more prompt disclosure of medical and other records to adoptive fathers and mothers. Namely, Michigan has a state statute expressly requiring disclosure of a detailed, wide-ranging list of types of medical, family, and other nonidentifying information from certain "child-placement" agencies. The Harshaws have not presented evidence of some similar statute on the books in Virginia, some counterpart to MICH. COMP. LAWS § 710.27.

Nonetheless, even absent record evidence of similar intent or policy of the *Virginia* Legislature, the remaining general tort policy reasoning of the sister-state decisions cited in *Dresser*, and Judge Lawson's reasoning in *Dresser* itself, are logical and practical, and thus likely sufficient on their own to persuade the Virginia Supreme Court to support recognition of BCS's direct disclosure duty to Roman.

In other words, it may be that the Virginia Supreme Court – as an unavoidable exercise in judicial policymaking in the interstices of existing statutory and case law – would likely rule as the Harshaws would have it on this score. The Virginia Supreme Court would likely recognize adoption

agencies' common-law duty, *owed directly to an adopted child such as Roman*, to use due diligence in obtaining and disclosing medical records (including, where applicable, school or family or counseling records), and providing them to the adoptive parents within a reasonable time under the circumstances. As a practical matter, a Virginia court would likely apply this duty to the period shortly before the formal adoption if the adoptive parents already have physical custody, and the duty would presumably continue through, and for some reasonable period of time after, the adoption.

But even assuming *arguendo* that the Virginia Supreme Court would recognize a duty to disclose which runs directly to the adopted child (and which continues after the adoption), Roman has not presented evidence sufficient to create a genuine issue as to whether he was damaged by the defendants' alleged negligent post-adoption breach of that duty. The defendants' supplemental reply brief adduced the deposition testimony of one of the Harshaws' medical experts, Dr. Aiello, who had the following exchange with counsel:

> Q.     So you suspected fetal alcohol syndrome as a possibility in January of '06; and sometime in mid to later 2007 you concluded that the child did have fetal alcohol syndrome, right?
> A.     Actually it was mid to late 2006.
>
> Q.     Sorry. 2006?
> A.     Yes.
>
> Q.     If the diagnosis had been made earlier when the child was a year, a year and a half, would the outcome for Roman have been any different?
> A.     I don't think so.

Defendants' Supplement to Reply in Support of Defendants' Motion for Dismissal and for Summary Disposition, filed February 13, 2010 ("Defs' Supp Reply for SJ"), Ex A (uncertified rough draft of Deposition of Frank Aiello, M.D., conducted December 13, 2009) at page 83.

The defendants attach much significance to Dr. Aiello's testimony on this score, stating that

"Dr. Aiello's testimony establishes as a matter of law that Plaintiffs cannot meet their burden of proving the necessary element of causation with regard to the child's individual claim", namely the damages element. Defs' Supp. Reply for SJ at 3. The defendants would conclude that "[b]ecause Roman Harshaw's alleged injury – fetal alcohol syndrome – was undeniably caused by someone other than Defendants well over a year before Defendants first had any contact with him or with Plaintiffs at all, the necessary element of causation, under both Michigan and Virginia law, is absent." *Id.* at 3. But it cannot be said that this testimony by the Harshaws' Dr. Aiello is entirely unrebutted or undisputed. In their response to the defendants' supplemental summary-judgment brief, the plaintiffs proffer treating psychologist Federici's deposition testimony. Dr. Federici testified as follows:

> I believe that there has been windows of opportunity missed for various reasons by catching him [Roman] at – what we call them – critical points. That catching this earlier and being able to intervene with the right amount [sic] by the right people, we might have been able to bring it up to some better level, because it's one of these unfortunate statements with the brain that it's on a downward spiral; if you don't use it you lose it.

> And kids with deteriorating brain patterns – and, for whatever reasons, which the main one is the most severe cases of FAS – they really need a lot [of treatment] early and if it's not done, they get worse like this. And I've unfortunately seen this pattern a lot of times.

> Is this more severe than typical? Yes.

Plaintiffs' Response in Opposition to Defendants' Motion for Leave to File Supplemental Reply Brief in Support of Defendants' Summary Judgment Motion ("P's Opp to Defs' Supp SJ Reply"), Ex A - Deposition of Dr. Ronald S. Federici, Psy.D., conducted February 24, 2010 ("Federici Dep") at 152:3-17 (¶ breaks added). *See also generally* http://www.nlm.nih.gov/medlineplus/ency/article/000911.htm, Outlook (Prognosis), retrieved May 11, 2010 ("Infants and children with fetal alcohol syndrome have many different problems . . . .

Children do best if diagnosed early and referred to a team of providers who can work with their families on educational and behavioral strategies that best fit the individual child's needs."). Psychiatrist Federici also opined that Roman's prognosis was bleak:

> [H]e has deteriorated, [is] doing worse, and is now plateaued out and will probably not go further.
>
> * * *
>
> My professional opinion is that Roman will be life-long, full-care, never live independently, require 24/7 supervision, will most likely require some period of long-term institutional or residential care, not psychiatric, for kids with brain damage and neurobehavioral and neurodevelopmental issues, and will always require a guardian, conservator, whatever you choose to call it . . . .

Defs' Supp Reply (Doc 255), Ex B (Federici Dep Feb. 24, 2010) 151:12 to 152:3.

The defendants allege that the plaintiffs did not plead the theory of damage to Roman "based on [post-adoption] delay in diagnosis/treatment of the fetal alcohol syndrome" in their complaint, *see* Defs' Supp Reply at 4. The Harshaws counter that they "originally raised their 'delay in diagnosis' allegation in . . . paragraph 103", which stated that "Bethany's negligence was the proximate cause of damages and injuries suffered by Roman in that the Harshaws and Roman's doctors were prevented from providing Roman effective treatment and/or no treatment at all." To place the paragraph 103 allegation in context, the Harshaws emphasize that it was "directly preceded by paragraph 101", which stated that "Bethany owed a duty to Roman to furnish the Harshaws with the medical and family records pertaining to Roman that were in Bethany's possession or control or that were reasonably available to Bethany in a reasonable amount of time" and paragraph 102, which alleged that "Bethany negligently failed to fulfill its duty to furnish these records to Roman within a reasonable time." P's Opp to Defs' Supp SJ Reply at 3 n.5. The court determines that the allegations of paragraphs 101-103 of the complaint adequately put the defendants on notice as to the nature of Roman's claim, and raises Roman's right to relief on the negligent failure-to-disclose claim

beyond the speculative level under Virginia law.

That is enough for Roman's claim for post-adoption negligent failure to disclose to survive the Rule 12(b)(6) dismissal, but it is not enough to survive Rule 56 summary judgment. It does not appear that the Harshaws have presented evidence explaining any *specific* changed or additional testing, counseling, medication, treatment, or other measures which medical professionals could or allegedly would have taken (after the adoption) if they had been given more specific and thorough medical records about Roman, and/or been given the existing records earlier. Nor have the Harshaws explained, in more than unduly general terms, how Roman has been or realistically might have been hindered in his physical, emotional, psychological, or social development due to the lack of any specific item of medical information which the defendants provided later than they allegedly could/should have provided it. Plaintiffs' adoption standard-of-care expert Professor Hollinger asserts that "Bethany breached it's a [sic] duty to Roman to provide his new adoptive parents with his medical records in order to enable them to seek appropriate care for what has turned out to be, sadly, his profound cognitive, physical and psychological disabilities", P's Opp Ex N at 22, but provides no details about how any particular piece of omitted or belatedly-provided information about Roman specifically might have helped ameliorate the extent of any of his physical, psychological, cognitive or social limitations.

**Accordingly, the court will deny the motion to dismiss Roman's claim (count 4) under Rule 12(b)(6), but will grant summary judgment to the defendants on that claim for failure to show a genuine issue as to whether Roman in particular was damaged by pre-adoption or post-**

**adoption negligent failure to disclose.**[15]

With the motion to dismiss denied in its entirety, and the defendants securing summary judgment on Roman's lone claim (count four), the court turns to the merits of the Harshaws' claims for intentional misrepresentation/fraud (count one), negligent misrepresentation (count two), and negligent failure to disclose (count three). The court will deny the defendants' motion for summary judgment on counts 1-3 and the plaintiffs' cross-motion for summary judgment on counts 2 and 3. The plaintiffs have not sought summary judgment on count 1.

## LEGAL STANDARD:
### Federal Court's Consideration of Summary Judgment on Virginia-Law Claims

Virginia Court "Rule 3:20 allows summary judgment to be entered in civil actions." *Burns v. Commonwealth of Virginia*, – S.E.2d –, –, 2010 WL 140780, *6 (Va. Jan. 15, 2010). "Summary judgment is proper if the 'pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Portinga v. Taylor*, 2009 WL 910800, *5, – F. Supp.2d –, – (W.D. Mich. Apr. 2, 2009) (Maloney, C.J.) (quoting *Patterson v. Hudson Area Schools*, 551 F.3d 438, 444 (6th Cir.) (quoting FED. R. CIV. P. 56(c)), *cert. denied*, – U.S. –, 130 S.Ct. 299 (2009);

---

15

The court is unpersuaded by the defendants' attempt to compare "Plaintiffs' claim for damages – that even though they would not have adopted the minor Plaintiff if Defendants had disclosed the medical records, the minor Plaintiff was nonetheless harmed by Defendants' failure to disclose – . . . to a claim for damages under a 'wrongful life' theory", a theory which they say the Virginia courts have rejected. *See* Defs' MTD/MSJ at 13 (citing and quoting *Glascock v. Laserna*, 30 Va. Cir. 266, 1993 WL 946053 (Va. Cir. Ct. May 3, 1993)).

*see also Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009)[16]; *Taylor v. Taylor* 2006 WL 1593883, *2 (Va. App. June 13, 2006) (Elder, <u>McClanahan</u>, Sr. J. Coleman) ("Summary judgment is an appropriate, though drastic, remedy where there is no genuine issue of material fact and the moving party is entitled to prevail as a matter of law.") (citing VA. CT. R. 2:21 and, *inter alia*, *Klaiber v. Freemason Assocs.*, 266 Va. 478, 484, 587 S.E.2d 555, 558 (Va. 2003) and *Thurmond v. Prince William Prof. Baseball Club*, 265 Va. 59, 64, 574 S.E.2d 246, 250 (Va. 2003)); *Kelly v. Grigsby*, 67 Va. Cir. 153, 2005 WL 533544, *1 (Va. Cir. Ct. Loudoun Cty. Mar. 8, 2005) (Thomas Horne, Cir. J.) (citing VA. CT. R. 3:18). *See, e.g., City of Winchester v. American Woodmark Corp.*, 252 Va. 98, 104, 471 S.E.2d 495, 499 (Va. 1996) (because no genuine issues of fact existed on plaintiff-taxpayer's Commerce Clause challenge to a city's assessment of certain taxes on all its receipts, summary judgment for plaintiff was proper); *Bio-Medical Etc., Inc. v. Dep't of Taxation*, 12 Va. Cir. 270, 1988 WL 619255, *1 (Va. Cir. Ct., City of Richmond June 3, 1988) (Randall G. Johnson, Cir. J.) ("The court agrees that there exists no genuine issue of any material fact and that summary judgment is appropriate.").

The movant has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *ARS*, 602 F. Supp.2d at 845 (citing *Conley*, 266 F.

---

[16]

Before the December 2007 amendment, FED. R. CIV. P. 56(c) stated that summary judgment is appropriate if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Appalachian Railcar Servs., Inc. v. Consumers Energy Co.*, 602 F. Supp.2d 829, 845 (W.D. Mich. 2008) (Maloney, J.) ("ARS") (quoting *Conley v. City of Findlay*, 266 F. App'x 400, 404 (6th Cir. 2008) (Griffin, J.)).

The amendment was stylistic only. *Portinga v. Taylor*, 2009 WL 910800, *5 n.9 (W.D. Mich. Apr. 2, 2009) (Maloney, C.J.) (citing *Dobrowiak v. Convenient Family Dentistry, Inc.*, 315 F. App'x 580, 584 n.4 (6th Cir. 2009) (citing FED. R. CIV. P. 56(c), Adv. Comm. Notes))).

App'x at 404 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord Farmers & Merchants Nat'l Bank of Hamilton v. Williams*, 30 Va. Cir. 167, 1993 WL 945955, *1 (Va. Cir. Ct. Loudoun Cty. Feb. 10, 1993) (Thomas Horne, Cir. J.) ("'The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment.'") (quoting *Celotex*, 477 U.S. 317).

However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial – e.g., if the movant is defending against a claim – "it may meet its burden merely by showing 'that there is an absence of evidence to support the moving party's case.'" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Celotex*, 477 U.S. at 323), *reh'g & reh'g en banc denied* (6th Cir. Oct. 23, 2009). *See also Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (Bell, J.) (movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, its initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . .") (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, No. 99-2113, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. Nov. 2, 2000).

Once the movant has met its burden, the non-movant must present "'significant probative evidence'" to demonstrate that there is more than "'some metaphysical doubt as to the material facts.'" *ARS*, 602 F. Supp.2d at 845 (citing *Conley*, 266 F. App'x at 404 (quoting *Moore*, 8 F.3d at 339-40)). *Accord Shupe v. Warren Cty. Sch. Bd.*, 53 Va. Cir. 56, 2000 WL 33340625, *3 (Va. Cir. Ct. Warren Cty. Mar. 31, 2000) (Wetsel, Cir. J.) ("'When the moving party has carried its burden . . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'") (quoting *Metro Machine Corp. v. Mizenko*, 244 Va. 78, 83, 419 S.E.2d 632

(Va. 1992) (citing *Gaudet v. Exxon Corp.*, 562 F.3d 351, 355 (1977))).

The non-movant may not rest on the mere allegations of his pleadings. *See Griffin v. Reznick*, 609 F. Supp.2d 695, 698 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, FED. R. CIV. P. 56(e) and *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)); *see also Transition Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*, 306 F. App'x 273, 278 (6th Cir. 2009).[17] If the movant puts forward evidence – such as affidavits, purported business records, purported government records, etc. – the other party cannot withstand summary judgment by simply sitting mute and failing to challenge the authenticity, admissibility, or veracity of those documents. *See Leys v. Lowe's Home Ctrs., Inc.*, – F. Supp.2d –, –, 2009 WL 3255597, *2 (W.D. Mich. 2009) (Maloney, C.J.) (citing *Donoho v. Smith Cty. Bd. of Ed.*, 21 F. App'x 293, 298 (6th Cir. 2001) (Boggs, J.) (affirming summary judgment for employer, Circuit noted that plaintiff's "affidavit does nothing to challenge the evidence put forward by the defendants that the last IEP meeting . . . also included provision to her of the apparently usual verbal and written notices of her rights.")).[18]

Moreover, the mere existence of an alleged factual dispute between the parties will not defeat

---

[17]

However, "[a] *verified* complaint 'carries the same weight as would an affidavit for the purposes of summary judgment." *ACLU of Ky. v. Grayson Cty., Ky.*, – F.3d –, –, 2010 WL 114361, *3 (6th Cir. Jan. 14, 2010) (McKeague, J.) (citing, *inter alia*, *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008)) (emphasis added).

[18]

*See, e.g., SBA v. McDonald*, 1985 WL 13600, *1 (6th Cir. Aug. 15, 1985) (p.c.) ("Even assuming the checks and money orders were mailed, there is no genuine issue as to their receipt. McDonald offers nothing to dispute the sworn affidavit that payment was not received. Payment does not occur without receipt. Summary judgment was appropriate."); *Robbins v. Black*, 2008 WL 4146185, *9 (E.D. Ky. Sept. 5, 2008) (Wilhoit, Sr. D.J.) ("Black is also entitled to judgment in her favor. She has stated under oath that she does not remember having any part in his care, and Plaintiff has not contradicted *her affidavit or exhibits*.") (emphasis added) (citing *Humphrey v. USAG*, 279 F. App'x 328 (6th Cir. 2008) (Griffin, J.)).

an otherwise properly supported summary judgment motion; there be some genuine issue of *material* fact. *ARS*, 602 F. Supp.2d at 845 (citing, *inter alia*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). And the non-movant "cannot defeat a properly supported motion for summary judgment motion by 'simply arguing that it relies solely or in part upon credibility determinations.'" *Heggie v. Kuzma*, 2009 WL 594908, *10 (W.D. Mich. Mar. 6, 2009) (Maloney, C.J.) (quoting *Fogerty v. MGM Group Holdings, Inc.*, 379 F.3d 348, 353 (6th Cir. 2004) (non-movant may not "have a trial on the hope that a jury may disbelieve factually uncontested proof")).

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691 (6th Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *cert. denied*, – U.S. –, 128 S.Ct. 1334 (2008), and view the evidence in the light most favorable to the non-movant, giving it the benefit of all reasonable inferences. *Fox v. Eagle Dist. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (Griffin, J.); *see also Patterson*, 551 F.3d at 445. *Accord Farmers & Merchants Nat'l Bank of Hamilton v. Williams*, 30 Va. Cir. 167, 1993 WL 945955, *1 (Va. Cir. Ct. Loudoun Cty. Feb. 10, 1993) (Thomas Horne, Cir. J.) ("[T]he court must view the facts and inferences in a light most favorable to the nonmoving party.") (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001 (4th Cir. 1987)).

But the court considers only evidence that would be admissible at trial under the Federal Rules of Evidence and applicable state substantive law. *See Elliott Co. v. Liberty Mut. Ins. Co.*, – F. App'x –, 2009 WL 750780, *10 (6th Cir. 2009) (on appeal from grant of summary judgment, panel declined to consider extrinsic evidence which would not be admissible under applicable state contract law) (citation omitted); *Bond v. Burson*, No. 96-5459, 134 F.3d 370, 1998 WL 24993, *4 (6th Cir. Jan. 16, 1998) ("The district court also acted within its discretion in denying plaintiff's

motion to strike the Smith affidavit from defendants' summary judgment motion. By relying upon the affidavit only for the purposes of establishing the history of the case and DHS's custody of plaintiff, the court properly disregarded those facts not admissible at trial."). *Accord Eccleston v. Patriot Harley Davidson, Inc.*, 75 Va. Cir. 421, 2008 WL 6759971, *5 (Va. Cir. Ct. Prince William Cty., Feb. 1, 2008) (Alston, Cir. J.) ("if a party relies on . . . an affidavit to attain summary judgment, the affidavit must be 'made with personal knowledge, setting forth only facts which are admissible in evidence [and] to which the affiant is competent to testify.") (citing *Claypotch v. Heller, Inc.*, 823 A.2d 844 (N.J. App. Div. 2003)).

Ultimately, entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party w[ould] bear the burden of proof at trial." *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 447 (6th Cir. 2007) (quoting *Celotex*, 477 U.S. at 322).[19] "As Chief Judge Bell has characterized the post-trilogy summary-judgment standard, '[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out fanciful, malicious, and unsupported claims before trial.'" *Ellis v. Kaye-Kibbey*, 581 F. Supp.2d 861, 874 (W.D. Mich. 2008) (Maloney, C.J.) (quoting *Wilson*, 112 F. Supp.2d at 654); *see also Townsend v. US*, 2000 WL 1616081, *1 (W.D. Mich. Aug. 31, 2000) (McKeague, J.); *Eckford-El v. Toombs*, 760 F. Supp. 1276,

---

[19]

A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior precedent, the use of summary judgment is not only permitted but encouraged in certain circumstances . . . ." *Collins v. Assoc'd Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7th Cir. 1988). *Accord In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) (the trilogy "encourage the use of summary judgment as a means to dispose of factually unsupported claims."); *Hurst v. Union Pacific Rail Co.*, 1991 WL 329588, *1 (W.D. Okla. 1991) ("This trilogy of cases establishes that factual and credibility conflicts are not necessarily enough to preclude summary judgment and encourage that a summary judgment be used to pierce the pleadings and determine if there is in actuality a genuine triable issue."), *aff'd*, 958 F.2d 1002 (10th Cir. 1992).

1268 (W.D. Mich. 1991) (Hillman, J.). *Accord Snyder v. City of Alexandria, Virginia*, 870 F. Supp. 672, 691 (E.D. Va. 1994) ("'[Federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later.'") (quoting *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coord. Unit*, 507 U.S. 163, 168-69, 113 S.Ct. 1160, 1163 (1993) (Rehnquist, C.J., for unanimous Court)).

### Representations Which the Harshaws Allege But Which They Fail to Show Were Made, or Which they Fail to Show are Material

Preliminarily, the court notes that the Harshaws charge the defendants with a number of alleged misrepresentations where the cited evidence does not even *tend* to establish that the defendants made the representation in question. First, the Harshaws state that "Bethany misrepresented to the Harshaws that it had offices in Russia when, in fact, Bethany did not have offices in Russia." Plaintiffs' Brief in Support of Motion for Partial Summary Judgment ("P's MSJ") at 8. The document excerpts they cite, however, do not show that any of the defendants ever represented that any of the BCS entities had offices in Russia:

> *See, e.g.,* Exhibit A, Bethany [Christian Services – International Services] letter from Glenn DeMots, President/CEO of Bethany International Services to V.M. Filippov, Minister of the Common and Professional Education of the Russian Federation, April 1, 2004 (Bates Number 001898) ("Bethany currently has 77 offices in 35 states of the United States, and since 1982 has provided services in 16 other countries, including Albania, Bulgaria, Romania and Ukraine, where we have many offices as well.").

> *See also*, Exhibit E, <u>Adoptions Programs – Bethany Hampton Roads</u>, undated (Bates numbers 000729-730) ("Bethany's International Adoption Program involves the placement of primarily children *through Bethany's own programs* through 52 field offices in 13 countries in Asia, Eastern Europe, and Latin America.") (emphasis added)

P's MSJ at 8 n.2. Neither of these excerpts mentions offices in Russia, and the court is not obligated to sift through the record to see whether other portions of these cited documents, or the other many

exhibits to the many briefs in this case, state that BCS entities have offices in Russia.

Second, the Harshaws allege that "Bethany misrepresented to the Harshaws that it had placed hundreds of international children with American families when, in fact, Bethany was prohibited by Russian and American law from placing international children with American families." P's MSJ at 8 and n.3 (citing Exhibit B, 2002 Bethany Quick Facts consolidated promotional/advertising materials, copyrighted 2002 (Bates numbers BCS 000762-5) ("In 2001, *Bethany placed* 1,594 children with their 'forever families' . . . *International placements* totaled 582 of these.") (emphases added)). Similarly, the Harshaws allege that "Bethany misrepresented that it would place a Russian child with the Harshaws when, in fact, Bethany was prohibited by law from doing placing [sic] Russian children with American families." P's MSJ at 8 and n.4 (citing, Exhibit C, Outline – Adoption Information Meeting – Bethany Christian Services of Hampton Roads, undated (Bates numbers 000754-755) ("Each year hundreds of international children *are* placed with permanent families through Bethany's International Adoption Services."), as well as Exhibits D and E (additional promotional/advertising materials)). But the Harshaws fail to explain how the defendants' allegedly inaccurate suggestion that they could and did "place" Russian children, or any other children, is material to any of their claims, i.e., how they were damaged by relying on it.

Third, the Harshaws allege that "Bethany misrepresented to the Harshaws that Bethany was accredited to perform adoptions in Russia when Bethany is not and has never been accredited to perform adoptions in Russia." P's MSJ at 10 (citing Exhibits B, C, D and E without quotation or more specific citation). Yet the Harshaws fail to show how this alleged representation is material to their claims.

Accordingly, the court has not considered alleged misrepresentations, including the three

aforementioned, where the Harshaws have not presented evidence showing a genuine issue as to whether the defendants made the representation at all, or where they have not presented evidence showing that the representation is material to some element of their claims (particularly, the element that they were damaged by reasonably relying on the representation).

## DISCUSSION:  COUNT 1's MERITS
### The Harshaws' Intentional Misrepresentation Claim under Virginia Law

Under Virginia law, in order to succeed on a claim for fraud in the form of intentional misrepresentation, a plaintiff must show that (1) the defendant made a false representation, (2) of a material fact, (3) intentionally and knowingly, (4) with intent to mislead, and (5) the plaintiff relied on the false representation and (6) was damaged as a result of that reliance.  *See Spence v. Griffin*, 236 Va. 21, 28, 372 S.E.2d 595 (Va. 1988); *see also Sea-Land Serv., Inc. v. O'Neal*, 224 Va. 343, 351, 297 S.E.2d 647 (Va. 1982) ("Intentional fraud consists of deception, intentionally practiced[.]").  The defendants point to *Spence-Parker v. Maryland Ins. Group*, 937 F. Supp. 551, 561-62 (E.D. Va. 1996) (no intentional fraud if "there is no factual basis for believing that deceit played any role") and *Bowie v. Sorrell*, 113 F. Supp. 373, 381 (W.D. Va. 1953) ("It follows from my findings of fact that no intentional fraud was practiced on the plaintiff by defendant's agent . . . .  Therefore, there was no actual fraud.").

The defendants seek summary judgment on count one, the Harshaws' claim for intentional misrepresentation / fraud, on the ground that the plaintiffs have presented no evidence that any misrepresentations were made intentionally.  The defendants argue as follows:

> [T]here is no evidence that any alleged misrepresentation was made deliberately to deceive Plaintiffs.  First, as discussed [elsewhere], there is no evidence of any failure to timely disclose medical records.  Second, there is no evidence that any hypothetical failure to

disclose was done deliberately with the intent to deceive Plaintiffs.

Similarly, there is no evidence that Ms. Walton's alleged misrepresentations regarding Dr. [Michael f/k/a Mikhail] Dubrovsky were made deliberately with the intent to deceive anyone. Not only did Ms. Walton deny making the alleged misrepresentations, but she also testified that she believed that everything she told the Harshaws was the truth. *See* Walton Dep. at 151, 177 (Ex. B).[20] In fact, even Mr. Harshaw admits that he believes that Ms. Walton, at the very least, "thought she was telling the truth." *See* William Harshaw Dep. at 191 (Ex H).

Plaintiffs have produced nothing to create an issue of fact that Defendants deliberately misled the Harshaws. To permit this claim to go to the jury would be to invite the jurors to engage in unfettered speculation, and this they cannot be permitted to do. *See Ferenc v. World Child, Inc.*, 977 F. Supp. 56, 60 (D.D.C. 1997) (dismissing plaintiffs' fraud claim against an adoption agency where the court explained that plaintiffs' claim that the defendant knew the adopted child to be more severely impaired than it made known to the plaintiffs "remains no more than a hypothesis, . . . [and] to allow a jury to find otherwise would be to countenance an exercise in . . . speculation.").

Defs' MTD/MSJ at 20.

The court is not persuaded by the defendants' contention that it was unreasonable for the

Harshaws to rely on Walton's statements regarding Dr. Dubrovsky. In support of this contention,

the defendants argue as follows:

---

20

The court first reminds the defendants that Walton's insistence that she told the truth does nothing to help them obtain summary judgment on the negligent-misrepresentation claim. *See Bergmueller v. Minnick*, 383 S.E.2d 722, 725, 238 Va. 332, 337 (Va. 1989) (holding that on claim for constructive fraud, which may be based "upon false representations *innocently* made", *"[t]he real inquiry is not whether the seller knew the representation to be false*, but whether the purchaser believed it to be true, and was misled by it into acting to his detriment.") (citing *Trust Co. of Norfolk v. Fletcher*, 152 Va. 868, 879, 148 S.E. 785, 788 (Va. 1929)).

Moreover, whether Walton believed she was telling the truth is a subjective credibility determination, which is exclusively within the province of the factfinder. Thus, Mr. Harshaw's statement that he thought Walton believed she was telling the truth, in no way forecloses the Harshaws's abiltiy to use Walton's statement as an example of *intentional* misrepresentation. A reasonable factfinder could conclude that Walton's statement was false, that she knew it was false when she made it, and that Mr. Harshaw was simply wrong to believe Walton thought she was telling the truth.

First, the Adoptive Family Assessment, which Plaintiffs possessed, expressly highlighted the risks of international adoption. It provided that Plaintiffs (1) "[understood] that children from overseas may arrive with previously undetected health problems"; (2) were "aware that children from overseas may have little or no background information (or inaccurate information) on the birth family, circumstances of the child's placement for adoption[,] or past medical care"; and (3) knew there were "no guarantees or predictions for the future mental, social or physical development of the child." *See* [Comp Ex. D].[21]

Additionally, Ms. Elseroad explained to Plaintiffs that some institutionalized children will have suffered fetal alcohol exposure, and that no one is able to predict the outcome of an individual child. *See* Elseroad Dep. at 302-306 (Ex. A).

Moreover, the Harshaws received an article at the educational workshop entitled, *Adopting an Institutionalized Child: What are the Risks?*, which explains that "[o]ver 50 percent of institutionalized children in Eastern Europe are low birth weight infants, many were born prematurely, and some have been exposed to alcohol in utero." See Article, attached as Exhibit J. Mrs. Harshaw admits that she received and read this article. *See* Julie Harshaw Dep. at 234 (Ex. C).

Finally, Plaintiffs' own pediatrician, Dr. Holland, informed Mrs. Harshaw that the diagnoses contained in the minor Plaintiff's medical record revealed that he may experience learning difficulties. *See* Holland Dep. at 33, 35 (Ex. G). Dr. Holland also informed Mrs. Harshaw that influences in the womb are generally unknown with adopted children, and that there was a risk that the child may have been exposed to drugs or alcohol. *See id.* at 14.

Given the documents and other information Plaintiffs received regarding the risks associated with international adoptions, their alleged reliance upon any alleged representation was objectively unreasonable. Therefore, their fraudulent and negligent misrepresentation claims (counts one and two) should be dismissed.

Defs' MTD/MSJ at 21-22.

But the defendants present no Virginia precedent for the proposition that it is unreasonable to rely on *specific* representations regarding a *specific* child merely because one has also been apprised of the *general* risks attendant upon an international adoption and/or adoption of an institutionalized child. Nor does the court have reason to believe that the Virginia Supreme Court

---

[21]

The Adoptive Family Assessment dated August 22, 2003 and signed and notarized on September 22, 2003, recited the same cautions and understandings conveyed to the Harshaws. *See* P's MSJ Ex F at 2, which is Bates Number BCS-000154.

would find that proposition just or logically tenable.  It is an undisputed and central fact in this case that BCS's written Adoptive Family Assessment for the Harshaws, prepared on September 29, 2003, clearly stated that the Harshaws "feel equipped to parent a child who may have a minor, correctable issue with good prognosis for normal development" and again that "[i]t is their desire to adopt a young child from Russia, who has a minor, correctable issue with good prognosis for normal development."  P's MSJ Ex F, Bates Number BCS000153-000159.  Later in the same Adoptive Family Assessment, BCS-HR states, "It is recommended that Mr. and Mrs. Harshaw be approved for adoptive placement of a child, male or female, from Russia, from 12 to 36 months of age, that [sic, who] has a minor, correctable condition with a good prognosis for normal development."  *Id.*

While the Virginia Supreme Court might well join other States in holding that an adoption agency is not  guarantor of an adoptive child's health, it would still hold, under basic common-law principles, that an agency has a duty to make a *reasonably diligent* effort to ensure that the child's health condition and prognosis meet required criteria which the parties have expressly memorialized in writing prior to the agency's approval of the adoption application.  The plaintiffs do not sufficiently focus on this point, which is the strongest part of their case, and the defendants conveniently ignore it, focusing only on their mantra that they cannot "guarantee" a healthy child. The Harshaws allege that "Bethany misrepresented to the Harshaws that Bethany would be responsible for investigating and acquiring medical information on Roman when, in fact, Bethany did not investigate Roman's medical background at all."  P's MSJ at 10 (citing Exs E, F and G generally, without quotation of particular language or citation of particular pages).

Taking this written understanding into account, the court finds that to a reasonable person in the Harshaws' position, the representations which specifically relate to their prospective adoptive

child naturally convey the assurance that, whatever problems may be generally common (or more common) with children in Roman's situation, such reasonably diligent steps have been taken to honor the mutual understanding that *Roman* met their express written requirement – a child with at most "a minor, correctable [medical/health] issue with good prognosis for normal development."

Those steps, the defendants may have led the Harshaws to believe, included Dr. Dubrovsky's review of Roman's medical records and video, and his supposed continuing practices of visiting prospective adoptive children in Russia and even advising the defendants against an adoption if a particular child did not seem suitable in his own opinion for the requirements of available known prospective adoptive parents. Generally, Bethany's promotional materials declared that Dr. Dubrovsky "is a Russian physician living in New York State" who "travels to Russia every 6-8 weeks and coordinates staff who directly assist Bethany families in five different regions." P's MSJ Ex H – "Bethany Eastern Europe – Russia – Krasnoyarsk – Children Available – Healthy *and* Children with Special Needs", undated, Bates number 000001. The same undated promotional materials state that "Dr. Dubrovsky has partnered with Bethany for more than three years" and "has worked with adoptions for more than seven years" and stated that his "staffing Russia assists families through the adoption process in the regions." *Id.* at Bates Number 000002; *see also* P's MSJ E (Dubrovsky Dep) at 93:2 to 94:20 (explaining how he came to be involved in facilitating Western adoptions of Russian children in 1995 or 1996).

In addition, the plaintiffs present evidence that the defendants told them at least *after the adoption* that Dr. Dubrovsky performed such functions. For example, in a September 13, 2006 e-mail to "Chip" Harshaw, presumably William Harshaw, BCS-HR stated that Dr. Dubrovsky "is a coordinator of many of our Russian regions" and "works with us to facilitate the adoption process"

and, more significantly, that he "supervises the staff there *and does review all of the available medical records before we present children to the families.*"  P's MSJ Ex I, Bates Number BCS 000440-01.  The same e-mail also stated that "[t]he advantage of his understanding of Russian medical terminology and culture" and that "[w]hen we first began to work in Russia, it did happen more often that he would see the children."  *Id.*

In another post-adoption e-mail to William Harshaw, on January 17, 2007, BCS-HR implied that Dr. Dubrovsky was facilitating more adoptions than previously and consequently did not visit orphanages as often as he had in earlier years.  P's MSJ Ex J at Bates Number BCS 000416; *see also* P's MSJ Ex E (Dubrovsky Dep) at 22:24 to 23:10 (Dubrovsky facilitated seventy adoptions in 2008, forty in 2006, and an estimated seventy in 2002, the year he facilitated the Harshaws' adoption of Roman).  BCS-HR went on to state that Dr. Dubrovsky "does[,] however, continue to review all the information sent to him on each referral.  That may be a video tape, still photos or just a brief medical history."  P's MSJ Ex J at Bates Number BCS 000417.  The e-mail then explained to William Harshaw that Dubrovsky's review of such video, photos or medical histories "is helpful because he has the knowledge [sic] of Russian medical terminology which can often be very confusing to Americans."  *Id.*

Perhaps most helpful to the Harshaws' general theory of how the defendants portrayed Dr. Dubrovsky and his role, the same January 17, 2007 e-mail from BCS-HR stated, "If he sees something in the information that concerns him, he will either call us to see if we have an appropriate family for those special needs or he would return the referral to the Russian staff as a child with too many special needs to be placed with any current waiting family."  *Id.*  In contrast, the Harshaws state, "Dr. Dubrovsky has testified that he has NEVER examined children or reviewed

medical records on behalf of Bethany" and that he "has NEVER practiced medicine or used his medical training in any way since he began working with Bethany." P's MSJ at 10 n.8 (capitalization in original). Indeed, Dr. Dubrovsky testified that while he visited another orphanage in Krasnoyarsk, he never visited the orphanage where Roman lived, and he never saw Roman, *see* P's MSJ E (Dubrovsky Dep) at 65:23 to 66:4.

A reasonable factfinder could conclude that the defendants made the statements about Dr. Dubrovsky's role, that the statements were false (at least as applied to Roman's case, and perhaps generally), and that the Harshaws were reasonable to rely on the representations because of the defendants' advertised expertise and experience and the relationship of trust between the defendants and prospective and actual adoptive parents. In particular, the factfinder could find that the false representations about Dr. Dubrovsky's role – whether intentional or negligent – reasonably could have led the Harshaws to view other potentially worrisome "red flags" about Roman's health and behavior as less troubling than they otherwise would have been. After all, parents in the Harshaws' position could reason, "if any of these things really suggested some problem with Roman that was more than 'minor and correctible', 'Dr. D' as an actively involved Russian physician who visits children and reviews their photos, videos and/or records, would have 'caught' them and warned Bethany that Roman did not meet our requirements." Accordingly, the court will deny the defendants' motion for summary judgment on count one, the parents' claim for intentional misrepresentation under Virginia law.


### DISCUSSION:  THE MERITS OF COUNTS 2, 3 and 4
### The Harshaws' Negligent Misrepresentation Claim under Virginia Law;
### The Harshaws' Negligent Failure-to-Disclose Claim under Virginia Law;

At oral argument, the Harshaws' counsel for the first time raised Virginia Code § 63.2-1208(F). Section 63.2-1208 is entitled "Investigations; Report to Circuit Court." Subsection A provides that when presented with an adoption petition, "the circuit court shall . . . immediately enter an order referring the case to a child-placing agency to conduct an investigation and prepare a report unless no investigation is required pursuant to this chapter." VA. CODE § 63.2-1208(A). Subsection D provides, in part, that

> the investigation requested by the circuit court shall include, in addition to other inquiries that the circuit court may require the child-placing agency or local director to make, inquiries as to . . . (ii) what the physical and mental condition of the child is . . . (vi) whether the child is a suitable child for adoption by the petitioner . . . and (viii) whether the requirements of subsections E and F have been met.

VA. CODE § 63.2-1208(D). In turn, subsection F states, in its entirety, "The report shall include a statement by the child-placing agency or local director that all reasonably ascertainable background, medical, and psychological records of the child have been provided to the prospective adoptive parent. The report also shall include a list of such records provided." VA. CODE § 63.2-1208(F).

However, it does not appear that the Harshaws ever alluded to VA. CODE § 63.2-1208 in any of their numerous briefs supporting or opposing the instant summary-judgment motions. It is inappropriate for the Harshaws to attempt to raise this statute for the first time at oral argument. *See US v. Lockett*, No. 07-6403, – F. App'x –, 2009 WL 5084096, *14 (6th Cir. Dec. 29, 2009) (C.J. Batchelder, Gibbons, <u>Chief D.J. Maloney</u>) (arguments not made in opening brief were waived) (citing, *inter alia, Am. Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004) (citing *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002))), *cert. denied*, – U.S. –, – S.Ct. –, 2010 WL 1532509 (U.S. May 3, 2010) (No. 09-9904); *US v. Mellies*, 329 F. App'x 592 (6th Cir. 2009) (Keith, Sutton, <u>Griffin</u>) (noting that court did not have to consider argument which party raised for the first time at oral argument rather than in its briefs). *See, e.g., Lee v. Runge*, 404 U.S. 887, 887 n.2 (1971) (Douglas, J., dissenting on other grounds from denial of *certiorari*) ("*Mazer v. Stein*, 347 U.S. 201 . . . dealt only with the statutory standards for copyrightability because the constitutional questions were not raised until oral argument."); *Danish News Co. v. City of Ann Arbor*, 517 F. Supp. 86, 91 (E.D. Mich. 1981) ("With respect to plaintiff's contention, pressed at oral argument for the first time in connection . . . , that the state nuisance *per se* statute is unconstitutional as its term apply to . . . , this asserted basis for preliminary injunctive relief also must fail. First, it is a proposition that was not briefed."), *aff'd w/o op.*, No. 82-1872, 751 F.2d 384 (6th Cir. Nov. 6, 1984) (table entry).

Accordingly, the court has not considered the potential applicability of belatedly-raised VA. CODE § 63.2-1208. The court also notes that it is far too late for the Harshaws to seek leave to amend their complaint to add a claim for violation of this Virginia statute (or a claim for negligence *per se* based on an alleged violation of that statute).

The defendants next seek summary judgment on both count 1 (intentional misrepresentation) and count 2 (negligent misrepresentation) on the ground that the Harshaws could not have *reasonably* relied on the alleged misrepresentations, whether intentional or negligent. The defendants argue as follows:

> Plaintiffs allege that Defendants failed to disclose a six-page English translation of a ten-page Russian medical document to them prior to then adoption. See [Comp Ex F] ¶¶ 55-56. Although Plaintiffs purportedly did not receive this document until after the adoption, Plaintiffs admit that they did receive a two-page medical extract prior to the adoption. *See* [Comp ¶ 27 and Comp Ex E].

> These medical records – the six-page record and the two-page record – are substantially the same. Each provides that the minor Plaintiff was diagnosed by a Russian neurologist with "perinatal impairment of the central nervous system." *See* [Comp] Exhibits E and F. Additionally, each provides that a psychiatrist diagnosed the minor plaintiff as having a "delay of psychomotor and speech development." *See id.* Despite these diagnoses, Plaintiffs allege that they would not have adopted the minor Plaintiff if they had received the six-page medical record prior to the adoption because it contained the additional diagnosis of "hypotrophy." *See* William Harshaw Dep at 224 (Ex. H); Julie Harshaw Dep. at 97 (Ex. C).

> While Plaintiffs assert that were unaware of the hypotrophy diagnosis prior to the adoption, the uncontroverted testimony of their own pediatrician, Dr. Holland, belies this assertion. Before the adoption, Mrs. Harshaw asked Dr. Holland to review a videotape, pictures [sic, photographs], and medical record[s]. *See* Julie Harshaw Dep at 26-7 (Ex. C).

> The medical record that Dr. Holland reviewed not only contained the diagnoses of "perinatal impairment of the central nervous system" and "delay of psychomotor and speech development", but it also provided a diagnosis of hypotrophy. *See* Holland Dep. at 20-22, 42-46 (Ex. G); *see also,* Medical Extract from Dr. Holland's Chart, attached as Exhibit I. Dr. Holland unequivocally testified that she discussed hypotrophy with Mrs. Harshaw prior to the adoption. *See* Holland Dep. at 42-46 (Ex. G). Since there is no genuine issue of material fact that plaintiffs knew of [Roman's Russian-diagnosed] hypotrophy, Plaintiffs' negligent failure[-]to[-]disclose claim fails.

> [ The court finds this argument by the defendants to be misleading (presumably unintentionally). The defendants cite globally to four pages of Dr. Holland's deposition, rather than quoting its actual exact language. What Dr. Holland said to the Harshaws is that the Russian medical record she reviewed did <u>not</u> specify the location or nature of the hypotrophy, i.e., the Harshaws certainly did <u>not</u> "know" that Roman had *brain* or *head* hypotrophy at that time. Dr. Holland also testified that the only way to diagnose *brain/head*

-70-

hypotrophy was to perform an MRI or CT scan on Roman, and she stated that the Russian record she reviewed had no evidence of such tests being done.  ]

But, even ignoring these undisputed facts, Plaintiffs' negligent failure to disclose claim still fails because there is no evidence that Defendants had possession of, and then failed to disclose, the six-page medical record to the Harshaws.  As Mr. Harshaw testified:

> Q. Do you have any reason to believe that [BCS-HR employee] Jeannie  Walton had possession of any medical-related documents and didn't give them to you?
> A.        I don't believe she did.

> Q.        Do you have any reason to believe that [BCS-HR Branch Director?] Karen Elseroad had possession of any medical related documents and didn't give them to you?
> A.        I don't know.

> Q.        And just so I know what to expect down the road, you are not saying that you think she did; you're saying you have no idea one way or the other.
> A.        That's correct.

> Q.        Is there anybody else from Bethany Christian services of Hampton Roads      that you believe may have had possession of medical records that were not given to you when . . . that person from Bethany received them?
> A.        I don't know.

> Q.        You know that the folks at the Hampton Roads Office received the two-page extract and then turned it over to you?
> A.        Correct.

> A.        You know that the folks from the Bethany Christian Services Hampton Roads office received sixteen pages of records in the Fall of 2006 and turned them over to you, correct?
> A.        Yes.

Defs' MTD/MSJ at 15-16 (quoting Ex H-Wm. Harshaw Dep at pages 406-407).  The defendants also proffer Mrs. Harshaw's admission that she had no evidence that defendants had possession of yet failed to disclose medical records to them:

> Q.        You and your husband asked Bethany to admit . . . that Bethany had . . . the ten pages of Russian and six pages of English that you received in the Fall of 2006 . . . before the adoption . . . .  so here is my question . . . do you

-71-

have any information to suggest that, in fact, Bethany had those particular

materials before the adoption?

A.      Not that I know of.

Defs' MTD/MSJ at 16 (quoting Ex C-Julie Harshaw Dep at pages 119-120).  The Harshaws'

testimony on this score, however, is not conclusive in favor of defendants' argument that they did

not withhold any medical information which was in their possession.  In the normal course of events,

how often *would* adoptive parents in this situation ever be expected to have any hard evidence that

the adoption agency had withheld records?  By definition, if the agency withheld records and *never*

disclosed them, the parents would typically have no way of knowing about the records' existence

– presumably the very purpose and intent of such withholding, when it occurs.

Proof that an adoption agency intentionally or negligently withheld medical records would

far likelier be established – if at all – by inferences drawn from circumstantial evidence.  Such

circumstantial evidence arguably exists here.  These defendants initially gave the Harshaws only a

two-page extract of Roman's Russian medical records prior to the adoption, *see* Comp ¶ 27 and

Comp Ex E, then later (after the adoption) gave them a six-page English translation of a ten-page

Russian medical document pertaining to Roman, *see* Comp ¶¶ 55-56 and Comp Ex F.  From the fact

that the defendants did not produce the lengthier document to the Harshaws before the adoption –

combined with the fact that the defendants made statements which could reasonably lead them to

believe that Russian-American "Dr. D" customarily reviewed a potential adoptee's medical records,

photos and videos and had done so in Roman's case -- a factfinder reasonably could infer that the

defendants' failure to turn over the longer document before the adoption was part of a pattern of

dishonesty or deception on their part.

*A fortiori* a factfinder could reasonably find that the defendants failure to turn over the longer

document before the adoption was part of a pattern of *carelessness* rising to the level of actionable negligence. That is, the factfinder could find that the defendants did not do what was reasonably possible to learn what records were available, locate and obtain them, and make them available to (1) ensure that prospective parents are able to make an informed choice, to the extent possible under the circumstances, and (2) to ensure that after the adoption, the adoptive parents can obtain, and the adopted child can most use and benefit from, medical and other treatment or rehabilitation. *See, e.g.,* Hollinger Report (P's opp Ex N) at 6, Summary ("Based on the information that has been made available to me to date, I have concluded that Defendants owed the Plaintiffs a duty of reasonable care in their provision of various adoption services [and] that Defendants breached this duty of care by negligently misrepresenting the condition of . . . Roman . . . prior to his placement with the Harshaws in January 2004 . . . failing to obtain or use reasonable efforts to obtain more complete medical records for the Harshaws prior to the finalization of the adoption in Russia in January 2004 . . . ."). In addition, a factfinder could impose liability on the parents' negligent failure-to-disclose claim based in part on the defendants' undisputed failure to inform them of their right, under Russian government adoption procedures, to have an independent medical examination of Roman conducted at a medical institute and to receive the results thereof before deciding whether to proceed. *See* Hollinger Report (P's Opp Ex N) at 7-8 ("There is nothing in the documents I have reviewed to indicate that Bethany Services advised the Harshaws of this option to have an independent and qualified Russian physician examine Roman before they went forward with their adoption plans.") (citing http://www.adopt-in-russia.ru and http://adoption.state.gov/country/russia.html#how).

Of course, the factfinder could reasonably reach the opposite conclusions as well, which would result in a verdict of no liability for the defendants on the parents' intentional and negligent

misrepresentation and negligent-failure-to-disclose claims. Summary judgment will be denied to both sides on counts 1, 2 and 3.

### PLAINTIFFS' BELATED MOTION FOR LEAVE TO FILE SUR-REPLY

Finally, on Thursday, May 6, 2010, just one business day before the long-scheduled oral argument on these dispositive motions, the Harshaws sought leave to file a sur-reply in further opposition to the defendants' motion to dismiss or for summary judgment. *See* Doc 256-1. The Harshaws' proposed sur-reply states as follows:

> Since the completion of the original briefing on Bethany's Motion on November 4, 2010 [sic, 2009], there have been three (3) depositions . . . that have produced evidence that bears directly on the issues now before the Court, particularly as those issues have been clarified in *Harshaw VI* [denying reconsideration of determination that Virginia substantive law governs all claim, and granting plaintiffs' motion to reinstate BCS-HR as a defendant]:
>
> • Dr. Deborah Holland on January 14, 2010 . . . ;
> • BCSI's Russian Program Coordinator, Judy Dalrymple, on February 19, 2010 . . . ; and
> • Dr. Ronald Federici on February 24, 2010.
>
> Each of these depositions contain[s] testimony directly disputing material facts that Bethany is relying on in its remaining dispositive motion, particularly in light of the Court's ruling in *Harshaw VI* on April 26, 2010. This testimony single-handedly refutes all of Bethany's remaining arguments in its Motion. The testimony is critical to the Court's consideration of Bethany's Motion.
>
> DR. DEBORAH HOLLAND
> In its motion, Bethany has asserted that "Plaintiffs allege that they would not have adopted the minor Plaintiff if they had received the six-page medical record prior to adoption because it contained the additional diagnosis of 'hypotrophy'" and that:
>
>> *While Plaintiffs assert that they were unaware of the hypotrophy diagnosis prior to the adoption, the uncontroverted testimony of their own pediatrician, Dr. Holland, belies this assertion . . . . The medical record that Dr. Holland reviewed not only contained the diagnoses of "perinatal impairment of the central nervous system"*

> *and "delay of psychomotor and speech development," <u>but it also provided a diagnosis of hypotrophy</u> . . . . Dr. Holland unequivocally testified that she discussed hypotrophy with Mrs. Harshaw prior to the adoption.*

[Doc] 131 at 15 (emphasis in original). Since the time that summary judgment briefing was completed on November 4, 2009, the Harshaws have deposed Dr. Deborah Holland [a second time, actually a continuation deposition compelled by the court]. [She] testified that she was mistaken in her earlier testimony about the medical records she reviewed with Julie Harshaw prior to the deposition:

> Q. Okay. And you're certain that you reviewed this with Mrs. Harshaw in October, late October, 2003?
> A. No, I'm not sure of the date.
> Q. But you knew it was warm out?
> A. Yes. That's as close as I can get you.
>
> Q. Okay. And . . . the last three pages of Exhibit 22 are the ones that you say that you reviewed and were in your file . . . ?
> A. Yes.
> Q. Okay, would you look on page two.
> A. Yes.
> Q. Which is the one without the Russian handwriting on it.
> A. Uh-huh.
>
> Q. You'll see down under Results of Medical Evaluation a dermatovenerologist.
> A. Yeah, whatever that is. Which – which page are you on, sir?
> Q. Page two, which the two pages you said that you reviewed with Julie Harshaw?
> A. Yes, okay.
> Q. There is a December 2nd[,] 2003 evaluation.
> * * *
> Q. Julie Harshaw has testified and has filed an affidavit that it was at the end of October, 2003.
> A. Uh-huh.
> Q. You – there is a test that was –
> A. Yes.
> Q. – conducted in December of 2003.
> A. Yes.
>
> Q. Now –
> A. That's not possible, is it?
> Q. Based upon that , is it possible that you reviewed these three

-75-

> Q. pages with Julie at that time or if you can take – is it possible that you reviewed let me just take that question, is it possible.
>
> A. Yes.
>
> Q. Can you have been mistaken that it was these three pages that you reviewed with Julie Harshaw?
>
> A. Yes . . . .

Holland Dep., January 14, 2010 [at 41:21 to 44:19], attached hereto as Exhibit B. Dr. Holland could not possibly have discussed "hypotrophy" with Julie Harshaw because the medical records that she indeed saw before the adoption did not contain any reference to "hypotrophy." *See id.*

DR. RONALD FEDERICI

[presenting Federici's deposition testimony, already quoted and discussed by the court above, that "catching this [apparent fetal alcohol syndrome] earlier and being able to intervene with the right amount by the right people, we might have been able to bring it up to some better level . . . ."]

* * * Furthermore, Plaintiffs' [sic] will ask Bethany's expert neuro-psychologist, Dr. Thomas G. Burns, about the "delay in diagnosis" issue at his upcoming deposition.

P's Proposed Sur-Reply Opposing Dismissal / Summary Judgment (Doc 256-2) at 2-4 (footnote 1 omitted). The Harshaws' proposed sur-reply goes on to counter the defendants' argument that the Harshaws have not alleged wrongdoing specifically by BCS and BCSI, only by BCS-HR. The Harshaws write as follows:

> [I]n addition to the services provided to the Harshaws by BCSI and BCS through their agent, BCS-HR, BCSI and BCS provided services directly to the Harshaws. [BCS-HR Branch Director] Karen Elseroad testified as follows: "Q. **But you know that Bethany International provided services to the Harshaws, right? A. They provided services, yes. Q. To the Harshaws, correct? A. Yes.**" Elseroad Dep. at [II.76:11-15], attached hereto as Exhibit D (emphasis added).

> Judy Dalrymple's deposition confirmed that . . . it was BCS and BCSI who made the misrepresentation that Roman was "healthy, on target, and beautiful" and passed it on to BCS-HR. *See* BCS 325, October 30, 2003 Notes between Judy Dalrymple and Karen Elseroad (. . . attached hereto as Exhibit E). Dalrymple suspiciously could not remember any portion of the (mis)representation. She could not deny it. *See* Dalrymple Dep., February 19, 2010 (attached hereto as Exhibit F), at [153:3 to 156:23]. BCS-HR's Karen Elseroad repeated the misrepresentation to the Harshaws.

Further, as admitted by Dalrymple, Bethany's own records document that Elseroad and Julie Harshaw had a "conference call with Judy Dalrymple." *See* BCS 319-20 . . . , attached hereto as Exhibit F. Dalrymple admits that, despite her convenient lack of memory on this critical issue, it is entirely possible that she had that conference call about Roman directly with Julie Harshaw. In that call, BCSI, through Dalrymple, provided the Harshaws with a wealth of information and induced the Harshaws to go to Russia for Roman. *See* BCS 319-20; Dalrymple Dep. at [157:21 to 158:9].

Hence, Elseroad's unequivocal testimony that BCSI provided services directly to the Harshaws is supported by BCSI's Dalrymple. Fifth, [Doc] 237 addresses this issue from another angle in the discussion of the alter ego theory.

P's Proposed Sur-Reply (Doc 256-2) at 5 (some paragraph breaks added). The following day, last Friday, May 7, 2010, the defendants filed a response contending that the court should disregard the plaintiffs' sur-reply because the plaintiffs do not justify their failure to adduce these deposition excerpts and make these arguments much earlier (which would have afforded the defendants a *meaningful* opportunity to respond, and this court time to carefully consider the filing and the response). *See* Doc 257 at 2-4. Even if the court considered this unjustifiably late proposed sur-reply and its exhibits, it would not change the court's disposition of the motion to dismiss or the cross-motions for summary judgment.

## ORDER

Defendants' motion to dismiss or for summary judgment
**[doc # 130] is GRANTED in part and DENIED in part**:
–     The defendants' Rule 12(b)(6) motion to dismiss is DENIED as to all counts.
–     The defendants' motion for summary judgment is DENIED as to counts 1, 2 and 3.
–     Summary judgment is GRANTED to the defendants on count 4.

Plaintiffs' motion for summary judgment on counts 2, 3 and 4 **[doc # 132] is DENIED**.

Plaintiffs' motion for leave to file a sur-reply brief (in further opposition to the defendants' motion to dismiss or for summary judgment) **[Doc #256] is DENIED**.

The following claims survive for trial:  counts 1, 2 and 3.
Roman Harshaw is no longer a party to this case.

This is not a final and immediately-appealable order.

**IT IS SO ORDERED** on this  _28th_  day of May 2010.

/s/ Paul L. Maloney
Honorable  Paul L. Maloney
Chief United States District Judge